**DECLARATION OF RUBEN PAYAN**

I, Ruben Payan, state and declare that the following is true and accurate to the best of my knowledge, information, and belief:

1. I am a senior investigator in the Office of Railroad, Pipeline, and Hazardous Materials ("RPH") at the National Transportation Safety Board ("NTSB") and have been employed by the NTSB since October 1997. Among my responsibilities is the investigation of selected railroad accidents involving safety issues of concern to the Board, with the purpose of aiding the Board in its determination of the facts, circumstances, and probable cause or causes of such accidents and the issuance of safety recommendations to prevent future railroad accidents.

2. I make this declaration in support of the NTSB's motion to enforce a subpoena *duces tecum* issued to the Rhode Island Hospital in Providence, Rhode Island. I am the investigator-in-charge ("IIC") of the NTSB's investigation in this matter. As the IIC, I am responsible for organizing, conducting, controlling, and managing the investigation. 49 C.F.R. § 831.8.

3. The NTSB investigates and establishes the facts, circumstances, and cause or probable cause of railroad accidents in which there is a fatality or substantial property damage, or that involves a passenger train. In general, RPH utilizes a set of established criteria for launches involving rail accidents. In making all such determinations, RPH considers the safety implications and issues, the public interest in the accident, the severity of the physical and environmental harm that the accident caused, and other such factors.

4. The NTSB is investigating a railroad accident that occurred on March 13, 2008, at

1:11 p.m., eastern daylight time, when eastbound Amtrak Acela Train 2154 en route from New York, New York to Boston, Massachusetts, struck an Amtrak maintenance-of-way crew at milepost ("MP") 186.44 in Providence, Rhode Island. I have come to learn the following facts as part of the NTSB's investigation:

a. The train engineer initiated an emergency brake application prior to the collision and the train came to a stop 558 feet past the point of impact. The train speed at the time of the accident was approximately 51 mph. Train 2154 consisting of two power cars and six coach cars was carrying approximately 162 passengers. There were no reported injuries to any of the passengers or train crew.

b. On the day of the accident, a track foreman and two trackmen were assigned to work with a contractor to inspect and mark defective concrete ties. One of the trackmen was assigned as watchman/lookout and accompanied the track foreman and contractor as they conducted a walking concrete tie inspection. The second trackman was following the crew in a highway vehicle and was away from the site at the time of the accident.

c. Throughout the morning, the track foreman was issued "foul time" from the train dispatcher to access the track being inspected and to provide the crew protection from trains. When "foul time" is issued, no trains are authorized to occupy the track segment that is being fouled by personnel or equipment on the tracks. The watchman/lookout provided lookout duties for trains approaching the crew's location on adjacent tracks. On the day of the accident, the track foreman released their "foul time" at 12:53 p.m. The crew continued their concrete tie inspection, with only the watchman/lookout providing any warning of approaching trains. Train

2154 was the first train to pass on the track being inspected by the crew after the "foul time" was released.

d. As a result of the accident, the contractor was fatally injured. The track foreman and watchman/lookout were transported to Rhode Island Hospital for treatment.

e. The Rhode Island Medical Examiner's Office will be providing blood and fluid samples from the deceased contractor to the NTSB for examination and testing.

f. The NTSB does not have any blood or fluid samples from the track foreman or from the watchman/lookout, respectively Richard Mallette and Julius Chisolm.

g. In the course of treating Messrs. Mallette and Chisolm, Rhode Island Hospital procured blood samples. The NTSB has asked Rhode Island Hospital to preserve those samples, and to the best of my knowledge, those samples are presently being maintained under conditions that will preserve them and are not necessary for provision of any further treatment to Messrs. Mallette or Chisolm.

5. On March 19, 2008, the NTSB issued an administrative subpoena to Rhode Island Hospital to procure a portion of the remaining blood and fluid specimens from the track foreman and the watchman/lookout, Mallette and Chisolm, in order to perform toxicological testing. The subpoena was delivered in person on March 19, 2008. As IIC, I signed the subpoena under authority delegated by NTSB Chairman Mark V. Rosenker and pursuant to the NTSB's authority as set forth in 49 U.S.C. § 1113(a). The subpoena and an accompany letter are attached as Exhibit 1 to this Declaration, the delegation of authority is attached as Exhibit 2.

6. In this investigation, the NTSB needs the subpoenaed information to effectively

discharge its duty to determine the facts, circumstances, and probable cause of the accident, identify problems of a recurring nature, and issue safety recommendations to prevent similar accidents in the future. Specifically, in order for the NTSB to conduct a complete investigation of the March 13th accident, the NTSB must be allowed to examine and test the foreman and watchman/lookout's blood samples. Without testing the blood, the NTSB has no way of determining whether drugs or alcohol played any role in this accident.

7. By letter dated March 19, 2008, Rhode Island Hospital, through counsel, informed the NTSB that it formally objected to the subpoena and would not comply without a court order directing the hospital to do so. The letter is attached to this Declaration as Exhibit 3.

8. On March 18, 2008, the Safety Board issued recommendations as a result of its investigation of another railroad accident where the question of track worker impairment was implicated. That accident involved the collision of a Massachusetts Bay Transit Authority train with a maintenance truck in Woburn, Massachusetts. There, the Safety Board determined the probable cause of the accident was the failure of the train dispatcher to maintain blocking that provided signal protection for the track segment occupied by the maintenance-of-way work crew, and the failure of the work crew to apply a shunting device that would have provided redundant signal protection for their track segment. This investigation also revealed that the track foreman failed to follow procedures that would have provided redundant protection when the dispatcher mistakenly removed the block on the track segment where the crew was working. Additionally, the fatally injured track foreman tested positive for marijuana. As a result of this accident, the Safety Board issued a recommendation to the U.S. Department of Transportation, Federal

Railroad Administration, to revise the definition of "covered employee" under 49 Code of Federal Regulations, Part 219 for purposes of Congressionally mandated alcohol and controlled substances testing programs to encompass all employees and agents performing safety sensitive functions, as described in 49 C.F.R., Sections 209.301 and 209.303.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 9, 2008.

Ruben Payan
Investigator-in-Charge
Office of Railroad, Pipeline, and Hazardous
Materials Safety
National Transportation Safety Board