Northwestern Memorial Hosp. v. Ashcroft
C.A.7 (Ill.),2004.

United States Court of Appeals,Seventh Circuit.
NORTHWESTERN MEMORIAL HOSPITAL,
Plaintiff-Appellee,
v.
John ASHCROFT, Attorney General of the United States, Defendant-Appellant.
**No. 04-1379.**

Argued March 23, 2004.
Decided March 26, 2004 FN*.

FN* This opinion is being released in typescript; a printed version will follow.

**Background:** Hospital challenged Department of Justice (DOJ) subpoena seeking medical records of certain patients upon whom late-term abortion procedures had been performed, which were sought for use in litigation challenging constitutionality of Partial-Birth Abortion Ban Act. The United States District Court for the Northern District of Illinois, Charles P. Kocoras, C.J., quashed subpoena based on state statute and Health Insurance Portability and Accountability Act (HIPAA) regulations, and DOJ appealed.

**Holdings:** The Court of Appeals, Posner, Circuit Judge, held that:
(1) supersession clause of HIPAA privacy provisions does not impose state evidentiary privileges on suits to enforce federal law;
(2) HIPAA regulations' procedure for obtaining authority to use medical records in litigation is purely procedural in nature and does not create federal physician-patient or hospital-patient privilege;
(3) there is no federal common law privilege for abortion records; but
(4) subpoena imposed undue burden on hospital, when limited probative value of records in question was weighed against patients' fear of identification and consequent harm to hospital.

Affirmed.

Manion, Circuit Judge, filed opinion concurring in part and dissenting in part.

West Headnotes

**[1] Courts 106 489(1)**

106 Courts
106VII Concurrent and Conflicting Jurisdiction
106VII(B) State Courts and United States Courts
106k489 Exclusive or Concurrent Jurisdiction
106k489(1) k. In General. Most Cited Cases

**Federal Courts 170B 416**

170B Federal Courts
170BVI State Laws as Rules of Decision
170BVI(C) Application to Particular Matters
170Bk416 k. Evidence Law. Most Cited Cases

Supersession clause of privacy provisions of Health Insurance Portability and Accountability Act (HIPAA), stating that if state law imposes more stringent medical-records privilege than Act's regulations then state law governs, does not impose state evidentiary privileges on suits to enforce federal law; state can enforce more-stringent privilege in suits in state court to enforce state law and in suits in federal court where state law supplies rule of decision. Social Security Act, § 1173(c)(2), as amended, 42 U.S.C.A. § 1320d-2(c)(2); Fed.Rules Evid.Rule 501, 28 U.S.C.A.

**[2] Witnesses 410 212**

410 Witnesses
410II Competency

EXHIBIT A

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

410II(D) Confidential Relations and Privileged Communications
410k207 Communications to or Information Acquired by Physician or Surgeon
410k212 k. Mode or Form of Communications or Acquisition of Information. Most Cited Cases
Procedure for obtaining authority to use medical records in litigation, created by Health Insurance Portability and Accountability Act (HIPAA) regulations, is purely procedural in nature and does not create federal physician-patient or hospital-patient privilege. Social Security Act, § 1173, as amended, 42 U.S.C.A. § 1320d-2; 45 C.F.R. §§ 160.203(b), 164.512(e)(1), 164.514(a); Fed.Rules Evid.Rule 501, 28 U.S.C.A.

**[3] Witnesses 410 ⚷212**

410 Witnesses
410II Competency
410II(D) Confidential Relations and Privileged Communications
410k207 Communications to or Information Acquired by Physician or Surgeon
410k212 k. Mode or Form of Communications or Acquisition of Information. Most Cited Cases
There is no federal common law privilege for abortion records. Fed.Rules Evid.Rule 501, 28 U.S.C.A.

**[4] Witnesses 410 ⚷16**

410 Witnesses
410I In General
410k16 k. Subpoena Duces Tecum. Most Cited Cases
Undue burden on hospital was imposed by Department of Justice (DOJ) subpoena seeking medical records of certain patients upon whom late-term abortion procedures had been performed, for use in suit challenging constitutionality of Partial-Birth Abortion Ban Act in order to impeach physician who had performed procedures and who was to testify as plaintiff's expert; limited probative value of records for crucial question of medical necessity of dilation and extraction (D & X) procedure contrasted with great sensitivity of records, patients' fear of identification even if records were redacted, and consequent harm to hospital via loss of patients' confidence. 18 U.S.C.A. § 1531; Fed.Rules Civ.Proc.Rule 45(c)(3)(A)(iv), 28 U.S.C.A.

***924** Joshua Waldman, Department of Justice Civil Division, Appellate Section, Washington, D.C., Shannen Wayne Coffin (argued), Department of Justice Office of the Attorney General, Washington, D.C., for Defendant-Appellant.
George F. Galland, Jr. (argued), Miner, Barnhill & Galland, Chicago, IL, for Appellee.

Before POSNER, MANION, and WILLIAMS, Circuit Judges.

POSNER, Circuit Judge.
The government appeals from an order by the district court quashing a subpoena commanding Northwestern Memorial Hospital in Chicago to produce the medical records of certain patients on whom Dr. Cassing Hammond had performed late-term abortions at the hospital using the controversial method known variously as "D & X" (dilation and extraction) and "intact D & E" (dilation and evacuation). We accelerated briefing and argument, and now accelerate our decision, in view of the pressures of time discussed later in the opinion.

The subpoenaed records, apparently some 45 in number, are sought for use in the forthcoming trial in the Southern District of New York of a suit challenging the constitutionality of the Partial-Birth Abortion Ban Act of 2003, Pub.L. No. 108-105, 117 Stat. 1201,18 U.S.C. § 1531. See *National Abortion Federation v. Ashcroft,* 2004 WL 540470 (S.D.N.Y. Mar.17, 2004) (order denying summary judgment for plaintiffs). Dr. Hammond is one of the plaintiffs in that suit and will also be testifying as an expert witness. The district court held that the production of the records is barred by regulations issued under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub.L. 104-191, 110 Stat. 1936, and let us begin there.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Section 264 of HIPAA, 42 U.S.C. § 1320d-2 Note, directs the Secretary of Health and Human Services to promulgate regulations to protect the privacy of medical records, but provides in subsection (c)(2) that such a regulation "shall not supercede a contrary provision of State law, if the provision of State law imposes requirements, standards, or implementation specifications that are more stringent than the requirements, standards, or implementation specifications imposed under the regulation." See also 45 C.F.R. § 160.203(b). A standard is "more stringent" if it "provides greater privacy protection for the individual who is the subject of the individually identifiable health information" than the standard in the regulation. § 160.202(6).

The particular focus of the appeal is an HHS regulation entitled "Standard: Disclosures for Judicial and Administrative ***925** Proceedings,"§ 164.512(e), which authorizes a "covered entity" (such as Northwestern Memorial Hospital) to disclose private health information in judicial or administrative proceedings "in response to an order of a court."§ 164.512(e)(1)(i). The regulation also allows the disclosure of such information in those proceedings "in response to a subpoena, discovery request, or other lawful process,"§ 164.512(e)(1)(ii), if the party seeking the information either notifies the patient (or at least makes a good faith effort to do so) or makes a "reasonable effort" to secure a qualified protective order, that is, an order that prohibits the use or disclosure of the information outside the litigation and requires the return or destruction of the information at the end of the litigation. 45 C.F.R. § 164.512(e)(1)(v).

The district judge presiding over the case in New York issued an order authorizing, although not directing, the hospital to provide the records to the government after redaction to remove information identifying the patients. The parties agree that his order is an "order" within the meaning of the "in response" provision. It hardly matters; the government didn't need such an order because it had obtained a protective order, thus qualifying under the alternative procedure for disclosure of medical records. But under Illinois law, even redacted medical records are not to be disclosed in judicial proceedings, with immaterial exceptions. 735 ILCS 5/8-802; *Department of Professional Regulation v. Manos,* 326 Ill.App.3d 698, 260 Ill.Dec. 364, 761 N.E.2d 208, 216-17 (2001); *Parkson v. Central DuPage Hospital,* 105 Ill.App.3d 850, 61 Ill.Dec. 651, 435 N.E.2d 140, 143-44 (1982). The district court in our case ruled that the Illinois law, because it sets a "more stringent" standard for disclosure than the HIPAA regulation, trumps that regulation by virtue of HIPAA's supersession provision. So he quashed the subpoena, precipitating this appeal.

[1] Although the issue is not free from doubt, we agree with the government that the HIPAA regulations do not impose state evidentiary privileges on suits to enforce federal law. Illinois is free to enforce its more stringent medical-records privilege (there is no comparable federal privilege) in suits in state court to enforce state law and, by virtue of an express provision in Fed.R.Evid. 501, in suits in federal court (mainly diversity suits) as well in which state law supplies the rule of decision. But the Illinois privilege does not govern in federal-question suits, such as the suit in the Southern District of New York. The enforcement of federal law might be hamstrung if state-law privileges more stringent than any federal privilege regarding medical records were applicable to all federal cases. We say "might" not "would" because some federal statutes authorize subpoenas in terms that would override the HIPAA regulations. See, e.g., 18 U.S.C. § 3486; *In re Subpoena Duces Tecum,* 228 F.3d 341 (4th Cir.2000). But almost certainly there are gaps; and we think it improbable that HHS intended to open such a can of worms when it set forth a procedure for disclosure of medical records in litigation-intended, that is, to be regulating, actually or potentially (depending on other statutory provisions regulating subpoenas), the litigation of federal employment discrimination cases, social security disability cases, ERISA cases, Medicare and Medicaid fraud cases, Food and Drug Administration cases,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and the numerous other classes of federal case in which medical records whether of the parties or of nonparties would not be privileged under federal evidence law.

[2] All that 45 C.F.R. § 164.512(e) should be understood to do, therefore, is to ***926** create a procedure for obtaining authority to use medical records in litigation. Whether the records are actually admissible in evidence will depend among other things on whether they are privileged. And the evidentiary privileges that are applicable to federal-question suits are given not by state law but by federal law, Fed.R.Evid. 501, which does not recognize a physician-patient (or hospital-patient) privilege. Rule 501 in terms makes federal common law the source of any privileges in federal-question suits unless an Act of Congress provides otherwise. We do not think HIPAA is rightly understood as an Act of Congress that creates a privilege.

The purely procedural character of the HIPAA standard for disclosure of medical information in judicial or administrative proceedings is indicated by the procedure for disclosure in response to a subpoena or other process; the notice to the patient must contain "sufficient information about the litigation or proceeding in which the protected health information is requested to permit the individual to raise an objection to the court."§ 164.512(e)(1)(iii)(B). The objection in court would often be based on a privilege-the source of which would be found elsewhere than in the regulations themselves.

This conclusion is buttressed by a HIPAA regulation which says that the "more stringent" clause applies only to "individually identifiable health information," § 160.203(b), as opposed to "health information that does not identify an individual and with respect to which there is no reasonable basis to believe that the information can be used to identify an individual."§ 164.514(a). Provided that medical records are redacted in accordance with the redaction requirements (themselves quite stringent) of § 164.514(a), they would not contain "individually identifiable health information" and the "more stringent" clause would fall away.

[3] As an alternative basis for quashing the subpoena, the district judge undertook to craft a new federal common law privilege for abortion records. He based this ruling on their sensitivity, which he compared to that of psychotherapists' treatment records, held privileged in *Jaffee v. Redmond,* 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). The creation of new common law evidentiary privileges is authorized by Fed.R.Evid. 501, and *Jaffee* is not the only recent case in which the authority was exercised. *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.,* 332 F.3d 976, 979-81 (6th Cir.2003); *In re Air Crash Near Cali, Colombia,* 959 F.Supp. 1529, 1533-35 (S.D.Fla.1997), and *United States v. Lowe,* 948 F.Supp. 97, 99-100 (D.Mass.1996), all created new privileges on the authority of *Jaffee.* But none relates to medical records and we are reluctant to embark on a case-by-case determination of the relative sensitivity of medical records of different ailments or procedures. Most medical records are sensitive, and many are as sensitive as late-term abortion records, such as the records of AIDS patients. Proceeding down the path taken by the district court would inevitably result in either arbitrary line drawing or the creation of an Illinois-type comprehensive privilege for medical records. Northwestern Memorial Hospital concedes that there is no federal common law physician-patient privilege. It is not for us-especially in so summary a proceeding as this litigation to quash the government's subpoena-to create one, whether all at once or by a process of slow but inevitable additions to the sole category recognized by *Jaffee.* Cf. *University of Pennsylvania v. EEOC,* 493 U.S. 182, 188-89, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990); ***927***United States v. Nixon,* 418 U.S. 683, 707-13, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *In re Witness Before Special Grand Jury 2000-2,* 288 F.3d 289 (7th Cir.2002); *In re Sealed Case,* 148 F.3d 1073, 1078-79 (D.C.Cir.1998) (per curiam).

[4] The district court did not reach a further ground

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

urged by Northwestern Memorial Hospital for quashing the government's subpoena, which is simply that the burden of compliance with it would exceed the benefit of production of the material sought by it. Fed.R.Civ.P. 45(c)(3)(A)(iv); *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563 (7th Cir.1984); *Roberts v. Shawnee Mission Ford, Inc.*, 352 F.3d 358, 361-62 (8th Cir.2003); *Miscellaneous Docket Matter # 1. v. Miscellaneous Docket Matter # 2,* 197 F.3d 922, 926-27 (8th Cir.1999); *In re Sealed Case,* 162 F.3d 670, 673-74 (D.C.Cir.1998). However, in support of his ruling expanding the federal common law of privilege to embrace the medical records of abortion patients, the judge made findings that are highly germane to-indeed arguably dispositive of-the Rule 45(c) issue. He pointed out that the "government seeks these records on the *possibility* that it may find something therein which would affect the testimony of Dr. Hammond adversely, that is, for its potential value in impeaching his credibility as a witness. What the government ignores in its argument is how little, if any, probative value lies within these patient records." He contrasted the dearth of probative value "with the potential loss of privacy that would ensue were these medical records used in a case in which the patient was not a party" and concluded that "the balance of harms resulting from disclosure severely out-weighs the loss to the government through non-disclosure."

These findings were solidly based. The hospital had urged both the lack of probative value of the records and the loss of privacy by the patients. The government had responded in generalities, arguing that redaction would eliminate any privacy concern and that since Dr. Hammond had "made assertions of fact about his experience and his patients that plaintiffs are using to support their claim that, without a health exception, the Act is unconstitutional," the government should be permitted to test those assertions; but the government had not indicated what assertions these were or how the records might bear on them. Although on appeal the hospital repeated at length its reasons for believing that the records sought by the government would have little or no probative value, the government's response in both its opening brief and its reply brief remained vague to the point of being evasive.

At the oral argument we pressed the government's lawyer repeatedly and hard for indications of what he hoped to learn from the hospital records, and drew a blank. (Contrary to our usual practice, we did not limit the length of the oral argument.) The lawyer did suggest that if Hammond testified that patients with leukemia are better off with the D & X procedure than with the conventional D & E procedure but the medical records indicate that not all abortion patients with leukemia undergo D & X abortions, this would both impeach Hammond and suggest that D & X is not the only medically safe abortion procedure available to pregnant women afflicted with leukemia. But such information would be unlikely to be found in *Hammond's* records, given his strongly expressed preference for using the D & X method in the case of patients in fragile health. The information would be much more likely to be found in the records of physicians who perform D & E rather than D & X abortions on such ***928** women. Those records, however, the government didn't seek.

We learned at argument for the first time that Dr. Hammond has been deposed in the New York litigation. The questions and answers in his deposition might illuminate the relevance of the medical records for impeachment of his testimony at the trial. But the government has made no effort to make the deposition a part of the record.

Ordinarily when a district judge has not addressed an issue committed to his discretion, such as the balance of benefit and burden in complying with a subpoena, e.g., *Peate v. McCann,* 294 F.3d 879, 884 (7th Cir.2002); *Deitchman v. E.R. Squibb & Sons, Inc., supra,* 740 F.2d at 563; *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 729 (8th Cir.2002), and the issue becomes critical to the disposition of the appeal, the appellate court must remand to give the judge a chance to exercise his dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cretion. *Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986). We do not follow that course, here, however, for two reasons. The first is that the judge, in the passages we quoted from his opinion, struck the balance-in other words, "weigh[ed the] competing hardships." *Deitchman v. E.R. Squibb & Sons, Inc., supra,* 740 F.2d at 563. True, he did so in the course of addressing a different issue from whether Rule 45(c) required that the subpoena be quashed; but, realistically, the result of a remand is foreordained.

The second reason is that with the trial in New York scheduled to begin on March 29 and to last only four weeks, the practical effect of a remand would be to moot the issue of compliance with the subpoena. The time factor is unfortunate, and is not the fault of the government (or of anyone else, so far as appears). If time permitted a remand, the judge would on remand examine the records, or at least a sample of them, in camera, as in the parallel subpoena case of *Planned Parenthood Federation of America, Inc. v. Ashcroft,* 2004 WL 432222 (N.D.Cal. Mar.5, 2004), to determine whether they are likely to have any probative value. Time does not permit. The government has not suggested that the case be remanded if we reject the district court's grounds for quashing the subpoena. A remand would be tantamount to mooting its appeal; in the government's words, "a remand would entirely frustrate the Government's interest in preparing a timely defense in the New York trial, which will begin on March 29." We take this as a waiver of any objection to our weighing the hardships ourselves, and we proceed to the weighing. See *Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920, 923 n. 2 (10th Cir.1986); *McCord v. Bailey,* 636 F.2d 606, 613 (D.C.Cir.1980); cf. *International Ins. Co. v. Caja Nacional De Ahorro y Seguro,* 293 F.3d 392, 401 (7th Cir.2002); *Dillard v. City of Greensboro,* 213 F.3d 1347, 1355-57 (11th Cir.2000).

Like the district judge, we think the balance weighs in favor of quashing the subpoena. The government does not deny that the hospital is an appropriate representative of the privacy interests of its patients. *Parkson v. Central DuPage Hospital, supra,* 61 Ill.Dec. 651, 435 N.E.2d at 142. But it argues that since it is seeking only a limited number of records and they would be produced to it minus the information that would enable the identity of the patient to be determined, there is no hardship to either the hospital or the patients of compliance. The argument is unrealistic and incomplete. What is true is that the *administrative* hardship from compliance would be modest. But it is not the only or the main hardship. The natural sensitivity that ***929** people feel about the disclosure of their medical records-the sensitivity that lies behind HIPAA-is amplified when the records are of a procedure that Congress has now declared to be a crime. Even if all the women whose records the government seeks know what "redacted" means, they are bound to be skeptical that redaction will conceal their identity from the world. This is hardly a typical case in which medical records get drawn into a lawsuit. Reflecting the fierce emotions that the long-running controversy over the morality and legality of abortion has made combustible, the Partial-Birth Abortion Ban Act and the litigation challenging its constitutionality-and even more so the rash of suits around the country in which the Department of Justice has been seeking the hospital records of abortion patients-have generated enormous publicity. These women must know that, and doubtless they are also aware that hostility to abortion has at times erupted into violence, including criminal obstruction of entry into abortion clinics, the firebombing of clinics, and the assassination of physicians who perform abortions.

Some of these women will be afraid that when their redacted records are made a part of the trial record in New York, persons of their acquaintance, or skillful "Googlers," sifting the information contained in the medical records concerning each patient's medical and sex history, will put two and two together, "out" the 45 women, and thereby expose

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

them to threats, humiliation, and obloquy. As the court pointed out in *Parkson v. Central DuPage Hospital, supra,* 61 Ill.Dec. 651, 435 N.E.2d at 144,"whether the patients' identities would remain confidential by the exclusion of their names and identifying numbers is questionable at best. The patients' admit and discharge summaries arguably contain histories of the patients' prior and present medical conditions, information that in the cumulative can make the possibility of recognition very high." In its opening brief, as throughout the district court proceeding, the government expressly reserved the right, at a later date, to seek the identity of the patients whose records are produced. Pressed at argument, the government's lawyer abandoned the reservation; but we do not know what would prevent reconsideration should the government, the subpoena having been enforced, discover that particular medical records that it had obtained were incomplete, opaque, or ambiguous.

Even if there were no possibility that a patient's identity might be learned from a redacted medical record, there would be an invasion of privacy. Imagine if nude pictures of a woman, uploaded to the Internet without her consent though without identifying her by name, were downloaded in a foreign country by people who will never meet her. She would still feel that her privacy had been invaded. The revelation of the intimate details contained in the record of a late-term abortion may inflict a similar wound.

If Northwestern Memorial Hospital cannot shield the medical records of its abortion patients from disclosure in judicial proceedings, moreover, the hospital will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment. It is not as if the government were seeking medical records from every hospital and clinic that performs late-term abortions, in which event women wanting assurance against the disclosure of their records would have nowhere to turn. It is Dr. Hammond's presence in the New York suit as plaintiff and expert that has resulted in the government's subpoenaing Northwestern Memorial Hospital.

***930** The concerns that the hospital has articulated do not necessarily justify withholding probative evidence from the government; nor can the possibility that medical records of abortion patients would yield evidence germane to the constitutionality of the Partial-Birth Abortion Ban Act be gainsaid. A nearly identical state predecessor of the Act was invalidated by the Supreme Court in *Stenberg v. Carhart,* 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000), because it did not permit the D & X procedure in cases in which it is required to protect the health of the pregnant woman. *Id.* at 930-38, 120 S.Ct. 2597. In response, the preamble to the Act contains a finding that the procedure is *never* required for health reasons. 117 Stat. 1201, § 2. The government concedes as it must that this finding, although entitled to respectful consideration, does not bind the courts. E.g., *United States v. Morrison,* 529 U.S. 598, 614, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 665-66, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (plurality). The issue of medical necessity remains for determination at the trial in New York, where Dr. Hammond will testify that he believes there are situations in which the D & X procedure is medically indicated. The essential difference between that procedure and the conventional D & E procedure is that in the latter procedure the fetus is destroyed while it is still entirely within the womb, while in the former procedure it is destroyed after the lower extremities, and sometimes the torso, have emerged from the womb and only the head remains inside. It is because part of the fetus is outside the womb when the fetus is destroyed that the supporters of the Act describe the D & X procedure as "partial birth" abortion. Dr. Hammond and other D & X practitioners argue that because less of the fetus is in the womb there is less danger of cutting the woman's tissues with the sharp knives used to dismember the fetus's body in the conventional D & E procedure and causing hemorrhaging, and that if the woman is in fragile

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

health avoiding that danger is medically indicated.

The merits of the dispute are for determination at trial. The only issue for us is whether, given that there is a potential psychological cost to the hospital's patients, and a potential cost in lost goodwill to the hospital itself, from the involuntary production of the medical records even as redacted, the cost is offset by the probative value of the records. The district judge presiding at the trial has said that the records are "relevant," and no doubt they are-in the attenuated sense in which non-privileged materials may be sought in discovery. "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1); see *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 350-52, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978); *CSC Holdings, Inc. v. Redisi,* 309 F.3d 988, 995-96 (7th Cir.2002). The trial judge has not opined on the *probative* value of the records, which appears to be meager.

The government has had repeated opportunities to articulate a use for the records that it seeks, and it has failed to do so. What it would like to prove at the trial in New York, to refute Dr. Hammond, is that D & E is always an adequate alternative, from the standpoint of a pregnant woman's health, to the D & X procedure. But the government has failed to explain how the record of a D & X abortion would show this. And it is not as if Hammond had relied on the medical records of his patients in preparing his expert testimony. (Had he done so, they would have had to be disclosed to the government under Fed.R.Civ.P. 26(a)(2).) He doesn't have the ***931** records, is not basing his testimony on them, and so far as appears doesn't even remember them.

None of the records is going to state that Dr. Hammond said that he performed a D & X although he believed that a D & E would be just as good. We thought the government might be hoping to find in the records evidence that Hammond had lied when he said he had performed a D & X on a woman who had leukemia or a woman who had breast cancer, but at argument the government disclaimed any such suggestion. We're still at a loss to understand what it hopes to gain from such discovery. (We begged the government's lawyer to be concrete.) Of course, not having seen the records, the government labors under a disadvantage, although it has surely seen other medical records. And of course, pretrial discovery is a fishing expedition and one can't know what one has caught until one fishes. But Fed.R.Civ.P. 45(c) allows the fish to object, and when they do so the fisherman has to come up with more than the government has been able to do in this case despite the excellence of its lawyers.

The Partial-Birth Abortion Ban Act was passed, as we said, in response to the Supreme Court's decision in the *Stenberg* case. *Stenberg* was one of a number of "first generation" partial-birth cases. The others were *Hope Clinic v. Ryan,* 195 F.3d 857 (7th Cir.1999) (en banc); *Planned Parenthood of Wisconsin v. Doyle,* 162 F.3d 463 (7th Cir.1998); *Planned Parenthood of Greater Iowa, Inc. v. Miller,* 195 F.3d 386 (8th Cir.1999); *Little Rock Family Planning Services, P.A. v. Jegley,* 192 F.3d 794 (8th Cir.1999); *Summit Medical Associates, P.C. v. Pryor,* 180 F.3d 1326 (11th Cir.1999); *Richmond Medical Center for Women v. Gilmore,* 144 F.3d 326 (4th Cir.1998); *Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187 (6th Cir.1997); *Armstrong v. State,* 296 Mont. 361, 989 P.2d 364 (1999); *WomanCare of Southfield, P.C. v. Granholm,* 143 F.Supp.2d 827 (E.D.Mich.2000); *Rhode Island Medical Soc. v. Whitehouse,* 66 F.Supp.2d 288 (D.R.I.1999), affirmed, 239 F.3d 104 (1st Cir.2001) (per curiam); *Richmond Medical Center for Women v. Gilmore,* 55 F.Supp.2d 441 (E.D.Va.1999), affirmed, 224 F.3d 337 (4th Cir.2000) (per curiam); *Causeway Medical Suite v. Foster,* 43 F.Supp.2d 604 (E.D.La.1999), affirmed, 221 F.3d 811 (5th Cir.2000); *A Choice for Women v. Butterworth,* 54 F.Supp.2d 1148 (S.D.Fla.1998); *Planned Parenthood of Central New Jersey v. Verniero,* 22 F.Supp.2d 331 (D.N.J.1998); *Planned Parenthood of Central New Jersey v. Verniero,* 41 F.Supp.2d 478 (D.N.J.1998), affirmed, 220 F.3d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 (3d Cir.2000); *Eubanks v. Stengel,* 28 F.Supp.2d 1024 (W.D.Ky.1998), affirmed, 224 F.3d 576 (6th Cir.2000) (per curiam); *Midtown Hospital v. Miller,* 36 F.Supp.2d 1360 (N.D.Ga.1997); *Planned Parenthood of Southern Arizona, Inc. v. Woods,* 982 F.Supp. 1369 (D.Ariz.1997); *Evans v. Kelley,* 977 F.Supp. 1283 (E.D.Mich.1997). In one of the cases decided by this court, *Hope Clinic v. Ryan, supra,* Dr. Hammond was both a plaintiff and an expert witness. *Hope Clinic v. Ryan,* 995 F.Supp. 847, 849-850 (N.D.Ill.1998). Yet in *none* of these many cases, so far as either we or the government is aware, was it so much as suggested that patient records might contain information that would help answer the question, crucial then as now, whether the D & X procedure is ever medically necessary.

Although Hammond is a plaintiff in the New York case, presumably because he actually performs D & X abortions and wants to be allowed to continue doing so, he will be testifying as an expert medical witness. Of all experts who testify in court, physicians are probably the most ***932** common. Yet the government has cited to us no case before this one in which medical experts' patient records were used to impeach the expert (*Langley v. Coughlin,* 1989 WL 436675 (S.D.N.Y. June 19, 1989), rejected the attempt, in a helpful discussion), though in malpractice cases it is not uncommon to use redacted medical records bearing on the defendant's alleged negligence for impeachment, as in *Terre Haute Regional Hospital, Inc. v. Trueblood,* 600 N.E.2d 1358 (Ind.1992), and *Todd v. South Jersey Hospital System,* 152 F.R.D. 676, 684-85 (D.N.J.1993).

Were the government sincerely interested in whether D & X abortions are ever medically indicated, one would have expected it to seek from Northwestern Memorial Hospital statistics summarizing the hospital's experience with late-term abortions. Suppose the patients who undergo D & X abortions are identical in all material respects (age, health, number of weeks pregnant, and so on) to those who undergo procedures not forbidden by the Partial-Birth Abortion Ban Act. That would be potent evidence that the D & X procedure does not have a compelling health rationale. No such evidence has been sought, in contrast to *Planned Parenthood Federation of America, Inc. v. Ashcroft, supra,* at Transcript 26 (Mar. 5, 2004). A variant of the suggested approach would be to obtain a random sample of late-term abortion records from various sources and then determine, through good statistical analysis, whether the patient characteristics that lead Dr. Hammond to perform a D & X lead other physicians to perform a conventional D & E instead, and whether there are differences in the health consequences for these two groups of women. If there are no differences, the government might have a good defense of the Act. Gathering records from Hammond's patients alone will not be useful; but if the government has *other* records (say, from VA hospitals) already in its files, then records of Hammond's procedures might enable a useful comparison. The government hasn't suggested doing anything like that either. Its motives in seeking individuals' medical records remain thoroughly obscure.

The question whether the D & X procedure is ever medically indicated will be resolved as a matter of legislative fact not requiring the taking of trial-type testimony at all (see *Hope Clinic v. Ryan, supra,* 195 F.3d at 885 (dissenting opinion)), or will pivot on the clash of expert witnesses at the New York trial, or perhaps, as suggested in *Stenberg,* will be answered by some combination of these two approaches to ascertaining facts. The medical records of expert witnesses are irrelevant to the first inquiry; and, so far as we can determine after having listened to the government's arguments at length, those records will not figure significantly in the resolution of experts' disagreements either.

The fact that quashing the subpoena comports with Illinois' medical-records privilege is a final factor in favor of the district order's action. As we held in *Memorial Hospital for McHenry County v. Shadur,* 664 F.2d 1058, 1061 (7th Cir.1981), comity

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy." See also *United States v. One Parcel of Property Located at 31-33 York Street*, 930 F.2d 139, 141 (2d Cir.1991) (per curiam). Patients, physicians, and hospitals in Illinois rely on Illinois' strong policy of privacy of medical records. They cannot rely completely, for they are not entitled to count on the state privilege's being applied in federal court. But in a case such as this in which, so far as we can determine, applying the privilege would not interfere significantly with federal proceedings, ***933** comity has required us not to apply the Illinois privilege, but to consider with special care the arguments for quashing the subpoena on the basis of relative hardship under Fed.R.Civ.P. 45(c).

AFFIRMED.

MANION, concurring in part, dissenting in part.

I agree with the court that HIPPA does not adopt state privilege law in a federal question suit brought in federal court, but rather Rule 501 of the Federal Rules of Evidence governs the evidentiary privileges applicable in such suits. Opinion at 925. I also agree that it is not for us to create a federal common law physician-patient privilege where none exists, and that the redacted medical records are not privileged. Opinion at 926. However, for several reasons, I disagree with the court's conclusion that enforcing the subpoena creates an undue burden under Fed.R.Civ.P. 45(c)(3)(A)(iv). In passing HIPPA, Congress recognized a privacy interest only in "individually identifiable medical records" and not redacted medical records, and HIPPA preempts state law in this regard. The "de-identification" (redaction) of all identifying information from the medical records and the extensive protective order in place also eliminates any privacy interest in the records. Additionally, not only are the records in this case relevant, as the court acknowledges, but they are highly probative of the underlying issue. Finally, contrary to the court's conclusion that quashing the subpoena occurs "at no substantial cost to federal substantive and procedural policy," both suffer greatly. This court should enforce the subpoena. I therefore concur in part and dissent in part.

As the court recognizes, in section 264 of HIPPA, Congress authorized the Secretary of Health and Human Services to promulgate regulations to protect the privacy of medical records. Opinion at 924 (*citing*42 U.S.C. § 1320d-2). Therefore, HIPPA and the related regulations determine the privacy interests at stake. While tediously detailed, these regulations appear to have thoroughly considered and resolved the privacy concerns expressed by the hospital and the court.

Section 164.502, which sets forth the general rules for the use and disclosure of "protected health information," provides that "[a] covered entity may not use or disclose protected health information, except as permitted or required by this subpart or by subpart C of part 160 of this subchapter." 45 C.F.R. § 164.502(a). Before looking to the various exceptions, the initial question is whether the information sought in this case is "protected health information." The regulations define "protected health information" as "individually identifiable health information." 45 C.F.R. § 160.103. Both Congress and HHS define "individually identifiable health information" as information that "is created or received by a health care provider, health plan, employer, or health care clearinghouse; and relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, *and-(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe the information can be used to identify the individual.*" 42 U.S.C. 1320d(6); 45 C.F.R. § 160.103 (emphasis added).

In this case, the government seeks only redacted medical records and agrees that all identifying information may be removed before Northwestern makes the records available for its review. Because the records will be redacted, they will not identify

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the individual. Nor is there a reasonable ***934** basis to believe that the information can be used to identify the individual. Section 164.514(b) confirms the latter conclusion. Section 164.514(b)(2)(i) sets forth specific identifiers which, if removed, "de-identify," the health records:

(A) Names;

(B) All geographic subdivisions smaller than a State, including street address, city, county, precinct, zip code, and their equivalent geocodes, except for the initial three digits of a zip code if, according to the current publicly available data from the Bureau of the Census:

(1) The geographic unit formed by combining all zip codes with the same three initial digits contains more than 20,000 people; and

(2) The initial three digits of a zip code for all such geographic units containing 20,000 or fewer people is changed to 000.

(C) All elements of dates (except year) for dates directly related to an individual, including birth date, admission date, discharge date, date of death; and all ages over 89 and all elements of dates (including year) indicative of such age, except that such ages and elements may be aggregated into a single category of age 90 or older;

(D) Telephone numbers;

(E) Fax numbers;

(F) Electronic mail addresses;

(G) Social security numbers;

(H) Medical record numbers;

(I) Health plan beneficiary numbers;

(J) Account numbers;

(K) Certificate/license numbers;

(L) Vehicle identifiers and serial numbers, including license plate numbers;

(M) Device identifiers and serial numbers;

(N) Web Universal Resource Locators (URLs);

(O) Internet Protocol (IP) address numbers;

(P) Biometric identifiers, including finger and voice prints;

(Q) Full face photographic images and any comparable images; and

(R) Any other unique identifying number, characteristic, or code, except as permitted by paragraph (c) of this section;

45 C.F.R. § 164.514(b)(2)(i).

Once these identifiers are redacted, the medical records are no longer "individually identifiable health information." 45 C.F.R. § 164.514(a).[FN1] Under HIPPA and the implementing regulations, there is no protected privacy interest in non-identifiable health information. Again, the regulations confirm this conclusion. 45 C.F.R. § 164.502(d)(2) provides:

FN1. The government does not object to the removal of these identifiers and in fact has consented to redaction beyond that required by Section 164.514(b)(2)(i), for instance by agreeing that Northwestern may delete the state of residence. The fact that the regulations allow the disclosure of the patient's state disproves Northwestern's assertion that, because the Hospital is located in Chicago, the patients could be identified since they would be assumed to be from Illinois. Such an assumption is unreasonable given that HIPPA allows for that very disclosure, while still treating the records as de-identified. But in any event, the government does not request that information.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> *Uses and disclosures of de-identified information.* Health information that meets the standard and implementation specifications for de-identification under § 164.514(a) and (b) is considered not to be individually identifiable health information, i.e., de-identified. The requirements of this subpart *do not* apply to information that has been de-identified in accordance with the applicable requirements of § 164.514....

45 C.F.R. § 164.502(d)(2) (emphasis added).

***935** Because the government seeks only redacted records that are not individually identifiable, under HIPPA there is no privacy interest in those records. However, even if the records were "individually identifiable," they would still be subject to the general privacy rules governing use and disclosure of protected health information set forth in § 164.502. As noted above, the privacy protection afforded in that section provides several exceptions. 45 C.F.R. § 164.502(a) ("A covered entity may not use or disclose protected health information, *except as permitted* or required by this subpart or by subpart C of part 160 of this subchapter.") (emphasis added). Of relevance here is 45 C.F.R. 164.512(e)(1)(i), which authorizes the disclosure of protected health information pursuant to a court order. In this case, the government obtained a court order authorizing the disclosure of the medical records. Under the regulations, such an order negates any need to redact identifying information.[FN2] 45 C.F.R. § 164.512(e)(1)(i). Yet, as the government stressed at oral argument, it has no need for, nor desire to know, the individual identities of the patients. Therefore, it is only seeking the relevant redacted medical records. Such redacted records are afforded no privacy protection under HIPPA, logically so because the redacted records have no identifiably private information to expose. And although Illinois law has adopted an expansive view of privilege that includes redacted medical records, as the court recognizes, Illinois law does not govern this question.

> FN2. As the court also recognizes, the government did not need a court order in this case because it obtained a protective order securing the confidentiality of the redacted records. Opinion at 925. Thus, the government complied with the privacy protections established by HIPPA in three independent ways: by obtaining a court order; by obtaining a protective order; and by seeking only redacted records.

That should end the inquiry. But instead the court resurrects the privacy question through the "undue burden" language of Fed.R.Civ.P. 45(c)(3)(A)(iv). Rule 45(c)(3)(A)(iv) provides that a court may quash or modify a subpoena if it "subjects a person to undue burden." Fed.R.Civ.P. 45(c)(3)(A)(iv). In the court's view, compliance with the subpoena would impose an undue burden (i.e. "potential psychological cost") on the women whose redacted records were subpoenaed. Such an undue burden exists, according to the court, because the potential loss of privacy outweighs the probative value of the medical records. *See* opinion at 927 (stating that the Illinois district court's finding that the "potential loss of privacy that would ensue were these medical records used in a case in which the patient was not a party ... outweighs the loss to the government through non-disclosure" is "solidly based"). This conclusion is wrong on several levels.

Initially, to reiterate, HIPPA and the implementing regulations recognize that there is no loss of privacy where the medical records are redacted (or in HIPPA jargon, "de-identified"). Nor is it reasonable to believe that the unidentified 45 women have "acquaintances ... who will put two and two together, 'out' the 45 women, and thereby expose them to threats, humiliation, and obloquy." Opinion at 929. In fact, there is no reason to believe that the women themselves have any idea that their records are among the few sought by the government in this case.[FN3] But even if they knew,[FN4] no one else ***936** ever would, because all of the information that could reasonably be used to identify them will be redacted, *see*45 C.F.R. § 164.514(b)(2)(i), and none of the information-not even the redacted non-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

identifying information-will ever be made public, much less paraded in court or placed on the Internet within the reach of "skillful Googlers." Opinion at 929. That is guaranteed by the additional security of the protective order entered in this case in the Southern District of New York. *See, e.g., Reproductive Serv., Inc. v. Walker,* 439 U.S. 1307, 1308, 99 S.Ct. 1, 58 L.Ed.2d 16 (1978) (Brennan, J., in chambers) (dissolving stay of subpoena seeking abortion records of non-party patients on condition that patient names were redacted and parties agreed to a protective order to ensure privacy of all patients).

FN3. Even if some are aware of the subpoena, there is nothing in the record to support the conclusion that "[t]he women whose records these are do not want them collected and examined by the Department of Justice and presented in evidence in the New York trial." Opinion at 927.

FN4. Notwithstanding the court's discussion of the notice procedures of HIPPA, see opinion at 926, HIPPA does not require notice where a court order authorizes disclosure, 45 C.F.R. § 164.512(e)(1), where there is a protective order in place, 45 C.F.R. § 164.512(e)(1)(ii)(B), or where the records are redacted, 45 C.F.R. § 164.502(d)(2).

The court's erroneous conclusion that a privacy interest exists in the redacted documents leads to the unnecessary attempt to assess the probative value of the evidence. Notably, the district court (Judge Kocoras) did not reach the undue burden of compliance issue of Fed.R.Civ.P. 45(c)(3)(A)(iv). In the interest of time, with the trial date at hand, the court bypassed a remand and accepted the district court's findings on the privilege issue and applied them to the undue burden question. It then in effect agrees with the district court that there is little if any probative value in the requested documents. Based on the complaint, Dr. Hammond's declaration, the congressional findings when it passed the law, and the arguments made by the government and the hospital (both very limited since privilege, not probative value, was the issue argued below), there is significant probative value. But that is not for us to decide, as the probative value of the evidence has already been determined. District Court Judge Casey, who is presiding over the underlying case, believes the information is relevant, so much so, that he has indicated that if it is not produced, he would consider lifting the stay and dismissing the case (or at least dismissing Dr. Hammond from the case). This should also make clear that Judge Casey believes the evidence is not just relevant "in the attenuated sense," opinion at 930, but highly probative to the difficult question he will face starting on March 29. If any deference is owed, it is to the presiding judge-the judge who handled this case pre-trial and who knows the arguments presented by both sides, and the judge who will need all (non-privileged) relevant evidence available to allow him to make the necessary factual findings to determine this difficult and contentious constitutional case.

However, while recognizing that "[t]he merits of the dispute are for determination at trial," opinion at 927, the court nonetheless interjects its own theory of the case and its own judgment of the probative value of the evidence. For instance, the court states: "What the government would like to show, in refutation of Dr. Hammond's impending testimony, is that D & E is always an adequate alternative, from the standpoint of a pregnant woman's health, to the D & X procedure. The government has failed to explain how the record of a D & X abortion would show this." Opinion at 930. But the government's document request was not so structured: The government did not ask for the records of the D & X abortions identified by Dr. Hammond, but rather requested the redacted medical records of patients who had abortions-both the D & E and D ***937** & X variety-for the reasons asserted by Dr. Hammond as justifying a partial-birth abortion. For instance, Dr. Hammond stated that he sometimes performed abortions for women to protect their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

health after they learned that "their fetuses have anomalies that are often quite severe." Declaration ¶ 4. The government requested the patient records for 2003 of any women who had an abortion during their 19th or 20th week of pregnancy, (whether partial-birth or D & E) for that reason. Interrogatories 1 At 3; Document Request at 7. As the government explained at oral argument, those records are highly relevant to the question of medical necessity because, if they show that Dr. Hammond did not regularly perform partial-birth abortions under those circumstances, that would demonstrate that Dr. Hammond does not believe a partial-birth abortion is necessary to protect the women's health. Of course, there could be some variations in the medical conditions of the individual cases that explain why Dr. Hammond used a different method, but Dr. Hammond remembers few, if any, of the circumstances surrounding the abortions. Opinion at 928. Thus, the only way the government (and the trial judge) can assess Dr. Hammond's contention that partial-birth abortions are medically necessary to protect the women's health is to review the medical records of the patients with the conditions that Dr. Hammond referenced.

The court rejects this theory, stating: "But such information would be unlikely to be found in *Hammond's* records in view of his strongly expressed preference for using the D & X method on patients in fragile health. It would be much more likely to be found in the records, not sought by the government, of physicians who perform D & E rather than D & X abortions on such women." Opinion at 927. But that is exactly the point: The government does not know what is to be found in Dr. Hammond's medical records. It only knows what could be found there-evidence that, notwithstanding Dr. Hammond's declaration that he strongly prefers using the D & X method of abortion on patients in fragile health, in practice, he does not use that procedure. Such evidence would be highly probative, as the court itself implies by recognizing it "would be unlikely to be found in *Hammond's* records in view of his strongly expressed preference for using the D & X method."

In fact, the relevance here cannot be overstated: Congress made explicit findings that a partial-birth abortion is never medically necessary to protect a women's health. Yet, Dr. Hammond claims Congress is wrong. The court concisely lays out Dr. Hammond's argument: In a D & X (partial-birth) abortion, "the fetus is destroyed after the lower extremities, and sometimes the torso, have emerged from the womb and only the head remains inside," and this, according to Dr. Hammond is safer then the D & E procedure, where "the fetus is destroyed while it is still entirely within the womb .... Opinion at 927. Dr. Hammond seeks to testify accordingly, and it is therefore imperative that the government be able to determine the veracity of his testimony. There is no better way than by determining if Dr. Hammond's actual practice supports his testimony. And this is not a question only of impeachment, but rather concerns the heart of this case.

Moreover, as the government explained during oral argument, the medical records are highly relevant to its case because its experts must be able to review Dr. Hammond's files to determine whether, in their expert opinion, a D & X procedure was the most appropriate procedure, as Dr. Hammond claims. The court recognizes that "[t]he need for a health exception to the ban in the Partial-Birth Abortion Ban Act will pivot on the clash of expert witnesses ***938** in the New York trial." Opinion at 931. Yet, the court refuses to recognize the importance of the redacted records to the government's case, even after the government explained the need for its experts to review the files to form independent expert opinions.

The medical records are also highly relevant to a second congressional finding, namely, that a "partial-birth abortion poses serious risks to the health of a woman undergoing the procedure." 117 Stat. 1201. Congress detailed numerous risks it found posed by partial-birth abortions. Although the government did not point this out during oral argument, Northwestern's attorney alerted the court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to the fact that the medical records will show whether there were any complications from the abortion, and this evidence is highly probative to the underlying constitutional challenge.[FN5]

FN5. Northwestern also acknowledged another point of relevancy during questioning: When asked whether the records could possibly demonstrate that the woman's life-and not just her health-was at risk, Northwestern's attorney responded, "yes, but that would help the other side." This case is not about sides, but about the document request, and providing the district court with the evidence it needs to resolve the constitutional question before it.

The court also questions whether the government sincerely wants to determine "whether D & X abortions are ever medically indicated," because the government did not seek summary statistics of all circumstances in which such abortions are performed. Opinion at 929. But as the government pointed out at oral argument, it was trying to limit the burden on Northwestern by confining its document request to those specific situations where Dr. Hammond claimed a partial birth abortion was necessary to preserve the mother's health. *See*Fed.R.Civ.P. 45(c)(1) ("A party or attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena."). And it succeeded, maybe even better than the government had hoped: During oral argument, the government learned for the first time that there are only 45 records that satisfy its document request. Given that Dr. Hammond stated in his declaration that he performs, teaches or supervises about 300 abortions a year, and that the government sought the records for a two- to three-year time frame, it probably surprised the government to learn that there were only 45 relevant records, with the rest apparently unrelated to the mother's or fetus's health.

In any event, the limited scope of the document request, and the government's agreement to redact the records-something not required by HIPPA-if anything, refutes any questioning of the government's motives or the court's implication that the government is on a fishing expedition. Opinion at 930. Although contradictory, the court also chastises the government for not asking for enough records, implying that since the government did not ask for all relevant documents, the documents it did request were somehow less than relevant. Granted, there were many more relevant records that the government did not seek, but the government should not be impugned for prudently limiting its document request to those few medical records Dr. Hammond directly referenced.[FN6]

FN6. The court also charges the government with being evasive on the question of the probative value of the medical documents. Opinion at 927. It is true that the government's main focus was not on the probative value of the medical records, but that is neither surprising nor nefarious, given the arguments below and the district court's ruling. The district court in this case ruled that Illinois privilege law governed and not HIPPA. The question of the relevance and probative value of the documents was not central to the question of whether Illinois privilege law applied. This court appropriately reversed the district court on the privilege issue without delving into the question of relevance. Thus, it is not surprising that the government's opening brief did not focus on the relevancy of the documents. Moreover, although Northwestern argued below that the documents were not relevant, it did so in the context of arguing for a federal common law doctor-patient privilege. On appeal, the government did not need to argue relevancy to address that legal issue, and in fact, this court again appropriately rejected the idea of a federal common law privilege without addressing the question of relev-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ance. Relevance only became relevant once the court discounted the import of HIPPA *de*-identification and looked to a balancing test under Rule 45(c)(3)(A)(iv). Again, that the government's opening brief did not focus on this question is not surprising given that Northwestern's Rule 45(c)(3)(A)(iv) undue burden argument below was limited to three short paragraphs, and the only tangential reference to relevance in its opening brief came from this sentence: "The Attorney General's subpoena is an unacceptable intrusion into the privacy of the Hospital's patients, promising no significant contribution to the ascertainment of truth in *NAF v. Ashcroft."* Memorandum in Support of Northwestern Memorial Hospital's Motion to Quash Subpoena at 20. After Northwestern changed direction on appeal, to argue that the production of the records constituted an undue burden because the records were not relevant, the government responded at length in its reply brief. *See* Appellant's Reply Brief at 8-11. At oral argument, the government also elaborated on the relevance of the documents, not in a vague or evasive way, but by specifically demonstrating that the medical records are *both* relevant and highly probative of the issues in the underlying case. *See supra* at 8-10.

***939** That brings us back to the question of undue burden, which, along with HIPPA, should have been the focus of the narrow question before the district court and this court in this case. Under Rule 45, a court may quash a subpoena where it creates an undue burden. There is no such burden in this case because HIPPA establishes that there is no privacy interest in redacted records and those records are highly relevant to the constitutional challenge to the Partial Birth Abortion Ban Act. The only burden identified by the court seems to be a "potential psychological cost." Opinion at 927. Even assuming that is the kind of "burden" Rule 45 contemplates, reliance on that as a burden in effect creates a privilege where none exists.[FN7]

FN7. Northwestern does not claim that it is an undue burden to comply with the subpoena because it is too costly, difficult or time consuming to produce the redacted records, only that it may negatively impact its reputation with past and future patients. The court agrees, calling it a "potential cost in lost goodwill," opinion at 930, because Northwestern "will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment." Opinion at 929. However, this is not an authentic "cost," because the same federal regulations apply equally to all hospitals. These regulations put all hospitals on the same footing, thus negating any basis for a patient rejecting a hospital's care because a federal court orders the production of redacted records pursuant to a federal regulatory standard.

Finally, contrary to the court's conclusion, quashing the subpoena in this case does come at a "substantial cost to federal substantive and procedural policy." The court's ruling may well be the death knell for Dr. Hammond's claim, as the district court made clear that it believed the records relevant and that it would consider dismissing the case if the records were not produced. Given that the government cannot adequately cross-examine Dr. Hammond, the district court would be well within its rights to bar Dr. Hammond's testimony, which will not only harm his case, but also the other plaintiffs'. The court's decision also comes at a substantial cost to the federal policy adopted by HIPPA. Lastly, and most significantly, it comes at a cost to the truth of Congress' ***940** findings that a partial-birth abortion is never necessary to protect a woman's health and poses significant health risks, and to the constitutionality of such a law. For these and the foregoing reasons, I would enforce the subpoena to produce

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the designated records.

C.A.7 (Ill.),2004.
Northwestern Memorial Hosp. v. Ashcroft
362 F.3d 923, 58 Fed.R.Serv.3d 173, 64 Fed. R. Evid. Serv. 334

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**C**
In re Grand Jury Proceedings
D.Me.,2006.

United States District Court,D. Maine.
In re GRAND JURY PROCEEDINGS.
**Misc. No. 06-102-P-DMC.**

Oct. 3, 2006.

**Background:** As part of a federal grand-jury investigation, the government served a subpoena on a hospital commanding production of any and all documentation reflecting whether a certain individual ever had been involuntarily committed to a mental institution. The hospital moved to quash that subpoena.

**Holding:** The District Court, David M. Cohen, United States Magistrate Judge, held that the subpoena was sufficient to authorize the hospital to produce the requested documentation, regardless of whether state law was more stringent.

Motion denied.

West Headnotes

**[1] Grand Jury 193 36.3(2)**

193 Grand Jury
193k36 Witnesses and Evidence
193k36.3 Grounds for Refusal to Appear, Testify, or Produce Evidence
193k36.3(2) k. Privilege. Most Cited Cases

State medical-privacy law did not apply in the context of a federal grand-jury investigation, and thus, pursuant to the federal Health Insurance Portability and Accountability Act (HIPAA), a grand jury subpoena was sufficient to authorize a hospital to produce documentation reflecting whether an individual ever had been involuntarily committed to a mental institution, regardless of whether state law was more stringent. 42 U.S.C.A. § 1320d-7(a); 45 C.F.R. §§ 160.203, 164.512(f)(1)(ii)(B).

**[2] Statutes 361 219(6.1)**

361 Statutes
361VI Construction and Operation
361VI(A) General Rules of Construction
361k213 Extrinsic Aids to Construction
361k219 Executive Construction
361k219(6) Particular Federal Statutes
361k219(6.1) k. In General. Most Cited Cases

Court must defer to the Department of Health and Human Services (HHS) reasonable interpretation of the federal Health Insurance Portability and Accountability Act (HIPAA). Health Insurance Portability and Accountability Act of 1996, § 101(a) et seq., 29 U.S.C.A. § 1181 et seq.

***116** Craig M. Wolff, U.S. Attorney's Office, District of Maine, Portland, ME, for Grand Jury Proceedings.
James P. Bailinson, Maine Health, Portland, ME, for Spring Harbor Hospital.

**MEMORANDUM DECISION AND ORDER**

DAVID M. COHEN, United States Magistrate Judge.

[1] As part of a federal grand-jury investigation, the government on August 23, 2006 served a subpoena on Spring Harbor Hospital ("Hospital") commanding production of any and all documentation reflecting whether a certain individual ever had been involuntarily committed to a mental institution. *See* Subpoena To Testify Before Grand Jury, Exh. A to Memorandum of Law in Support of Spring Harbor Hospital's Motion To Quash Subpoena To Produce Records ("Supporting Memorandum"), attached to Motion To Quash Subpoena To Produce Records ("Motion") (Docket No. 1). The Hospital moves to quash that subpoena on narrow grounds. *See* Supporting Memorandum at 1-2. It concedes that it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

possesses no information that would permit it to challenge the subpoena on grounds that the information sought is either irrelevant or obtainable by alternate means. *See id.* at 1. And it acknowledges that, pursuant to regulations implementing the federal Health Insurance Portability and Accountability Act ("HIPAA"), which governs confidentiality of medical records, "a grand jury subpoena alone is sufficient for a covered entity such as [the Hospital] to disclose protected health information ... for law enforcement purposes." *Id.* at 4; *see also*45 C.F.R. § 164.512(f)(1)(ii)(B) ("A covered entity may disclose protected health information ... [i]n compliance with and as limited by the relevant requirements of ... [a] grand jury subpoena[.]"). But, according to the Hospital, it is uncertain whether section 164.512(f)(1)(ii)(B) applies in this case. *See* Supporting Memorandum at 3-4. This is so, it explains, inasmuch as:

1. HIPAA regulations elsewhere expressly state that HIPAA does not preempt more stringent state medical privacy laws.

2. In the Hospital's view, relevant Maine law is more stringent and does not permit it to make such a disclosure solely in response to a subpoena.

3. There is a split of authority whether the HIPAA preemption provision effectuates a kind of reverse preemption, pursuant to which stricter state medical privacy laws apply to federal-law cases brought in federal court.

4. Neither this court nor the First Circuit has weighed in on that latter point.

*See id.* at 4-5. Unsure of its obligations, the Hospital understandably has taken the precaution of filing the instant motion. *See *117 id.* The government rejoins that (i) Maine medical-privacy law does not apply in the context of a federal grand-jury investigation and, (ii) in any event, relevant Maine law is not more stringent than its federal counterpart. *See* Government's Response to Motion To Quash Subpoena To Produce Records (Docket No. 3) at 1-2. I agree with the first proposition and hence need not and do not reach the second.

In section 264 of HIPAA, titled "Recommendations With Respect to Privacy of Certain Health Information," Congress directed: "A regulation promulgated under paragraph (1) shall not supercede a contrary provision of State law, if the provision of State law imposes requirements, standards, or implementation specifications that are more stringent than the requirements, standards, or implementation specifications imposed under the regulation." HIPAA, § 264(c)(2), 110 Stat 1936, 2033-34 (1996). Section 1178, titled "Effect on State Law" (contained within section 262 of the act), added:

(1) GENERAL RULE.-Except as provided in paragraph (2), a provision or requirement under this part, or a standard or implementation specification adopted or established under sections 1172 through 1174, shall supersede any contrary provision of State law, including a provision of State law that requires medical or health plan records (including billing information) to be maintained or transmitted in written rather than electronic form.

(2) EXCEPTIONS.-A provision or requirement under this part, or a standard or implementation specification adopted or established under sections 1172 through 1174, shall not supersede a contrary provision of State law, if the provision of State law-

* * * * * *

(B) subject to section 264(c)(2) of the Health Insurance Portability and Accountability Act of 1996, relates to the privacy of individually identifiable health information.

*Id.* at 2030 (codified at 42 U.S.C. § 1320d-7(a)).

The Department of Health and Human Services ("HHS") subsequently promulgated the HIPAA preemption regulation in issue, which provides, in relevant part:

A standard, requirement, or implementation specification adopted under this subchapter that is con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

trary to a provision of State law preempts the provision of State law. This general rule applies, except if one or more of the following conditions is met:

* * * * * *

(b) The provision of State law relates to the privacy of individually identifiable health information and is more stringent than a standard, requirement, or implementation specification adopted under subpart E of part 164 of this subchapter.

45 C.F.R. § 160.203.

HHS made clear, in proposing the foregoing rule, that it neither construed section 264(c)(2) of HIPAA to create any sort of reverse preemption nor intended its own regulation to do so, stating:

We considered whether the preemption provision of section 264(c)(2) of Public Law 104-191, discussed in the preceding section, would give effect to State laws that would otherwise be preempted by federal law. For example, we considered whether section 264(c)(2) could be read to make the Medicare program subject to State laws relating to information disclosures that are more stringent than the requirements proposed in this rule, where such laws are presently preempted by the Medicare statute. We also considered whether section ***118** 264(c)(2) could be read to apply such State laws to procedures and activities of federal agencies, such as administrative subpoenas and summons, that are prescribed under the authority of federal law. In general, we do not think that section 264(c)(2) would work to apply State law provisions to federal programs or activities with respect to which the State law provisions do not presently apply. Rather, the effect of section 264(c)(2) is to give preemptive effect to State laws that would otherwise be in effect, to extent they conflict with and are more stringent than the requirements promulgated under the Administrative Simplification authority of HIPAA. Thus, we do not believe that it is the intent of section 264(c)(2) to give an effect to State law that it would not otherwise have in the absence of section 264(c)(2).

Standards for Privacy of Individually Identifiable Health Information, 64 Fed.Reg. 59918, 60000 (Nov. 3, 1999).

[2] As the United States District Court for the Southern District of New York noted in a case closely on point, a court "must defer to HHS's reasonable interpretation of HIPAA." *National Abortion Fed'n v. Ashcroft,* No. 03 Civ. 8695(RCC), 2004 WL 555701, at *5 (S.D.N.Y. Mar. 19, 2004); *see also, e.g., Rumierz v. Gonzales,* 456 F.3d 31, 37 (1st Cir.2006) ("[A] court must uphold [an agency's] interpretation of a silent or ambiguous statute so long as it is reasonable and consistent with the statute."). In *Ashcroft,* the court confronted the question whether, in a case brought in federal district court challenging the constitutionality of a federal statute, issues of access to medical records were to be resolved in accordance with more stringent New York law. *Ashcroft,* 2004 WL 555701, at *1, 3. The court held that they were not, observing: "Here, HIPAA is at best ambiguous about the effect of more stringent state laws in areas controlled by federal law prior to HIPAA. HHS reasonably construed section 264(c)(2) not to give any more effect to state law than it would have had in the absence of HIPAA." *Id.* at *5. The *Ashcroft* court reasoned:

There is a difference ... between a federal law that does not preempt a state law and a federal law that *incorporates* a state rule of law. The latter gives the state law the force of federal law and makes it binding where it would not otherwise be; the former merely allows the state law to continue to operate in its sphere of influence, unaffected by the federal statute. The negative language in section 264(c)(2) does not equate to the positive power to create binding law in the federal domain-here, a case arising under federal law brought in federal court.

*Id.* at *4 (emphasis in original).

Inasmuch as appears, most courts considering the matter have reached the same end point. *See, e.g.,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Northwestern Mem.'l Hosp. v. Ashcroft,* 362 F.3d 923, 925 (7th Cir.2004) (declining to apply Illinois privilege rules to adjudicate medical-records-access issue in context of suit challenging constitutionality of federal statute; observing, "Although the issue is not free from doubt, we agree with the government that the HIPAA regulations do not impose state evidentiary privileges on suits to enforce federal law."); *Kalinoski v. Evans,* 377 F.Supp.2d 136, 141 (D.D.C.2005) (declining to apply District of Columbia privilege rules to adjudicate medical-records-access issue in context of federal discrimination claim); *but see United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.,* No. Civ. 99-3298, 01-MS-50(MDL)(RCL), 2004 WL 2009416, at *2-3 (D.D.C. May 17, 2004) (applying Florida medical records-access law in context of federal False ***119** Claims Act litigation). There is no reason to believe that the First Circuit would do otherwise.

Because (i) the instant case involves a federal grand-jury subpoena, (ii) state medical-privacy law, even if more stringent, is inapposite in this context, and (iii) the Hospital acknowledges that, pursuant to 45 C.F.R. § 164.512(f)(1)(ii)(B), a grand-jury subpoena alone suffices to permit it to release the requested records (if any exist), the Motion is **DENIED.**

So ordered.

D.Me.,2006.
In re Grand Jury Proceedings
450 F.Supp.2d 115

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H
National Abortion Federation v. Ashcroft
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
NATIONAL ABORTION FEDERATION, Mark I. Evans, M.D., Carolyn Westhoff, M.D., M.Sc., Cassing Hammond, M.D., Marc Heller, M.D., Timothy R.B. Johnson, M.D., Stephen Chasen, M.D., Gerson Weiss, M.D., on behalf of themselves and their patients, Plaintiffs,
v.
John ASHCROFT, in his capacity as Attorney General of the United States, along with his officers, agents, servants, employees, and successors in office, Defendant.
**No. 03 Civ. 8695(RCC).**

March 19, 2004.

MEMORANDUM & ORDER

CASEY, J.
*1 Now before the Court is Defendant's motion to enforce a subpoena against the New York and Presbyterian Hospital pursuant to Federal Rule of Civil Procedure 45(c)(2)(B). For the reasons stated below, the motion is GRANTED.

I. BACKGROUND

Plaintiffs, a group of physicians and medical providers, filed this action on November 4, 2003, to challenge the constitutionality of the Partial-Birth Abortion Ban Act of 2003 ("the Act"), 18 U.S.C. § 1531, which imposes criminal and civil sanctions on physicians who perform certain abortion procedures. This Court temporarily enjoined enforcement of the Act on November 6, 2003, and set the matter for trial to commence March 29, 2004. Plaintiffs assert that the Act is unconstitutional, among other reasons, because it lacks an exception to protect a woman's health as required under the Supreme Court's decision in *Stenberg v. Carhart,* 530 U.S. 914 (2000).

During the discovery process, the Attorney General of the United States ("Defendant") issued subpoenas to a number of hospitals throughout the country seeking medical records of women on whom the plaintiff physicians performed certain abortion procedures. One of those hospitals is the New York and Presbyterian Hospital ("the Hospital").

On December 18, 2003, this Court issued an order that authorized, but did not require, the Hospital to produce the records. On December 22, Defendant served a subpoena on the Hospital, accompanied by the Court order, demanding production of "all medical records associated with those medical record numbers to be identified by plaintiffs Carolyn Westhoff, M.D. and Stephen Chasen, M.D. in response to the discovery demands served upon them in" this case. Drs. Westhoff and Chasen, both plaintiffs in this suit, are employed on the faculties of Columbia and Cornell medical schools, which are both affiliated with the Hospital. According to the Hospital, both are attending physicians at, but not employees of, the Hospital. (Memorandum of Law of Non-Party the New York and Presbyterian Hospital in Opposition to Defendant's Motion to Enforce Subpoena, at 2.)

Defendant also issued similar subpoenas to other hospitals. One such institution, Northwestern University Hospital in Illinois, moved to quash the subpoena in the United States District Court for the Northern District of Illinois. Chief Judge Charles P. Kocoras granted Northwestern's motion on February 4, 2004. *SeeNat'l Abortion Fed'n v. Ashcroft,* No. 04 C 55, 2004 WL 292079 (N.D.Ill. Feb. 4, 2004). In a parallel case challenging the Act, Judge Phyllis Hamilton of the Northern District of California denied Defendant's motion to compel discovery seeking similar medical records from health care providers in California and elsewhere. *SeePlanned Parenthood Fed'n of Am., Inc. v. Ash-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*croft,* No. C 03-4872, 2004 WL 432222 (N.D.Cal. Mar. 5, 2004). Defendant has appealed Judge Kocoras's decision to the Seventh Circuit Court of Appeals.[FN1] The Court is unaware whether Defendant has also appealed Judge Hamilton's order to the Ninth Circuit.

> FN1. The Court has been informed that the Seventh Circuit will hear oral argument on the appeal on March 23, 2004.

*2 In this case, Defendant brought a motion to enforce the subpoena and compel production of the documents. By stipulation of the parties in this case, the Court issued a protective order on January 23, 2004, that requires redaction of individual identification material prior to disclosure. The Hospital argues that the protective order is insufficient under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.L. No. 104-191, §§ 261-264, 110 Stat.1936 (Aug. 21, 1996), because HIPAA incorporates New York State law requiring patient consent before disclosure. Defendant responds that disclosure is required because the protective order complies with administrative regulations promulgated pursuant to HIPAA. *See*45 C.F.R. § 164.512(e) (providing conditions for disclosure of protected health information in judicial proceedings).

II. DISCUSSION

This issue brings into conflict two profoundly important interests: respect for the sanctity of the physician-patient relationship, and the search for truth at the heart of the litigation process. Resolution of the issue requires careful attention to HIPAA and the regulatory framework promulgated to implement it.

A. The Statutory and Regulatory Framework

HIPAA is a complex piece of legislation that addresses the exchange of health-related information. Title II of HIPAA includes provisions entitled "Administrative Simplification." *See* 110 Stat.1936, 2021-2034 (codified at 42 U.S.C. §§ 1320d-1320d-8). In one of the Administrative Simplification provisions, Congress delegated to the Secretary of Health and Human Services ("HHS") the authority to make final regulations concerning the privacy of individually identifiable health information.[FN2] *See* HIPAA, § 264(b), (c)(1), 110 Stat.1936, 2033. Those regulations were to address, among other things, the rights of individuals with regard to their health information, the procedures by which individuals may exercise their rights, and the uses and disclosures of health information that may be authorized or required. *Id.* § 264(b).

> FN2. HIPAA defines "individually identifiable health information" as any information collected from an individual that:
>
> (A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and
>
> (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and-
>
> (i) identifies the individual; or
>
> (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.
>
> 42 U.S.C. § 1320d(6) (codifying HIPAA, § 1171(6), 110 Stat.1936, 2021-2023).

In accordance with this rulemaking authority, in February 2001, HHS promulgated regulations to protect the privacy of protected health information. *See*45 C.F.R. § 164.500-.534; *South Carolina Medical Ass'n v. Thompson,* 327 F.3d 346, 349 (4th Cir.2003). Protected health information means indi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

vidually identifiable health information transmitted or maintained in any form or medium. 45 C.F.R. § 160.103. HHS explicitly addressed disclosure of protected health information during judicial or administrative proceedings. *Seeid.*§ 164.512(e). That provision permits health care providers and other covered entities to disclose protected health information without patient consent: (1) in response to a court order, provided only the information specified in the court order is disclosed; or (2) in response to a subpoena or discovery request if the health care provider receives adequate assurance that the individual whose records are requested has been given sufficient notice of the request, or if reasonable efforts have been made to secure a protective order. *Id.*§ 164.512(e)(1)(i), (ii). Protective orders must (1) prohibit use of the protected health information outside the litigation process; and (2) require the return or destruction of the records, including all copies made, at the conclusion of the litigation. *Id.*§ 164.512(e)(1)(v).

*3 The regulations also provide that health records are not considered individually identifiable, and thus not "protected health information," if certain information is redacted. HHS determined that "[h]ealth information that does not identify an individual and with respect to which there is no reasonable basis to believe that information can be used to identify an individual is not individually identifiable health information."*Id.* § 164.514(a). The following identifiers must be removed to render medical records not individually identifiable: names; geographic subdivisions smaller than a state (including addresses and full zip codes); all dates except years; telephone and fax numbers; email addresses; social security numbers; medical record numbers; health plan beneficiary numbers; account numbers; license numbers; vehicle identifiers; device identifiers; internet addresses; biometric identifiers such as finger and voice prints; photographs of the individual's full face; and any other unique identifying number, characteristic, or code. *Id.* § 164.514(b)(2)(i). Records without this data are not considered to be individually identifiable, and therefore are not protected health information.

Recognizing that HIPAA's privacy provisions might differ from state regulations, Congress directed that all state laws contrary to the regulations promulgated by HHS be preempted, unless the state laws fall within the exception created by HIPAA section 264(c)(2).*See*42 U.S.C. § 1320d-7(a)(2)(B).Section 264(c)(2) states: "PREEMPTION.-A regulation promulgated under ... [HHS's rulemaking authority] shall not supercede a contrary provision of State law, if the State law imposes requirements, standards, or implementation specifications that are more stringent than the requirements, standards, or implementation specifications imposed under the [HHS] regulation." 110 Stat.1936, 2033-2034. This antipreemption exception is echoed in the implementing regulations:

A standard, requirement, or implementation specification adopted under this subchapter that is contrary to a provision of State law preempts the provision of State law .... except if ... [t]he provision of State law relates to the privacy of individually identifiable health information and is more stringent than a standard, requirement, or implementation specification adopted under [HIPAA]....

45 C.F.R. § 160.203. A state privacy standard is more stringent than the HHS regulations if the state law "prohibits or restricts a use or disclosure in circumstances upon which such use or disclosure otherwise would be permitted" under HIPAA. *Id.* § 160.202.

B. The Issues Before the Court

The fundamental disagreement between the parties to this dispute revolves around the meaning of HIPAA's antipreemption provision. The Hospital reads the antipreemption provision to *incorporate* "more stringent" state laws into federal law.[FN3] Because New York law requires patient consent before disclosure and HIPAA provides for certain exceptions to that rule, New York law is more strin-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

gent.[FN4] *See*N.Y. C.P.L.R. 4504(a).[FN5] According to the Hospital's interpretation, the enforceability of the subpoena is therefore governed by New York law.

FN3. The Hospital also argues that production of the records would place an undue burden on it under Federal Rule of Civil Procedure 45(c), and that Judge Kocoras's decision bars Defendant's motion in this district under the principle of res judicata. The former is discussed below, the latter can be disposed of here. Under the doctrine of res judicata, "a valid, final judgment, rendered on the merits, constitutes an absolute bar to a subsequent action between the same parties, or those in privity with them, upon the same claim or demand...."*Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 108 (2d Cir.2001). The action before Judge Kocoras involved a different hospital and different state law. Thus, res judicata does not apply.

FN4. Defendant cites *American Tobacco Co. v. Mount Sinai School of Medicine,* 880 F.2d 1520, 1528 (2d Cir.1989), for the proposition that New York law permits disclosure of redacted medical records. However, that case dealt with the existence of a scholar's privilege under New York law, and did not once mention N.Y. C.P.L.R. 4504(a). It cannot be read to recognize an exception to the physician-patient privilege established in Rule 4504(a).

FN5.C.P.L.R.section4504(a)'sphysician-patient privilege applies to all state-court proceedings. *See*N.Y. C.P.L.R. 101. It provides in relevant part:

> Unless the patient waives the privilege, a person authorized to practice medicine ... shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity.

*Id.* 4504(a). The statutory and common-law exceptions to the privilege would not apply to this case. *See,e.g.,id.*§ 4504(b) (exempting information indicating patient under sixteen was victim of crime); N.Y. Penal Law § 265.25 (obligating medical providers to report wounds from gunshots and sharp instruments which might result in death); *id.* § 265.26 (creating reporting requirement for serious burns); N.Y. Pub. Health Law § 2101(1) (creating disclosure requirement for communicable diseases); N.Y. Soc. Serv. Law § 413(1) (requiring reports of child abuse); *In re Camperlango v. Blum,* 436 N.E.2d 1299, 1301 (N.Y.1982) (excepting disclosures for purpose of investigating Medicaid fraud); *People v.. Bhatt,* 611 N.Y.S.2d 447, 449 (Sup.Ct.1994) (excepting disclosures for grand jury proceedings involving Medicare fraud).

*4 Defendant argues that HIPAA's antipreemption clause does not provide for incorporation of more stringent state laws; rather the antipreemption clause simply permits more stringent state laws to retain the same force that they had before HIPAA was enacted, but no more. Because state medical privacy regulations lacked any effect on rules of discovery and evidence in federal court proceedings before HIPAA, Defendant contends that those state regulations have no such effect after HIPAA. Instead, he submits that the disclosure of health information in federal court proceedings is governed by Federal Rule of Evidence 501, and that the rule creates no physician-patient privilege that would protect the records from a subpoena.

C. The Purpose of HIPAA's Antipreemption Provision

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The doctrine of preemption arises from the Supremacy Clause of the U.S. Constitution. *See*U.S. Const. art. VI, cl. 2; *Allis-Chambers Corp. v. Lueck,* 471 U.S. 202, 208 (1985)."[T]he question whether a certain state action is pre-empted by federal law is one of congressional intent."*Allis-Chambers,* 471 U.S. at 208 (internal quotation marks omitted). In HIPAA, Congress expressly provided for preemption of inconsistent state medical privacy laws except when those laws are more stringent than the standards that HIPAA gives HHS the authority to promulgate. HIPAA § 264(c)(2), 110 Stat.1936, 2033-2034.

There is a difference, however, between a federal law that does not preempt a state law and a federal law that *incorporates* a state rule of law. The latter gives the state law the force of federal law and makes it binding where it would not otherwise be; the former merely allows the state law to continue to operate in its sphere of influence, unaffected by the federal statute. The negative language in section 264(c)(2) does not equate to the positive power to create binding law in the federal domain-here, a case arising under federal law brought in federal court. *SeeBlonder-Tongue Labs., Inc. v. Univ. of Ill. Found.,* 402 U.S. 313, 324 n. 12 (1971) ("In federal-question cases, the law applied is federal law.").

The Hospital quarrels with this reasoning, maintaining that HIPAA's antipreemption provision requires federal courts to apply more stringent state standards because, in effect, those state standards preempt the HHS regulations. Congress has been more explicit when it intended such a result. For example, the Occupational Safety and Health Act of 1970 ("OSHA"), 29 U.S.C. §§ 251*etseq.,* includes a provision that permits state standards to preempt federal law. *Seeid.* § 667(b); *seealsoGade v. Nat'l Solid Wastes Mgmt.Ass'n,* 505 U.S. 88, 97 (1992). That section is entitled, "Submission for state plan for development and enforcement of State standards to *preempt applicable Federal standards.*"29 U.S.C. § 667(b) (emphasis added).

Similarly, Congress has explicitly incorporated state standards into federal law when it so intends. *See,e.g.,* Individuals with Disabilities in Education Act, 20 U.S.C. § 1401(8)(B) (defining "free appropriate public education" to include special education services that meet standards set by state educational agencies); Assimilative Crimes Act of 1948, 18 U.S.C. § 13 (making violations of state or local criminal laws federal crimes when committed on federal territory); Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1333(a)(2)(A) ("[T]he civil and criminal laws of each adjacent State *...are declared to be the law of the United States....*") (emphasis added).

*5 No such language of incorporation is present in HIPAA. The language of section 264(c)(2) evinces no congressional intent to adopt state law as federal law, thereby placing the power of the Supremacy Clause behind more stringent state medical privacy laws.

In contrast, Defendant's interpretation of the antipreemption clause is in harmony with that of HHS. As part of the notice-and-comment process used by administrative agencies when Congress gives them rulemaking power, HHS interpreted section 264(c)(2), HIPAA's antipreemption provision. HHS stated:

We considered whether the preemption provision of section 264(c)(2)... would give effect to State laws that would otherwise be preempted by federal law. For example, we considered whether section 264(c)(2) could be read to make the Medicare program subject to State laws relating to information disclosures that are more stringent than the requirements proposed in this rule, where such laws are presently preempted by the Medicare statute. We also considered whether section 264(c)(2) could be read to apply such State laws to procedures and activities of federal agencies, such as administrative subpoenas and summons, that are prescribed under the authority of federal law. In general, we do not think that section 264(c)(2) would work to apply State law provisions to federal programs or activities with respect to which the State law provisions

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

do not presently apply. Rather, the effect of section 264(c)(2) is to give preemptive effect to State laws that would otherwise be in effect, to the extent they conflict with and are more stringent than the requirements promulgated under the Administrative Simplification authority of HIPAA. *Thus, we do not believe that it is the intent of section 264(c)(2) to give an effect to State law that it would not otherwise have in the absence of section 264(c)(2).*

64 Fed.Reg. 59918, 6000 (Nov. 3, 1999) (emphasis added). Thus, HHS interpreted the antipreemption provision to merely maintain the status quo in states in which more stringent privacy regulations existed prior to HIPAA.

The Court must defer to HHS's reasonable interpretation of HIPAA. *SeeChevron USA, Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 843-44 (1984). In *Chevron,* the Supreme Court held that courts must defer to reasonable constructions of a statute, ambiguous or silent on an issue, made by the administrative agency responsible for administering it. *Id.* at 843.Here, HIPAA is at best ambiguous about the effect of more stringent state laws in areas controlled by federal law prior to HIPAA. HHS reasonably construed section 264(c)(2) not to give any more effect to state law than it would have had in the absence of HIPAA.

Under the Hospital's interpretation, on the other hand, HIPAA would give to state legislatures a sword when it really provides a shield. If not for HIPAA's antipreemption exception, the Supremacy Clause would sweep away all contrary state medical privacy regulations. Instead, Congress spared more stringent state statutes from preemptive effect. It did not, however, give more stringent state regulations the force of federal law. Thus, N.Y. C.P.L.R. 4504(a) remains the law in areas in which New York State has the authority to regulate, but it has not become the law in areas within the federal domain. Accordingly, New York law does not apply here.

D. Privilege of the Medical Records Under Federal Law

*6 In cases arising under federal law such as this one, privileges against disclosure are governed by principles of federal law. *SeeVon Bulow v. Von Bulow,* 811 F.2d 136, 141 (2d Cir.1987) (holding federal law of privileges applies in cases presenting a federal question); *Ehrich v. Binghampton City Sch. Dist.,* 210 F.R.D. 17, 21 (2002) ("[W]hen a complaint asserts a federal question ... the federal law of privilege applies.").Federal Rule of Civil Procedure 45(c)(3)(A)(iii) permits a court to quash or modify a subpoena that requires disclosure of privileged material. The Court must look to the Federal Rules of Evidence to determine when materials are privileged. *SeeMemorial Hosp. v. Shadur,* 664 F.2d 1058, 1061 (7th Cir.1981).Rule 501 provides:

*Except as otherwise* required by the Constitution of the United States or *provided by Act of Congress* or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Fed.R.Evid. 501 (emphasis added).

Defendant argues that HIPAA is not intended to affect the application of Rule 501, and therefore does not constitute an exception provided by Congress. However, this argument ignores the plain language of Rule 501 as well as provisions of the HHS regulations.

Rule 501's savings clause requires federal courts to fashion common law in the light of reason and experience only when the Constitution and federal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

statutes are silent on the issue. The Rule reflects the general principle that courts develop federal common law only "[w]hen Congress has not spoken to a particular issue."*City of Milwaukee v. Illinois,* 451 U.S. 304, 313 (1981). Congress has spoken on the privacy of medical records through HIPAA. Thus, this Court agrees with Judge Kocoras that "HIPAA and the regulations promulgated thereunder, not Federal Rule of Evidence 501, control the protections provided to patient medical records held by hospitals."*Nat'l Abortion Fed'n,* 2004 WL 292079, at *5. This conclusion is bolstered by the fact that the regulations include provisions specifically devoted to disclosure of patient health information during judicial proceedings. *See*45 C.F.R. § 160.512(e). HIPAA, through its implementing regulations, speaks directly to the privilege asserted in this case.

The privacy provisions promulgated under HIPAA therefore control the enforceability of the subpoena. As explained above, the regulations permit disclosure of health information without patient consent pursuant to a qualified protective order. *See*45 C.F.R. § 164.512(e)(ii), (v). The protective order in this case satisfies the HHS regulations because it permits the use of the health information solely for the purposes of this litigation and requires the destruction or return of the records, and all copies made, within sixty days of the resolution of the case.[FN6](Agreed Protective Order, Jan. 23, 2004 ["Prot. Order"] ¶¶ 7, 16.)

FN6. The protective order includes a provision permitting Defendant to retain a copy of records necessary to comply with the Federal Records Act, 44 U.S.C. § 3101, and its implementing regulations, 36 C.F.R. § 1222.38. (Prot. Order ¶ 16.) Such a provision may not be consistent with the HHS regulations requiring return or destruction of the protected health information, including *all* copies made, at the end of the litigation or proceeding. *See*45 C.F.R. § 164.512(e)(v)(B). The protective order does require Defendant's counsel to notify in writing any entity that produces documents of which documents it intends to retain and the legal grounds for retaining them, as well as providing the entities the right to object to retention. (Prot. Order ¶ 16.) The Court will entertain any application to amend the protective order to eliminate this provision, or to order destruction or return of all records at the close of the case.

*7 In addition, the protective order calls for redaction of at least the following identifying information:

[T]he patient's name; the name of any spouse, partner, child, and emergency contact (collectively 'patient relatives'); the birth date, social security number, address, telephone number, fax number, and e-mail address of the patient and any patient relative; the patient and any patient's relative's insurance policy number or group number, and any medical record or chart number.

(*Id.* ¶ 3.) The Hospital must also redact any other information that might reasonably lead to individual identification as provided in the HHS regulations on de-identification of individual health records. *See*45 C.F.R. § 164.514(b)(2)(i). Once redacted, the records are not considered under the regulations to be individually identifiable, and thus can be produced by the Hospital even without a protective or court order. *Seeid.*HHS has determined that these redactions maintain the anonymity of patients and their families. This Court cannot impose an absolute privilege on health information when HHS, the federal agency which Congress has authorized to institute protections for the privacy of health information, has chosen a different course.

E. Undue Burden on the Hospital

The Hospital also argues that compelling production of the records places an undue burden on it un-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

der Federal Rule of Civil Procedure 45(c). According to the Hospital, the burdens that will unduly be placed upon it are dealing with the anger and mistrust of its patients, and damage to its reputation. However, production of the records will not be attributable to any misconduct or complicity by the Hospital, but is the direct result of this Court's order enforcing Defendant's subpoena. The Hospital's reputation as a provider of medical services will not be adversely affected by its compliance with a court order. In addition, the Court notes that the Hospital permitted Dr. Chasen to use the records in researching a study that he plans to publish in *The American Journal of Obstetrics and Gynecology.* Therefore, its arguments on undue burden are not persuasive.

III. CONCLUSION

For the foregoing reasons, Defendant's motion to enforce the subpoena is GRANTED.

So Ordered:

S.D.N.Y.,2004.
National Abortion Federation v. Ashcroft
Not Reported in F.Supp.2d, 2004 WL 555701 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.