National Abortion Federation v. Ashcroft
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
NATIONAL ABORTION FEDERATION, et al., Plaintiff,
v.
John ASHCROFT, Defendant.
NORTHWESTERN MEMORIAL HOSPITAL, Movant.
**No. 04 C 55.**

Feb. 6, 2004.

AUSA, United States Attorney's Office, Chicago, IL, for defendant.
George Freeman Galland, Jr., Nancy L. Maldonado, Miner, Barnhill & Galland, Chicago, IL, for movant.

*MEMORANDUM OPINION*

KOCORAS, Chief J.

*1 This matter comes before the court on Northwestern Memorial Hospital's ("Northwestern") motion to quash a subpoena pursuant to Federal Rule of Civil Procedure 45(c)(3)(A). For the reasons set forth below, the motion is granted.

BACKGROUND

In November 2003, the National Abortion Federation ("NAF"), a professional organization of abortion providers, and seven individual physicians commenced a civil action against the U.S. Attorney General in the Southern District of New York. *National Abortion Federation et al. v. Ashcroft,* Case No. 03 Civ. 8695(RCC) (S.D.N.Y.2003). This pending lawsuit challenges the constitutionality of the recently enacted Partial Birth Abortion Ban Act of 2003 ("PBABA"), 18 U.S.C. § 1531, which prohibits certain late-term abortion procedures. The NAF and the physician plaintiffs allege that the PBABA is unconstitutional under Supreme Court precedent because it contains no exception for preserving a woman's health. One of the plaintiffs is Dr. Cassing Hammond, an attending physician at Northwestern who performs abortions that would be banned under the PBABA. Northwestern is a large teaching hospital in Chicago which maintains no facilities in New York and is not a party to the lawsuit. Dr. Hammond has privileges to practice at Northwestern but he is not a Northwestern employee.

In support of the *NAF* plaintiffs' motion for a temporary restraining order, which was filed concurrently with the complaint, Dr. Hammond submitted a declaration in which he made assertions concerning his practice as an abortion provider. Dr. Hammond's declaration states that he provides PBABA-banned abortions to women with a variety of medical conditions for the protection of their health.

On November 21, 2003, government attorneys representing the Attorney General served Dr. Hammond with interrogatories and document requests. These requests asked Dr. Hammond to identify the patient medical record numbers for the medically necessary abortion procedures that Dr. Hammond described in his declaration. The government also requested Dr. Hammond to produce the medical records of the patients who received the above-described abortions. The government's document request asked only for the medical records of patients having abortions during the past two years. The requests appear to have been sought for the purpose of testing the assertions in Dr. Hammond's declarations. At best, the government is seeking possible impeachment material. Dr. Hammond responded to the government that he does not possess or control the medical records in question as they are the property and in the possession of Northwestern.

After learning that Northwestern possessed and controlled the medical records to be identified by Dr. Hammond, on December 18, 2003, the government served Northwestern with a subpoena pursuant to Federal Rule of Civil Procedure 45. The subpoena sought production of "[a]ll medical records associated with those medical record numbers to be identified by [Dr. Hammond] in response to the discovery demand served upon him" in *NAF*.Accompanying the subpoena was an Order signed by District Judge Richard Conway Casey,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

who is presiding over the litigation in New York. The Order authorizes Northwestern, as a non-party witness, to disclose to the government the medical records sought by the attached subpoena in accordance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.L. No. 104-191, §§ 261-264, 110 Stat.1936 (Aug. 21, 1996), and 45 C.F.R. § 164.512(e)(1)(i). The government has agreed that if Northwestern is ordered by this court to produce the medical records in question, it may initially redact "all patient identifying information" from the records, except for the state of residence of the patient. However, the government has reserved the right to request or subpoena additional patient identifying information in the future. On January 23, 2004, Judge Casey issued an Agreed Protective Order holding that if Northwestern is compelled to disclose the records of Dr. Hammond's patients, it may redact such information as a patient's name, address, phone number, and the like, but the Order does not authorize redaction of a patient's medical history.

***2** Northwestern now moves to quash the subpoena pursuant to Federal Rules of Civil Procedure 45(c)(3)(A)(iii) and (iv). Northwestern asserts that the medical records sought by the subpoena are privileged from disclosure under HIPAA as well as Illinois and federal statutory and common law. Northwestern also claims that production of the medical records in accordance with the subpoena would impose an undue burden on Northwestern and its patients.

## DISCUSSION

A district court must quash or modify a subpoena if it "requires disclosure of privileged or otherwise protected matter and no exception or waiver applies."Fed.R.Civ.P. 45(c)(3)(A)(iii); *Abbott v. Kidder, Peabody & Co.,* 1997 WL 337228, *2 (N.D.Ill.1997). Northwestern argues that the medical records sought by the government cannot be released under Illinois law, which provides for strict disclosure protections under the physician-patient privilege, and are therefore protected under HIPAA. The government counters that federal law governs this case and because federal common law does not recognize a physician-patient privilege, the medical records of Dr. Hammond's patients must be disclosed subject to the subpoena.

### HIPAA

Recognizing "the importance of the privacy of medical records,"*U.S. v. Sutherland,* 143 F.Supp.2d 609, 612 (W.D.Va.2001), Congress addressed the issue when it enacted HIPAA in 1996. One provision of HIPAA directed the Secretary of Health and Human Services (the "Secretary") to promulgate final regulations setting standards "with respect to the privacy of individually identifiable health information" such as patient medical records. HIPAA, Pub.L. No. 104-191, § 264(a), 110 Stat.1936 (1996); *Sutherland* at 612.The federal regulation covering the disclosure of protected patient medical records is 45 C.F.R. § 164.512. *Sutherland* at 612;*U.S. ex rel. Stewart v. Louisiana Clinic,* 2002 WL 31819130, *3 (E.D.La.2002).[FN1] This regulation allows for the disclosure of non-party medical information "in the course of any judicial or administrative proceeding ... in response to an order of the court."45 C.F.R. § 164.512(e)(1)(i). Judge Casey's December 18, 2003, Order thus granted Northwestern the authority to disclose to the government Dr. Hammond's patient's medical records pursuant to 45 C.F.R. § 164.512. (e)(1)(i). However, Judge Casey's authorization Order does not end our inquiry into whether the medical records at issue are privileged from disclosure under other aspects of HIPAA.

FN1. While HIPAA's regulations became effective on April 14, 2001, *Sutherland* at 612 (citing 66 Fed.Reg. 12,434 (Feb. 26, 2001)), compliance by hospitals was not required until April 14, 2003. 45 C.F.R. § 164.534(a).

HIPAA contains a preemption provision that the statute and the regulations promulgated by the Secretary thereunder expressly "supercede [sic] any contrary provision of State law,"42 U.S.C. § 1320d-7(a)(1) (implemented by 45 C.F.R. § 160.203). HIPAA's preemption over state medical privacy laws is not absolute, as HIPAA and its subsequent regulations do not preempt state law if the state law is "contrary" to HIPAA and "relates to the privacy of individually identifiable health information" such as patient medical records. *Id.* § 1320d7-(a)(2)(b) (implemented at 45 C.F.R. § 160.203(b)); *Louisiana Clinic* at *3. A state law is "contrary" to HIPAA and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

its regulations if a "covered entity would find it impossible to comply with both the State and federal requirements."45 C.F.R. § 160.202. A contrary state health information privacy law will not be preempted by a HIPAA regulation if the state law is "more stringent" than HIPAA's requirements. 45 C.F.R. § 160.203(b); *Louisiana Clinic* at *3. A state privacy law is "more stringent" than a HIPAA requirement if the state law "prohibits or restricts a use or disclosure in circumstances under which such use or disclosure otherwise would be permitted" under HIPAA. 45 C.F.R. § 160.202. We must then ask if Illinois medical information privacy laws are more stringent than HIPAA's requirements.

***3** As mentioned above, HIPAA allows a hospital such as Northwestern to disclose patient medical records subject to a court order. 45 C.F .R. § 164.512(e)(1)(i). HIPAA does limit the authority of a court by requiring that the order:

[p]rohibit[ ] the parties from using or disclosing the protected health information for any purpose other than the litigation and proceeding for which such information was requested [and r]equires the return ... or destruction of the protected health information (including all copies made) at the end of the litigation or proceeding.

45 C.F.R. § 164.512(e)(1)(v).

In other words, HIPAA's regulations clearly allow a hospital to disclose patient medical records, when ordered in judicial proceedings, subject to the above limitations.

ILLINOIS MEDICAL PRIVACY LAW

Illinois law concerning when nonparty patient medical records may be disclosed by hospitals or doctors is far more restrictive. The Illinois Code of Civil Procedure states that "[n]o physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve the patient" unless one of eleven enumerated conditions exist. 735 ILCS 5/8-802. This medical privacy protection extends to hospitals that possess nonparty patient medical records. *Parkson v. Central DuPage Hospital,* 105 Ill.App.3d 850, 61 Ill.Dec. 651, 435 N.E.2d 140, 142 (Ill.App.Ct.1982). Unless one of these conditions is satisfied, absent the patient's consent, a hospital may not disclose a patient's medical records, even in response to a subpoena. *Dep't of Professional Regulation v. Manos,* 326 Ill.App.3d 698, 260 Ill.Dec. 364, 761 N.E.2d 208, 216-17 (Ill.App.Ct.2001) (citing *People v. Bickham,* 89 Ill.2d 1, 6, 59 Ill.Dec. 80, 431 N.E.2d 365 (Ill.1982)). Illinois courts have continued to hold that 735 ILCS 5/8-802's protection applies even if the patients' names and identification numbers are deleted or redacted from their medical records. *SeeManos* at 216;*Ekstrom v. Temple,* 197 Ill.App.3d 120, 142 Ill.Dec. 910, 553 N.E.2d 424, 430 (Ill.App.Ct.1990); *Parkson* at 143-44.These courts have reasoned that even if a patient's name and identification number are redacted from his or her file, because prior and present medical history would still be disclosed, the patient's right to confidentiality could potentially be compromised. *Manos* at 216.

While the government states that it would permit Northwestern to redact "all patient identifying information," its subpoena requests information concerning the medical necessity of abortions performed by Dr. Hammond. By demanding the rationale behind the abortions he performed, the subpoena would thereby require Northwestern to disclose medical history information of Dr. Hammond's patients. Further increasing the possibility that Dr. Hammond's patients could be identified despite the government's redaction proposal is the fact that it only seeks patient records from the past two years and requires that the patient's state of residence not be deleted. The proposal simply offers less security of confidentiality than other redaction plans that have been found to infringe on Illinois residents' right to privacy guaranteed by the state's Constitution.*Manos* at 217.While Illinois does not differentiate between the types of medical information that is subject to protection, it is only reasonable that the privilege should not be diluted in a case involving procedures as sensitive and personal as late-term abortions.

***4** Neither Northwestern nor the government asserts that any of the conditions of 735 ILCS 5/8-802 have been met that would allow Northwestern to disclose Dr. Hammond's patients' records under the Illinois Code of Civil Procedure. The parties also do not dispute that disclosure of the medical records would

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

violate other provisions of Illinois law such as the Medical Patients Rights Act, 410 ILCS 50/3a(a) and (d), and the Hospital Licensing Act, 210 ILCS 85/6.17(d). Because we find that Illinois law is more stringent than HIPAA's disclosure requirements and that it would be impossible for Northwestern to comply with both Judge Casey's HIPAA-pursuant Order and various provisions of Illinois law, Illinois's nonparty patient privacy laws are not preempted by HIPAA and its subsequent regulations.

HIPAA, F.R.E. 501, and the SUPREMACY CLAUSE

The government argues that because *NAF* is a federal case that applies federal law, the Supremacy Clause, U.S. Const. Art. VI, cl. 2, and Federal Rule of Evidence 501 dictate that Illinois's strict privacy laws should be trumped by federal common law, which does not recognize a physician-patient privilege.[FN2] The Supremacy Clause commands that state laws that "interfere with, or are contrary to the laws of Congress ... must yield" to federal laws.*Gibbons v. Ogden,* 9 Wheat. 1, 22 U.S. 1, 211, 6 L.Ed. 23 (1824). The Seventh Circuit has recently described the Supremacy Clause's application in the following manner: "A conflict between state and federal law, even if not over goals but merely over methods of achieving a common goal, is a clear case for invoking the [Supremacy Clause] to resolve the conflict in favor of federal law."*Wisconsin Bell, Inc. v. Bie,* 340 F.3d 441, 443 (7th Cir.2003), *cert. denied,* --- U.S. ---, 124 S.Ct. 1075, 157 L.Ed.2d 953, 2004 WL 47558 (Jan. 12, 2004).

> FN2. Neither the Supreme Court nor the Seventh Circuit has recognized a federal physician-patient privilege. *See Whalen v. Roe,* 429 U.S. 569, 602 n. 28, 97 S.Ct. 850, 51 L.Ed.2d 48 (1977); *Patterson v. Caterpillar, Inc.,* 70 F.3d 503, 506-07 (7th Cir.1995). See, however, the Supreme Court's recognition of a psychotherapist-patient privilege, upholding the Seventh Circuit's view, in *Jaffee v. Redmond,* 518 U.S. 1, 8, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996).

According to the government, this is a clear case for applying the Supremacy Clause to invalidate Illinois' privacy laws by relying on Federal Rule of Evidence 501, which states:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court ... the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

F.R.E. 501. As we have already stated, and the parties recognize, there has never been a federal common law physician-patient privilege. Under this proposition the government cites a litany of cases, beginning with *Memorial Hospital for McHenry County v. Shadur,* 664 F.2d 1058 (7th Cir.1981), where federal courts have relied on the Supremacy Clause and Federal Rule of Evidence 501 to hold that state privilege laws cannot be used to hinder discovery in cases governed by federal law. However, it is important to note that all of the cases cited by the government either predate April 14, 2003, the date when HIPAA's regulations became effective, or deal with privileges that are outside of HIPAA's scope.

***5** Because the authorities cited by the government do not contemplate HIPAA, they cannot be read in a vacuum. Federal Rule of Evidence 501 does state that evidentiary privileges should be governed by federal common law, but only "except as otherwise ... provided by Act of Congress."For this reason, HIPAA and the regulations promulgated thereunder, not Federal Rule of Evidence 501, control the protections provided to patient medical records held by hospitals. If the case were otherwise, Congress' directive to the Secretary of Health and Human Services to set standards and regulations "with respect to the privacy of individually identifiable health information," HIPAA, Pub.L. No. 104-191, § 264(a), 110 Stat.1936 (1996), would be rendered meaningless in a regime where Federal Rule of Evidence 501 recognizes no privilege as to such records.

The government contends that to quash its subpoena as a result of Illinois' privacy laws would violate the Supremacy Clause by a state law trumping federal law. However, because Illinois' privacy protections are activated only through HIPAA's anti-preemption

provision, this not a case of Illinois law trumping federal law but instead a case of one federal law displacing another. It surely cannot be the case that the Supremacy Clause is violated when state law is followed pursuant to a federal statute that demands its application. As the government itself points out, state and federal laws are in conflict where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."*Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). The application of Illinois' medical privacy laws is not an "obstacle" to achieving Congress' aims in enacting HIPAA, but rather appears to be Congress' desired outcome under a statute that contemplates that state medical privacy laws supersede less protective federal regulations. Because HIPAA, not Federal Rule of Evidence 501, governs how individually identifiable health information, such as medical records, should be kept private, Illinois law controls and the government's subpoena must be quashed.

F.R.E. 501 and the PHYSICIAN-PATIENT PRIVILEGE

The government contends that state privileges are honored in federal litigation only when state law supplies the rule of decision. It asserts that when federal law governs, as it does here, only privileges recognized by the national government matter. It argues that because no physician-patient privilege exists under federal common law, Northwestern must produce the records.

As pointed out above, HIPAA's preemption over state privacy laws must yield when state law is stricter than and contrary to HIPAA and the material sought relates to the privacy of individually identifiable health information. That is reason enough to quash the government's subpoena to Northwestern. Beyond that, however, the government's reliance on the absence of an express declaration that Federal Rule of Evidence 501 includes a physician-patient privilege is, in the context of this case, unsupportable.

***6**Federal Rule of Evidence 501 speaks to privileges recognized under "principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."The Court of Appeals for the Seventh Circuit concluded that "reason and experience," the touchstones for acceptance of a privilege under Rule 501, compelled recognition of a psychotherapist-patient privilege. *Jaffee v. Redmond*, 51 F.3d 1346, 1355 (7th Cir.1995). Psychotherapists and patients share a unique relationship, in which the ability to communicate freely without the fear of public disclosure is the key to successful treatment. The Supreme Court agreed with that holding and the recognition of the privilege.

It can be no less when dealing with a woman, her doctor, and the necessity to make a decision on abortion, issues indisputably of the most sensitive stripe. American history discloses that the abortion decision is one of the most controversial decisions in modern life, with opprobrium ready to be visited by many upon the woman who so decides and the doctor who engages in the medical procedure. An emotionally charged decision will be rendered more so if the confidential medical records are released to the public, however redacted, for use in public litigation in which the patient is not even a party. Patients would rightly view such disclosure as a significant intrusion on their privacy.

That result is to be contrasted with the loss to the government if the physician-patient privilege were found to exist in these circumstances. The government seeks these records on the *possibility* that it may find something therein which would affect the testimony of Dr. Hammond adversely, that is, for its potential value in impeaching his credibility as a witness. What the government ignores in its argument is how little, if any, probative value lies within these patient records and the ready availability of information traditionally used to challenge the veracity of Dr. Hammond's scientific assertions and medical opinions. The presence or absence of medical risks, their likelihood and nature are undoubtably described and discussed in available medical literature. Challenges to Dr. Hammond's views would be readily available, as would the enlistment of experts supporting contrary opinions. The search for the truth that any hearing or trial seeks to produce would hardly be infringed by finding that a physician-patient privilege exists in these circumstances. When contrasted with the potential loss of privacy that would ensue were these medical records used in a case in which the patient was not a party, the balance of harms resulting from disclosure severely outweighs the loss to the government

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

through non-disclosure. Reason and experience dictate that Federal Rule of Evidence 501 indeed recognizes a physician-patient privilege in the circumstances of this case, that is, matters relating to abortion. We so hold.

CONCLUSION

*7 Based on the foregoing analysis, Northwestern's motion to quash the government's subpoena is granted.

N.D.Ill.,2004.
National Abortion Federation v. Ashcroft
Not Reported in F.Supp.2d, 2004 WL 292079 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**NORTHWESTERN MEMORIAL HOSPITAL, Plaintiff-Appellee, v. JOHN ASHCROFT, Attorney General of the United States, Defendant-Appellant.**

**No. 04-1379**

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

**362 F.3d 923; 2004 U.S. App. LEXIS 5724; 64 Fed. R. Evid. Serv. (Callaghan) 334; 58 Fed. R. Serv. 3d (Callaghan) 173**

**March 23, 2004, Argued**
**March 26, 2004 *, Decided**

* This opinion is being released in typescript; a printed version will follow.

**SUBSEQUENT HISTORY:** The Publication Status of this Document has been Changed by the Court from Unpublished to Published April 6, 2004.

**PRIOR HISTORY:** [**1] Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 04 C 55. Charles P. Kocoras, Chief Judge.
Nat'l Abortion Fed'n v. Ashcroft, 2004 U.S. Dist. LEXIS 1701 (N.D. Ill., Feb. 5, 2004)

**DISPOSITION:** AFFIRMED.

**LexisNexis(R) Headnotes**

***Healthcare Law > Business Administration & Organization > Patient Confidentiality > Health Insurance Portability & Accountability Act***

***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Health Insurance Portability & Accountability Act***
[HN1] Section 264 of the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C.S. § 1320d-2 note, directs the United States Secretary of Health and Human Services to promulgate regulations to protect the privacy of medical records, but provides in 42 U.S.C.S. § 1320d-2, note (c)(2) that such a regulation shall not supercede a contrary provision of State law, if the provision of State law imposes requirements, standards, or implementation specifications that are more stringent than the requirements, standards, or implementation specifications imposed under the regulation. 45 C.F.R. § 160.203(b). A standard is more stringent if it provides greater privacy protection for the individual who is the subject of the individually identifiable health information" than the standard in the regulation. 45 C.F.R. § 160.202(6).

***Healthcare Law > Business Administration & Organization > Patient Confidentiality > General Overview***
[HN2] 45 C.F.R. § 164.512(e) authorizes a covered entity to disclose private health information in judicial or administrative proceedings in response to an order of a court. 45 C.F.R. § 164.512(e)(1)(i).

***Civil Procedure > Discovery > Protective Orders***
***Civil Procedure > Pretrial Matters > Subpoenas***
***Healthcare Law > Business Administration & Organization > Patient Confidentiality > General Overview***
[HN3] 45 C.F.R. § 164.512(e)(1)(ii) allows the disclosure of private health information in judicial or administrative proceedings in response to a subpoena, discovery request, or other lawful process if the party seeking the information either notifies the patient (or at least makes a good faith effort to do so) or makes a reasonable effort to secure a qualified protective order, that is, an order that prohibits the use or disclosure of the information outside the litigation and requires the return or destruction of the information at the end of the litigation. 45 C.F.R. § 164.512(e)(1)(v).

***Healthcare Law > Business Administration & Organization > Patient Confidentiality > General Overview***
[HN4] Under Illinois law, even redacted medical records are not to be disclosed in judicial proceedings. 735 Ill. Comp. Stat. 5/8-802.

***Civil Procedure > Discovery > Privileged Matters > General Overview***
***Healthcare Law > Business Administration & Organization > Patient Confidentiality > General Overview***

***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Health Insurance Portability & Accountability Act***
[HN5] The Health Insurance Portability and Accountability Act of 1996 regulations do not impose state evidentiary privileges on suits to enforce federal law.

***Civil Procedure > Discovery > Privileged Matters > General Overview***
***Evidence > Privileges > Doctor-Patient Privilege > Scope***
[HN6] Illinois is free to enforce its more stringent medical-records privilege (there is no comparable federal privilege) in suits in state court to enforce state law and, by virtue of an express provision in Fed. R. Evid. 501, in suits in federal court (mainly diversity suits) as well in which state law supplies the rule of decision. But, the Illinois privilege does not govern in federal-question suits.

***Evidence > Procedural Considerations > Preliminary Questions > Admissibility of Evidence > General Overview***
***Evidence > Procedural Considerations > Rulings on Evidence***
***Healthcare Law > Business Administration & Organization > Patient Confidentiality > General Overview***
[HN7] All that 45 C.F.R. § 164.512(e) should be understood to do is to create a procedure for obtaining authority to use medical records in litigation. Whether the records are actually admissible in evidence will depend among other things on whether they are privileged.

***Evidence > Privileges > Doctor-Patient Privilege > General Overview***
***Healthcare Law > Business Administration & Organization > General Overview***
[HN8] The evidentiary privileges that are applicable to federal-question suits are given not

by state law but by federal law, Fed. R. Evid. 501, which does not recognize a physician-patient (or hospital-patient) privilege.

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Federal Questions > General Overview***
***Civil Procedure > Federal & State Interrelationships > Federal Common Law > General Overview***
***Governments > Courts > Common Law***
[HN9] Fed. R. Evid. 501 makes federal common law the source of any privileges in federal-question suits unless an Act of Congress provides otherwise.

***Evidence > Privileges > General Overview***
***Healthcare Law > Business Administration & Organization > Patient Confidentiality > Health Insurance Portability & Accountability Act***
***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Health Insurance Portability & Accountability Act***
[HN10] The United States Court of Appeals for the Seventh Circuit does not think the Health Insurance Portability and Accountability Act of 1996 is rightly understood as an Act of Congress that creates a privilege.

***Civil Procedure > Pretrial Matters > Subpoenas***
***Healthcare Law > Business Administration & Organization > Patient Confidentiality > General Overview***
***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Health Insurance Portability & Accountability Act***
[HN11] Under the Health Insurance Portability and Accountability Act of 1996, the procedure for disclosure in response to a subpoena or other process is notice to the patient; the notice to the patient must contain sufficient information about the litigation or proceeding in which the protected health information is requested to permit the individual to raise an objection to the court. 45 C.F.R. § 164.512(e)(1)(iii)(B).

***Civil Procedure > Federal & State Interrelationships > Federal Common Law > General Overview***
***Evidence > Privileges > General Overview***
***Governments > Courts > Common Law***
[HN12] The creation of new common law evidentiary privileges is authorized by Fed. R. Evid. 501.

***Civil Procedure > Judicial Officers > General Overview***
***Civil Procedure > Pretrial Matters > Subpoenas***
***Civil Procedure > Appeals > Remands***
[HN13] Ordinarily, when a district judge has not addressed an issue committed to his discretion, such as the balance of benefit and burden in complying with a subpoena, and the issue becomes critical to the disposition of the appeal, an appellate court must remand to give the judge a chance to exercise his discretion.

***Civil Procedure > Discovery > Methods > General Overview***
***Civil Procedure > Discovery > Relevance***
[HN14] Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1).

***Evidence > Privileges > Doctor-Patient Privilege > Scope***
***Governments > Courts > Judicial Comity***
***Healthcare Law > Business Administration & Organization > Patient Confidentiality > General Overview***

[HN15] Comity impels federal courts to recognize state privileges where that can be accomplished at no substantial cost to federal substantive and procedural policy. Patients, physicians, and hospitals in Illinois rely on Illinois's strong policy of privacy of medical records. They cannot rely completely, for they are not entitled to count on the state privilege's being applied in federal court.

**COUNSEL:** For JOHN D. ASHCROFT, Defendant - Appellant: Joshua Waldman, DEPARTMENT OF JUSTICE Civil Division, Appellate Section, Washington, DC USA. Shannen Wayne Coffin, DEPARTMENT OF JUSTICE Office of the Attorney General, Washington, DC USA.

For NORTHWESTERN MEMORIAL HOSPITAL, Appellee: George F. Galland, Jr., MINER, BARNHILL & GALLAND, Chicago, IL USA.

**JUDGES:** Before POSNER, MANION, and WILLIAMS, Circuit Judges. MANION, concurring in part, dissenting in part.

**OPINION BY:** POSNER

**OPINION**

[*924] POSNER, *Circuit Judge*. The government appeals from an order by the district court quashing a subpoena commanding Northwestern Memorial Hospital in Chicago to produce the medical records of certain patients on whom Dr. Cassing Hammond had performed late-term abortions at the hospital using the controversial method known variously as "D & X" (dilation and extraction) and "intact D & E" (dilation and evacuation). We accelerated briefing and argument, and now accelerate our decision, in view of the pressures of time discussed later in the opinion.

The subpoenaed records, apparently some 45 in number, are sought for use in the forthcoming trial in the Southern District of New York of a suit challenging the constitutionality of the Partial-Birth Abortion Ban Act of 2003, Pub. L. No. 108-105, 117 Stat. 1201, 18 U.S.C. § 1531. See [**2] *National Abortion Federation v. Ashcroft*, 2004 U.S. Dist. LEXIS 4249, No. 03 Civ. 8695 (Rcc), 2004 WL 540470 (S.D.N.Y. Mar. 17, 2004) (order denying summary judgment for plaintiffs). Dr. Hammond is one of the plaintiffs in that suit and will also be testifying as an expert witness. The district court held that the production of the records is barred by regulations issued under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. 104-191, 110 Stat. 1936, and let us begin there.

Section 264 of HIPAA, 42 U.S.C. § 1320d-2 Note, [HN1] directs the Secretary of Health and Human Services to promulgate regulations to protect the privacy of medical records, but provides in subsection (c)(2) that such a regulation "shall not supercede a contrary provision of State law, if the provision of State law imposes requirements, standards, or implementation specifications that are more stringent than the requirements, standards, or implementation specifications imposed under the regulation." See also 45 C.F.R. § 160.203(b). A standard is "more stringent" if it "provides greater privacy protection for the individual who is the subject of the individually identifiable health information" than the standard in the regulation. § 160.202(6).

[**3] The particular focus of the appeal is an HHS regulation entitled "Standard: Disclosures for Judicial and Administrative [*925] Proceedings," § 164.512(e), which [HN2] authorizes a "covered entity" (such as Northwestern Memorial Hospital) to disclose private health information in judicial or administrative proceedings "in response to an order of a court." § 164.512(e)(1)(i). The regulation also [HN3] allows the disclosure of such information in those proceedings "in response to a subpoena, discovery request, or other lawful proc-

ess," § 164.512(e)(1)(ii), if the party seeking the information either notifies the patient (or at least makes a good faith effort to do so) or makes a "reasonable effort" to secure a qualified protective order, that is, an order that prohibits the use or disclosure of the information outside the litigation and requires the return or destruction of the information at the end of the litigation. 45 C.F.R. § 164.512(e)(1)(v).

The district judge presiding over the case in New York issued an order authorizing, although not directing, the hospital to provide the records to the government after redaction to remove information identifying the patients. The [**4] parties agree that his order is an "order" within the meaning of the "in response" provision. It hardly matters; the government didn't need such an order because it had obtained a protective order, thus qualifying under the alternative procedure for disclosure of medical records. But [HN4] under Illinois law, even redacted medical records are not to be disclosed in judicial proceedings, with immaterial exceptions. 735 ILCS 5/8-802; *Department of Professional Regulation v. Manos*, 761 N.E.2d 208, 216-17, 326 Ill. App. 3d 698, 260 Ill. Dec. 364 (Ill. App. 2001); *Parkson v. Central DuPage Hospital*, 105 Ill. App. 3d 850, 435 N.E.2d 140, 143-44, 61 Ill. Dec. 651 (Ill. App. 1982). The district court in our case ruled that the Illinois law, because it sets a "more stringent" standard for disclosure than the HIPAA regulation, trumps that regulation by virtue of HIPAA's supersession provision. So he quashed the subpoena, precipitating this appeal.

Although the issue is not free from doubt, we agree with the government that the HIPAA [HN5] regulations do not impose state evidentiary privileges on suits to enforce federal law. [HN6] Illinois is free to enforce its more stringent medical-records privilege (there is no [**5] comparable federal privilege) in suits in state court to enforce state law and, by virtue of an express provision in Fed. R. Evid. 501, in suits in federal court (mainly diversity suits) as well in which state law supplies the rule of decision. But the Illinois privilege does not govern in federal-question suits, such as the suit in the Southern District of New York. The enforcement of federal law might be hamstrung if state-law privileges more stringent than any federal privilege regarding medical records were applicable to all federal cases. We say "might" not "would" because some federal statutes authorize subpoenas in terms that would override the HIPAA regulations. See, e.g., 18 U.S.C. § 3486; *In re Subpoena Duces Tecum)*, 228 F.3d 341 (4th Cir. 2000). But almost certainly there are gaps; and we think it improbable that HHS intended to open such a can of worms when it set forth a procedure for disclosure of medical records in litigation--intended, that is, to be regulating, actually or potentially (depending on other statutory provisions regulating subpoenas), the litigation of federal employment discrimination [**6] cases, social security disability cases, ERISA cases, Medicare and Medicaid fraud cases, Food and Drug Administration cases, and the numerous other classes of federal case in which medical records whether of the parties or of nonparties would not be privileged under federal evidence law.

[HN7] All that 45 C.F.R. § 164.512(e) should be understood to do, therefore, is to [*926] create a procedure for obtaining authority to use medical records in litigation. Whether the records are actually admissible in evidence will depend among other things on whether they are privileged. And [HN8] the evidentiary privileges that are applicable to federal-question suits are given not by state law but by federal law, Fed. R. Evid. 501, which does not recognize a physician-patient (or hospital-patient) privilege. Rule 501 in terms [HN9] makes federal common law the source of any privileges in federal-question suits unless an Act of Congress provides otherwise. [HN10] We do not think HIPAA is rightly understood as an Act of Congress that creates a privilege.

The purely procedural character of the HIPAA standard for disclosure of medical information in judicial or administrative [**7] proceedings is indicated by [HN11] the procedure for disclosure in response to a subpoena or other process; the notice to the patient must contain "sufficient information about the litigation or proceeding in which the protected health information is requested to permit the individual to raise an objection to the court." § 164.512(e)(1)(iii)(B). The objection in court would often be based on a privilege--the source of which would be found elsewhere than in the regulations themselves.

This conclusion is buttressed by a HIPAA regulation which says that the "more stringent" clause applies only to "individually identifiable health information," § 160.203(b), as opposed to "health information that does not identify an individual and with respect to which there is no reasonable basis to believe that the information can be used to identify an individual." § 164.514(a). Provided that medical records are redacted in accordance with the redaction requirements (themselves quite stringent) of § 164.514(a), they would not contain "individually identifiable health information" and the "more stringent" clause would fall away.

As an alternative basis for quashing the subpoena, the district judge undertook [**8] to craft a new federal common law privilege for abortion records. He based this ruling on their sensitivity, which he compared to that of psychotherapists' treatment records, held privileged in *Jaffee v. Redmond*, 518 U.S. 1, 135 L. Ed. 2d 337, 116 S. Ct. 1923 (1996). [HN12] The creation of new common law evidentiary privileges is authorized by Fed. R. Evid. 501, and *Jaffee* is not the only recent case in which the authority was exercised. *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 979-81 (6th Cir. 2003); *In re Air Crash Near Cali, Colombia*, 959 F. Supp. 1529, 1533-35 (S. D. Fla. 1997), and *United States v. Lowe*, 948 F. Supp. 97, 99-100 (D. Mass. 1996), all created new privileges on the authority of *Jaffee*. But none relates to medical records and we are reluctant to embark on a case-by-case determination of the relative sensitivity of medical records of different ailments or procedures. Most medical records are sensitive, and many are as sensitive as late-term abortion records, such as the records of AIDS patients. Proceeding down the path taken by the district court would [**9] inevitably result in either arbitrary line drawing or the creation of an Illinois-type comprehensive privilege for medical records. Northwestern Memorial Hospital concedes that there is no federal common law physician-patient privilege. It is not for us--especially in so summary a proceeding as this litigation to quash the government's subpoena--to create one, whether all at once or by a process of slow but inevitable additions to the sole category recognized by *Jaffee*. Cf. *University of Pennsylvania v. EEOC*, 493 U.S. 182, 188-89, 107 L. Ed. 2d 571, 110 S. Ct. 577 (1990); *United* [*927] *States v. Nixon*, 418 U.S. 683, 707-13, 41 L. Ed. 2d 1039, 94 S. Ct. 3090 (1974); *In re Witness Before the Special Grand Jury 2000-2* 288 F.3d 289 (7th Cir. 2002); *In re Sealed Case*, 331 U.S. App. D.C. 219, 148 F.3d 1073, 1078-79 (D. C. Cir. 1998) (per curiam).

The district court did not reach a further ground urged by the hospital for quashing the government's subpoena, which is simply that the burden of compliance with it would exceed the benefit of production of the material sought by it. Fed. R. Civ. P. 45(c)(3)(A)(iv) [**10] ; *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563 (7th Cir. 1984); *Roberts v. Shawnee Mission Ford, Inc.*, 352 F.3d 358, 361-62 (8th Cir. 2003); *Miscellaneous Docket Matter # 1. v. Miscellaneous Docket Matter # 2* 197 F.3d 922, 926-27 (8th Cir. 1999); *In re Sealed Case*, 333 U.S. App. D.C. 245, 162 F.3d 670, 673-74 (D. C. Cir. 1998). However, in support of his ruling expanding the federal common law of privilege to embrace the medical records of abortion patients, the judge made findings that are highly germane to--indeed ar-

guably dispositive of-- the Rule 45(c) issue. He pointed out that the "government seeks these records on the *possibility* that it may find something therein which would affect the testimony of Dr. Hammond adversely, that is, for its potential value in impeaching his credibility as a witness. What the government ignores in its argument is how little, if any, probative value lies within these patient records." He contrasted the dearth of probative value "with the potential loss of privacy that would ensue were these medical records used in a case in which the patient was not a party" and concluded [**11] that "the balance of harms resulting from disclosure severely outweighs the loss to the government through non-disclosure."

These findings were solidly based. The hospital had urged both the lack of probative value of the records and the loss of privacy by the patients. The government had responded in generalities, arguing that redaction would eliminate any privacy concern and that since Dr. Hammond had "made assertions of fact about his experience and his patients that plaintiffs are using to support their claim that, without a health exception, the Act is unconstitutional," the government should be permitted to test those assertions; but the government had not indicated what assertions these were or how the records might bear on them. Although on appeal the hospital repeated at length its reasons for believing that the records sought by the government would have little or no probative value, the government's response in both its opening brief and its reply brief remained vague to the point of being evasive.

At the oral argument we pressed the government's lawyer repeatedly and hard for indications of what he hoped to learn from the hospital records, and drew a blank. (Contrary [**12] to our usual practice, we did not limit the length of the oral argument.) The lawyer did suggest that if Hammond testified that patients with leukemia are better off with the D & X procedure than with the conventional D & E procedure but the medical records indicate that not all abortion patients with leukemia undergo D & X abortions, this would both impeach Hammond and suggest that D & X is not the only medically safe abortion procedure available to pregnant women afflicted with leukemia. But such information would be unlikely to be found in *Hammond's* records, given his strongly expressed preference for using the D & X method in the case of patients in fragile health. The information would be much more likely to be found in the records of physicians who perform D & E rather than D & X abortions on such [*928] women. Those records, however, the government didn't seek.

We learned at argument for the first time that Dr. Hammond has been deposed in the New York litigation. The questions and answers in his deposition might illuminate the relevance of the medical records for impeachment of his testimony at the trial. But the government has made no effort to make the deposition a part of the [**13] record.

[HN13] Ordinarily when a district judge has not addressed an issue committed to his discretion, such as the balance of benefit and burden in complying with a subpoena, e.g., *Peate v. McCann*, 294 F.3d 879, 884 (7th Cir. 2002); *Deitchman v. E.R. Squibb & Sons, Inc., supra*, 740 F.2d at 563; *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 729 (8th Cir. 2002), and the issue becomes critical to the disposition of the appeal, the appellate court must remand to give the judge a chance to exercise his discretion. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 89 L. Ed. 2d 739, 106 S. Ct. 1527 (1986). We do not follow that course, here, however, for two reasons. The first is that the judge, in the passages we quoted from his opinion, struck the balance--in other words, "weighed the competing hardships." *Deitchman v. E.R. Squibb & Sons, Inc., supra*, 740 F.2d at 563. True, he did so in the course of addressing a different issue from whether Rule 45(c) required that the subpoena be quashed;

but, realistically, the result of a remand is foreordained.

The second reason is that with the trial in New York scheduled to [**14] begin on March 29 and to last only four weeks, the practical effect of a remand would be to moot the issue of compliance with the subpoena. The time factor is unfortunate, and is not the fault of the government (or of anyone else, so far as appears). If time permitted a remand, the judge would on remand examine the records, or at least a sample of them, in camera, as in the parallel subpoena case of *Planned Parenthood Federation of America, Inc. v. Ashcroft*, 2004 U.S. Dist. LEXIS 3383, No. C03-4872 PJH, 2004 WL 432222 (N.D. Cal. Mar. 5, 2004), to determine whether they are likely to have any probative value. Time does not permit. The government has not suggested that the case be remanded if we reject the district court's grounds for quashing the subpoena. A remand would be tantamount to mooting its appeal; in the government's words, "a remand would entirely frustrate the Government's interest in preparing a timely defense in the New York trial, which will begin on March 29." We take this as a waiver of any objection to our weighing the hardships ourselves, and we proceed to the weighing. See *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 923 n.2 (10th Cir. 1986); *McCord v. Bailey*, 204 U.S. App. D.C. 334, 636 F.2d 606, 613 (D.C. Cir. 1980); [**15] cf. *International Ins. Co. v. Caja Nacional De Ahorro y Seguro*, 293 F.3d 392, 401 (7th Cir. 2002); *Dillard v. City of Greensboro*, 213 F.3d 1347, 1355-57 (11th Cir. 2000).

Like the district judge, we think the balance weighs in favor of quashing the subpoena. The government does not deny that the hospital is an appropriate representative of the privacy interests of its patients. *Parkson v. Central DuPage Hospital, supra*, 435 N.E.2d at 142. But it argues that since it is seeking only a limited number of records and they would be produced to it minus the information that would enable the identity of the patient to be determined, there would be no hardship to either the hospital or the patients from compliance. The argument is unrealistic and incomplete. What is true is that the *administrative* hardship of compliance would be modest. But it is not the only or the main hardship. The natural sensitivity that [*929] people feel about the disclosure of their medical records--the sensitivity that lies behind HIPAA--is amplified when the records are of a procedure that Congress has now declared to be a crime. Even if all the women whose records the [**16] government seeks know what "redacted" means, they are bound to be skeptical that redaction will conceal their identity from the world. This is hardly a typical case in which medical records get drawn into a lawsuit. Reflecting the fierce emotions that the long-running controversy over the morality and legality of abortion has made combustible, the Partial-Birth Abortion Ban Act and the litigation challenging its constitutionality--and even more so the rash of suits around the country in which the Department of Justice has been seeking the hospital records of abortion patients--have generated enormous publicity. These women must know that, and doubtless they are also aware that hostility to abortion has at times erupted into violence, including criminal obstruction of entry into abortion clinics, the firebombing of clinics, and the assassination of physicians who perform abortions.

Some of these women will be afraid that when their redacted records are made a part of the trial record in New York, persons of their acquaintance, or skillful "Googlers," sifting the information contained in the medical records concerning each patient's medical and sex history, will put two and two together, [**17] "out" the 45 women, and thereby expose them to threats, humiliation, and obloquy. As the court pointed out in *Parkson v. Central DuPage Hospital, supra*, 435 N.E.2d at 144, "whether the patients' identities would remain confidential by the exclusion of their names and identifying numbers is questionable at best.

The patients' admit and discharge summaries arguably contain histories of the patients' prior and present medical conditions, information that in the cumulative can make the possibility of recognition very high." In its opening brief, as throughout the district court proceeding, the government expressly reserved the right, at a later date, to seek the identity of the patients whose records are produced. Pressed at argument, the government's lawyer abandoned the reservation; but we do not know what would prevent reconsideration should the government, the subpoena having been enforced, discover that particular medical records that it had obtained were incomplete, opaque, or ambiguous.

Even if there were no possibility that a patient's identity might be learned from a redacted medical record, there would be an invasion of privacy. Imagine if nude pictures of [**18] a woman, uploaded to the Internet without her consent though without identifying her by name, were downloaded in a foreign country by people who will never meet her. She would still feel that her privacy had been invaded. The revelation of the intimate details contained in the record of a late-term abortion may inflict a similar wound.

If Northwestern Memorial Hospital cannot shield its abortion patients' records from disclosure in judicial proceedings, moreover, the hospital will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment. It is not as if the government were seeking medical records from every hospital and clinic that performs late-term abortions, in which event women wanting assurance against the disclosure of their records would have nowhere to turn. It is Dr. Hammond's presence in the New York suit as plaintiff and expert that has resulted in the government's subpoenaing the records of Northwestern Memorial Hospital.

[*930] The concerns that the hospital has articulated do not necessarily justify withholding probative evidence from the government; nor can the possibility that medical records of abortion [**19] patients would yield evidence germane to the constitutionality of the Partial-Birth Abortion Ban Act be gainsaid. A nearly identical state predecessor of the Act was invalidated by the Supreme Court in *Stenberg v. Carhart*, 530 U.S. 914, 147 L. Ed. 2d 743, 120 S. Ct. 2597 (2000), because it did not permit the D & X procedure in cases in which it is required to protect the health of the pregnant woman. *Id.* at 930-38. In response, the preamble to the Act contains a finding that the procedure is *never* required for health reasons. 117 Stat. 1201, § 2. The government concedes as it must that this finding, although entitled to respectful consideration, does not bind the courts. E.g., *United States v. Morrison*, 529 U.S. 598, 614, 146 L. Ed. 2d 658, 120 S. Ct. 1740 (2000); *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 665-66, 129 L. Ed. 2d 497, 114 S. Ct. 2445 (1994) (plurality). The issue of medical necessity remains for determination at the trial in New York, where Dr. Hammond will testify that he believes there are situations in which the D & X procedure is medically indicated. The essential difference between that procedure and the conventional D & E procedure [**20] is that in the latter procedure the fetus is destroyed while it is still entirely within the womb, while in the former procedure it is destroyed after the lower extremities, and sometimes the torso, have emerged from the womb and only the head remains inside. It is because part of the fetus is outside the womb when the fetus is destroyed that the supporters of the Act describe the D & X procedure as "partial birth" abortion. Dr. Hammond and other D & X practitioners argue that because less of the fetus is in the womb there is less danger of cutting the woman's tissues with the sharp knives used to dismember the fetus's body in the conventional D & E procedure and causing hemorrhaging, and that if the woman is in fragile health avoiding that danger is medically indicated.

The merits of the dispute are for determination at trial. The only issue for us is whether, given that there is a potential psychological cost to the hospital's patients, and a potential cost in lost goodwill to the hospital itself, from the involuntary production of the medical records even as redacted, the cost is offset by the probative value of the records. The district judge presiding at the trial has said that [**21] the records are "relevant," and no doubt they are--in the attenuated sense in which nonprivileged materials may be sought in discovery. [HN14] "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1); see *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350-52, 57 L. Ed. 2d 253, 98 S. Ct. 2380 (1978); *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 995-96 (7th Cir. 2002). The trial judge has not opined on the *probative* value of the records, which appears to be meager.

The government has had repeated opportunities to articulate a use for the records that it seeks, and it has failed to do so. What it would like to prove at the trial in New York, to refute Dr. Hammond, is that D & E is always an adequate alternative, from the standpoint of a pregnant woman's health, to the D & X procedure. But the government has failed to explain how the record of a D & X abortion would show this. And it is not as if Hammond had relied on the medical records of his patients in preparing his expert testimony. (Had he done so, the records [**22] would have had to be disclosed to the government under Fed. R. Civ. P. 26(a)(2).) He doesn't have the [*931] records, is not basing his testimony on them, and so far as appears doesn't even remember them.

None of the records is going to state that Dr. Hammond said that he performed a D & X although he believed that a D & E would be just as good. We thought the government might be hoping to find in the records evidence that Hammond had lied when he said he had performed a D & X on a woman who had leukemia or a woman who had breast cancer, but at argument the government disclaimed any such suggestion. We're still at a loss to understand what it hopes to gain from such discovery. (We begged the government's lawyer to be concrete.) Of course, not having seen the records, the government labors under a disadvantage, although it has surely seen other medical records. And of course, pretrial discovery is a fishing expedition and one can't know what one has caught until one fishes. But Fed. R. Civ. P. 45(c) allows the fish to object, and when they do so the fisherman has to come up with more than the government has been [**23] able to do in this case despite the excellence of its lawyers.

The Partial-Birth Abortion Ban Act was passed, as we said, in response to the Supreme Court's decision in the *Stenberg* case. *Stenberg* was one of a number of "first generation" partial-birth cases. The others were *Hope Clinic v. Ryan*, 195 F.3d 857 (7th Cir. 1999) (en banc), vacated, 530 U.S. 1271, 147 L. Ed. 2d 1001, 120 S. Ct. 2738 (2000); *Planned Parenthood of Wisconsin v. Doyle*, 162 F.3d 463 (7th Cir. 1998); *Planned Parenthood of Greater Iowa, Inc. v. Miller*, 195 F.3d 386 (8th Cir. 1999); *Little Rock Family Planning Services, P.A. v. Jegley*, 192 F.3d 794 (8th Cir. 1999); *Summit Medical Associates, P.C. v. Pryor*, 180 F.3d 1326 (11th Cir. 1999); *Richmond Medical Center for Women v. Gilmore*, 144 F.3d 326 (4th Cir. 1998); *Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187 (6th Cir. 1997); *Armstrong v. State*, 1999 MT 261, 296 Mont. 361, 989 P.2d 364 (Mont. 1999); *WomanCare of Southfield, P.C. v. Granholm*, 143 F. Supp. 2d 827 (E. D. Mich. 2000); *Rhode Island Medical Soc. v. Whitehouse*, 66 F. Supp. 2d 288 (D. R.I. 1999), [**24] affirmed, 239 F.3d 104 (1st Cir. 2001) (per curiam); *Richmond Medical Center for Women v. Gilmore*, 55 F. Supp. 2d 441 (E.D. Va. 1999), affirmed, 224 F.3d 337 (4th Cir. 2000) (per curiam);

*Causeway Medical Suite v. Foster*, 43 F. Supp. 2d 604 (E.D. La. 1999), affirmed, 221 F.3d 811 (5th Cir. 2000); *A Choice for Women v. Butterworth*, 54 F. Supp. 2d 1148 (S.D. Fla. 1998); *Planned Parenthood of Central New Jersey v. Verniero*, 22 F. Supp. 2d 331 (D. N.J. 1998); *Planned Parenthood of Central New Jersey v. Verniero*, 41 F. Supp. 2d 478 (D. N.J. 1998), affirmed under the name *Planned Parenthood of Central New Jersey v. Farmer*, 220 F.3d 127 (3d Cir. 2000); *Eubanks v. Stengel*, 28 F. Supp. 2d 1024 (W.D. Ky. 1998), affirmed, 224 F.3d 576 (6th Cir. 2000) (per curiam); *Midtown Hospital v. Miller*, 36 F. Supp. 2d 1360 (N.D. Ga. 1997); *Planned Parenthood of Southern Arizona, Inc. v. Woods*, 982 F. Supp. 1369 (D. Ariz. 1997); *Evans v. Kelley*, 977 F. Supp. 1283 (E.D. Mich. 1997). In one of the cases decided by this court, *Hope Clinic v. Ryan, supra*, [**25] Dr. Hammond was both a plaintiff and an expert witness. *Hope Clinic v. Ryan*, 995 F. Supp. 847, 849-850 (N.D. Ill. 1998). Yet in *none* of these many cases, so far as either we or the government is aware, was it so much as suggested that patient records might contain information that would help answer the question, crucial then as now, whether the D & X procedure is ever medically necessary.

Although Hammond is a plaintiff in the New York case, presumably because he actually performs D & X abortions and wants to be allowed to continue doing so, he will be testifying as an expert medical witness. Of all experts who testify in court, physicians are probably the most [*932] common. Yet the government has cited to us no case before this one in which medical experts' patient records were used to impeach the expert (*Langley v. Coughlin*, 1989 U.S. Dist. LEXIS 6782, No. 84 Civ. 5431, 1989 WL 436675 (S.D.N.Y. June 19, 1989), rejected the attempt, in a helpful discussion), though in malpractice cases it is not uncommon to use redacted medical records bearing on the defendant's alleged negligence for impeachment, as in *Terre Haute Regional Hospital, Inc. v. Trueblood*, 600 N.E.2d 1358 (Ind. 1992), [**26] and *Todd v. South Jersey Hospital System*, 152 F.R.D. 676, 684-85 (D. N.J. 1993).

Were the government sincerely interested in whether D & X abortions are ever medically indicated, one would have expected it to seek from Northwestern Memorial Hospital statistics summarizing the hospital's experience with late-term abortions. Suppose the patients who undergo D & X abortions are identical in all material respects (age, health, number of weeks pregnant, and so on) to those who undergo procedures not forbidden by the Partial-Birth Abortion Ban Act. That would be potent evidence that the D & X procedure does not have a compelling health rationale. No such evidence has been sought, in contrast to the *Planned Parenthood* case, *supra*, at Transcript 26 (Mar. 5, 2004). A variant of the suggested approach would be to obtain a random sample of late-term abortion records from various sources and then determine, through good statistical analysis, whether the patient characteristics that lead Dr. Hammond to perform a D & X lead other physicians to perform a conventional D & E instead, and whether there are differences in the health consequences for these two groups of women. [**27] If there are no differences, the government might have a good defense of the Act. Gathering records from Hammond's patients alone will not be useful; but if the government has *other* records (say, from VA hospitals) already in its files, then records of Hammond's procedures might enable a useful comparison. The government hasn't suggested doing anything like that either. Its motives in seeking individuals' medical records remain thoroughly obscure.

The question whether the D & X procedure is ever medically indicated will be resolved as a matter of legislative fact not requiring the taking of trial-type testimony at all (see *Hope Clinic v. Ryan, supra*, 195 F.3d at 885 (dissenting opinion)), or will pivot on the clash of expert witnesses at the New York trial, or perhaps, as suggested by *Stenberg*, will be an-

swered by some combination of these two approaches to determining facts. The medical records of expert witnesses are irrelevant to the first inquiry; and, so far as we can determine after having listened to the government's arguments at length, those records will not figure significantly in the resolution of experts' disagreements either.

The fact that quashing [**28] the subpoena comports with Illinois' medical-records privilege is a final factor in favor of the district order's action. As we held in *Memorial Hospital for McHenry County v. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981), [HN15] comity "impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy." See also *United States v. One Parcel of Property Located at 31-33 York Street*, 930 F.2d 139, 141 (2d Cir. 1991) (per curiam). Patients, physicians, and hospitals in Illinois rely on Illinois' strong policy of privacy of medical records. They cannot rely completely, for they are not entitled to count on the state privilege's being applied in federal court. But in a case such as this in which, so far as we can determine, applying the privilege would not interfere significantly with federal proceedings, [*933] comity has required us, not to apply the Illinois privilege, but to consider with special care the arguments for quashing the subpoena on the basis of relative hardship under Fed. R. Civ. P. 45(c).

AFFIRMED.

**CONCUR BY:** MANION (In Part)

**DISSENT BY:** MANION (In Part)

**DISSENT**

[**29] MANION, concurring in part, dissenting in part. I agree with the court that HIPAA does not adopt state privilege law in a federal question suit brought in federal court, but rather Rule 501 of the Federal Rules of Evidence governs the evidentiary privileges applicable in such suits. Opinion at 3-4. I also agree that it is not for us to create a federal common law physician-patient privilege where none exists, and that the redacted medical records are not privileged. Opinion at 4-6. However, for several reasons, I disagree with the court's conclusion that enforcing the subpoena creates an undue burden under Fed. R. Civ. P. 45(c)(3)(A)(iv). In passing HIPAA, Congress recognized a privacy interest only in "individually identifiable medical records" and not redacted medical records, and HIPAA preempts state law in this regard. The "de-identification" (redaction) of all identifying information from the medical records and the extensive protective order in place also eliminate any privacy interest in the records. Additionally, not only are the records in this case relevant, as the [**30] court acknowledges, but they are highly probative of the underlying issue. Finally, contrary to the court's conclusion that quashing the subpoena occurs "at no substantial cost to federal substantive and procedural policy," both suffer greatly. This court should enforce the subpoena. I therefore concur in part and dissent in part.

As the court recognizes, in section 264 of HIPPA, Congress authorized the Secretary of Health and Human Services to promulgate regulations to protect the privacy of medical records. Opinion at 2 (*citing* 42 U.S.C. § 1320d-2). Therefore, HIPAA and the related regulations determine the privacy interests at stake. While tediously detailed, these regulations appear to have thoroughly considered and resolved the privacy concerns expressed by the hospital and the court.

Section 164.502, which sets forth the general rules for the use and disclosure of "protected health information," provides that "[a] covered entity may not use or disclose protected health information, except as permitted or required by this subpart or by subpart C of part 160 of this subchapter." 45 C.F.R. §

164.502(a). Before looking to [**31] the various exceptions, the initial question is whether the information sought in this case is "protected health information." The regulations define "protected health information" as "individually identifiable health information." 45 C.F.R. § 160.103. Both Congress and HHS define "individually identifiable health information" as information that "is created or received by a health care provider, health plan, employer, or health care clearinghouse; and relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, *and--(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe the information can be used to identify the individual.*" 42 U.S.C. 1320d(6); 45 C.F.R. § 160.103 (emphasis added).

In this case, the government seeks only redacted medical records and agrees that all identifying information may be removed before Northwestern makes the records available for its review. Because the records [**32] will be redacted, they will not identify the individual. Nor is there a reasonable [*934] basis to believe that the information can be used to identify the individual. Section 164.514(b) confirms the latter conclusion. Section 164.514(b)(2)(i) sets forth specific identifiers which, if removed, "de-identify" the health records:

> (A) Names;
>
> (B) All geographic subdivisions smaller than a State, including street address, city, county, precinct, zip code, and their equivalent geocodes, except for the initial three digits of a zip code if, according to the current publicly available data from the Bureau of the Census:
>
> (1) The geographic unit formed by combining all zip codes with the same three initial digits contains more than 20,000 people; and
>
> (2) The initial three digits of a zip code for all such geographic units containing 20,000 or fewer people is changed to 000.
>
> (C) All elements of dates (except year) for dates directly related to an individual, including birth date, admission date, discharge date, date of death; and all ages over 89 and all elements of dates (including year) indicative of such age, except that such ages and elements may be aggregated into a single [**33] category of age 90 or older;
>
> (D) Telephone numbers;
>
> (E) Fax numbers;
>
> (F) Electronic mail addresses;
>
> (G) Social security numbers;
>
> (H) Medical record numbers;
>
> (I) Health plan beneficiary numbers;
>
> (J) Account numbers;
>
> (K) Certificate/license numbers;
>
> (L) Vehicle identifiers and serial numbers, including license plate numbers;
>
> (M) Device identifiers and serial numbers;
>
> (N) Web Universal Resource Locators (URLs);
>
> (O) Internet Protocol (IP) address numbers;

> (P) Biometric identifiers, including finger and voice prints;
>
> (Q) Full face photographic images and any comparable images; and
>
> (R) Any other unique identifying number, characteristic, or code, except as permitted by paragraph (c) of this section;

45 C.F.R. § 164.514(b)(2)(i).

Once these identifiers are redacted, the medical records are no longer "individually identifiable health information." 45 C.F.R. § 164.514(a). [1] Under HIPAA and the implementing regulations, there is no protected privacy interest in non-identifiable health information. Again, the regulations confirm this conclusion. 45 C.F.R. § 164.502(d)(2) [**34] provides:

> *Uses and disclosures of de-identified information.* Health information that meets the standard and implementation specifications for de-identification under § 164.514(a) and (b) is considered not to be individually identifiable health information, i.e., de-identified. The requirements of this subpart *do not* apply to information that has been de-identified in accordance with the applicable requirements of § 164.514 . .

45 C.F.R. § 164.502(d)(2) (emphasis added).

> 1 The government does not object to the removal of these identifiers and in fact has consented to redaction beyond that required by Section 164.514(b)(2)(i), for instance by agreeing that Northwestern may delete the state of residence. The fact that the regulations allow the disclosure of the patient's state disproves Northwestern's assertion that, because the hospital is located in Chicago, the patients could be identified since they would be assumed to be from Illinois. Such an assumption is unreasonable given that HIPAA allows for that very disclosure, while still treating the records as de-identified. But in any event, the government does not request that information.

[**35] [*935] Because the government seeks only redacted records that are not individually identifiable, under HIPAA there is no privacy interest in those records. However, even if the records were "individually identifiable," they would still be subject to the general privacy rules governing use and disclosure of protected health information set forth in § 164.502. As noted above, the privacy protection afforded in that section provides several exceptions. 45 C.F.R. § 164.502(a) ("A covered entity may not use or disclose protected health information, *except as permitted* or required by this subpart or by subpart C of part 160 of this subchapter.") (emphasis added). Of relevance here is 45 C.F.R. 164.512(e)(1)(i), which authorizes the disclosure of protected health information pursuant to a court order. In this case, the government obtained a court order authorizing the disclosure of the medical records. Under the regulations, such an order negates any need to redact identifying information. [2] 45 C.F.R. § 164.512(e)(1)(i). Yet, as the government stressed at oral argument, it has no need for, nor desire to know, [**36] the individual identities of the patients. Therefore, it is only seeking the relevant redacted medical records. Such redacted records are afforded no privacy protection under HIPAA, logically so because the redacted records have no identifiably private information to expose. And although Illinois law has adopted an expansive view of privilege that includes redacted medical records, as the court recognizes, Illinois law does not govern this question.

2 As the court also recognizes, the government did not need a court order in this case because it obtained a protective order securing the confidentiality of the redacted records. Opinion at 3. Thus, the government complied with the privacy protections established by HIPAA in three independent ways: by obtaining a court order; by obtaining a protective order; and by seeking only redacted records.

That should end the inquiry. But instead the court resurrects the privacy question through the "undue burden" language of Fed. R. Civ. P. 45(c)(3)(A)(iv) [**37] . Rule 45(c)(3)(A)(iv) provides that a court may quash or modify a subpoena if it "subjects a person to undue burden." Fed. R. Civ. P. 45(c)(3)(A)(iv). In the court's view, compliance with the subpoena would impose an undue burden (i.e. "potential psychological cost") on the women whose redacted records were subpoenaed. Such an undue burden exists, according to the court, because the potential loss of privacy outweighs the probative value of the medical records. *See* opinion at 7 (stating that the Illinois district court's finding that the "potential loss of privacy that would ensue were these medical records used in a case in which the patient was not a party . . . outweighs the loss to the government through non-disclosure" is "solidly based"). This conclusion is wrong on several levels.

Initially, to reiterate, HIPAA and the implementing regulations recognize that there is no loss of privacy where the medical records are redacted (or in HIPAA jargon, "de-identified"). Nor is it reasonable to believe that the unidentified 45 women have acquaintances who "will put two and two together, 'out' the 45 women, and thereby expose them to threats, [**38] humiliation, and obloquy." Opinion at 11. In fact, there is no reason to believe that the women themselves have any idea that their records are among the few sought by the government in this case. But even if they knew, [3] no one else [*936] ever would, because all of the information that could reasonably be used to identify them will be redacted, *see* 45 C.F.R. § 164.514(b)(2)(i), and none of the information--not even the redacted non-identifying information--will ever be made public, much less paraded in court or placed on the Internet within the reach of "skillful 'Googlers'." Opinion at 11. That is guaranteed by the additional security of the protective order entered in this case in the Southern District of New York. *See, e.g., Reproductive Serv., Inc. v. Walker*, 439 U.S. 1307, 1308, 58 L. Ed. 2d 16, 99 S. Ct. 1 (1978) (Brennan, J., in chambers) (dissolving stay of subpoena seeking abortion records of non-party patients on condition that patient names were redacted and parties agreed to a protective order to ensure privacy of all patients).

3 [**39] Notwithstanding the court's discussion of the notice procedures of HIPAA, see opinion at 5, HIPAA does not require notice where a court order authorizes disclosure, 45 C.F.R. § 164.512(e)(1), where there is a protective order in place, 45 C.F.R. § 164.512(e)(1)(ii)(B), or where the records are redacted, 45 C.F.R. § 164.502(d)(2).

The court's erroneous conclusion that a privacy interest exists in the redacted documents leads to the unnecessary attempt to assess the probative value of the evidence. Notably, the district court (Judge Kocoras) did not reach the undue burden of compliance issue of Fed. R. Civ. P. 45(c)(3)(A)(iv). In the interest of time, with the trial date at hand, the court bypasses a remand and accepts the district court's findings on the privilege issue and applies them to the undue burden question. It then in effect agrees with the district court that there is little if any probative value in the requested documents. Based on the complaint, Dr. Hammond's [**40]

declaration, the congressional findings when it passed the law, and the arguments made by the government and the hospital (both very limited since privilege, not probative value, was the issue argued below), there is significant probative value. But that is not for us to decide, as the probative value of the evidence has already been determined. District Court Judge Casey, who is presiding over the underlying case, believes the information is relevant, so much so that he has indicated that if it is not produced, he would consider lifting the stay and dismissing the case (or at least dismissing Dr. Hammond from the case). This should also make clear that Judge Casey believes the evidence is not just relevant "in the attenuated sense," opinion at 13, but highly probative to the difficult question he will face starting on March 29. If any deference is owed, it is to the presiding judge--the judge who handled this case pre-trial and who knows the arguments presented by both sides, and the judge who will need all (non-privileged) relevant evidence available to allow him to make the necessary factual findings to determine this difficult and contentious constitutional case.

However, while [**41] recognizing that "the merits of the dispute are for determination at trial," opinion at 13, the court nonetheless interjects its own theory of the case and its own judgment of the probative value of the evidence. For instance, the court states: "What [the government] would like to prove at the trial in New York, to refute Dr. Hammond is that D & E is always an adequate alternative, from the standpoint of a pregnant woman's health, to the D & X procedure. But the government has failed to explain how the record of a D & X abortion would show this." Opinion at 13-14. But the government's document request was not so structured: The government did not ask for the records of the D & X abortions identified by Dr. Hammond, but rather requested the redacted medical records of patients who had abortions--both the D & E and D [*937] & X variety--for the reasons asserted by Dr. Hammond as justifying a partial-birth abortion. For instance, Dr. Hammond stated that he sometimes performed abortions for women to protect their health after they learned that "their fetuses have anomalies that are often quite severe." Declaration P 4. The government requested the patient records for 2003 of any women who had an abortion [**42] during their 19th or 20th week of pregnancy, (whether partial-birth or D & E) for that reason. Interrogatories 1 at 3; Document Request at 7. As the government explained at oral argument, those records are highly relevant to the question of medical necessity because, if they show that Dr. Hammond did not regularly perform partial-birth abortions under those circumstances, that would demonstrate that Dr. Hammond does not believe a partial-birth abortion is necessary to protect the women's health. Of course, there could be some variations in the medical conditions of the individual cases that explain why Dr. Hammond used a different method, but Dr. Hammond remembers few, if any, of the circumstances surrounding the abortions. Opinion at 14. Thus, the only way the government (and the trial judge) can assess Dr. Hammond's contention that partial-birth abortions are medically necessary to protect the women's health is to review the medical records of the patients with the conditions that Dr. Hammond referenced.

The court rejects this theory, stating: "But such information would be unlikely to be found in *Hammond's* records, given his strongly expressed preference for [**43] using the D & X method in the case of patients in fragile health. The information would be much more likely to be found in the records of physicians who perform D & E rather than D & X abortions on such women. Those records, however, the government didn't seek." Opinion at 8. But that is exactly the point: The government does not know what is to be found in Dr. Hammond's medical records. It only knows what could be found there--evidence that, notwithstanding Dr. Hammond's declaration that he strongly prefers

using the D & X method of abortion on patients in fragile health, in practice, he does not use that procedure. Such evidence would be highly probative, as the court itself implies by recognizing it "would be unlikely to be found in *Hammond's* records given his strongly expressed preference for using the D & X method."

In fact, the relevance here cannot be overstated: Congress made explicit findings that a partial-birth abortion is never medically necessary to protect a women's health. Yet, Dr. Hammond claims Congress was wrong. The court concisely lays out Dr. Hammond's argument: In a D & X (partial-birth) abortion, the fetus "is destroyed after the lower extremities, and sometimes the torso, have emerged from the [**44] womb and only the head remains inside," and this, according to Dr. Hammond is safer then the D & E procedure, where "the fetus is destroyed while it is still entirely within the womb . . . . " Opinion at 13. Dr. Hammond seeks to testify accordingly, and it is therefore imperative that the government be able to determine the veracity of his testimony. There is no better way than by determining if Dr. Hammond's actual practice supports his testimony. And this is not a question only of impeachment, but rather concerns the heart of this case.

Moreover, as the government explained during oral argument, the medical records are highly relevant to its case because its experts must be able to review Dr. Hammond's files to determine whether, in their expert opinion, a D & X procedure was the most appropriate procedure, as Dr. Hammond claims. The court recognizes that the need for a health exception to the ban in the Partial-Birth Abortion Ban Act "will pivot on the clash of expert witnesses at [*938] the New York trial, . . . ." Opinion at 17. Yet, the court refuses to recognize the importance of the redacted records to the government's case, even after the government explained the need for its experts to review [**45] the files to form independent expert opinions.

The medical records are also highly relevant to a second congressional finding, namely, that a "partial-birth abortion poses serious risks to the health of a woman undergoing the procedure." 117 Stat. 1201. Congress detailed numerous risks it found posed by partial-birth abortions. Although the government did not point this out during oral argument, Northwestern's attorney alerted the court to the fact that the medical records will show whether there were any complications from the abortion, and this evidence is highly probative to the underlying constitutional challenge. [4]

4 Northwestern also acknowledged another point of relevancy during questioning: When asked whether the records could possibly demonstrate that the woman's life--and not just her health--was at risk, Northwestern's attorney responded, "yes, but that would help the other side." This case is not about sides, but about the document request, and providing the district court with the evidence it needs to resolve the constitutional question before it.

[**46] The court also questions whether the government sincerely wants to determine "whether D & X abortions are ever medically indicated," because the government did not seek summary statistics of all circumstances in which such abortions are performed. Opinion at 16. But as the government pointed out at oral argument, it was trying to limit the burden on Northwestern by confining its document request to those specific situations where Dr. Hammond claimed a partial-birth abortion was necessary to preserve the mother's health. *See* Fed. R. Civ. P. 45(c)(1) ("A party or attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena."). And it succeeded,

maybe even better than the government had hoped: During oral argument, the government learned for the first time that there are only 45 records that satisfy its document request. Given that Dr. Hammond stated in his declaration that he performs, teaches or supervises about 300 abortions a year, and that the government sought the records for a two- to three-year time frame, it probably surprised [**47] the government to learn that there were only 45 relevant records, with the rest apparently unrelated to the mother's or fetus's health.

In any event, the limited scope of the document request, and the government's agreement to redact the records-- something not required by HIPAA--if anything, refute any questioning of the government's motives or the court's implication that the government is on a fishing expedition. Opinion at 14. Although contradictory, the court also chastises the government for not asking for enough records, implying that since the government did not ask for all relevant documents, the documents it did request were somehow less than relevant. Granted, there were many more relevant records that the government did not seek, but the government should not be impugned for prudently limiting its document request to those few medical records Dr. Hammond directly referenced. [5]

5 The court also charges the government with being evasive on the question of the probative value of the medical documents. Opinion at 7. It is true that the government's main focus was not on the probative value of the medical records, but that is neither surprising nor nefarious, given the arguments below and the district court's ruling. The district court in this case ruled that Illinois privilege law governed and not HIPAA. The question of the relevance and probative value of the documents was not central to the question of whether Illinois privilege law applied. This court appropriately reversed the district court on the privilege issue without delving into the question of relevance. Thus, it is not surprising that the government's opening brief did not focus on the relevancy of the documents. Moreover, although Northwestern argued below that the documents were not relevant, it did so in the context of arguing for a federal common law doctor-patient privilege. On appeal, the government did not need to argue relevancy to address that legal issue, and in fact, this court again appropriately rejected the idea of a federal common law privilege without addressing the question of relevance. Relevance only became relevant once the court discounted the import of HIPAA *de*-identification and looked to a balancing test under Rule 45(c)(3)(A)(iv). Again, that the government's opening brief did not focus on this question is not surprising given that Northwestern's Rule 45(c)(3)(A)(iv) undue burden argument below was limited to three short paragraphs, and the only tangential reference to relevance in its opening brief came from this sentence: "The Attorney General's subpoena is an unacceptable intrusion into the privacy of the Hospital's patients, promising no significant contribution to the ascertainment of truth in *NAF v. Ashcroft.*" Memorandum in Support of Northwestern Memorial Hospital's Motion to Quash Subpoena at 20. After Northwestern changed direction on appeal, to argue that the production of the records constituted an undue burden because the records were not relevant, the government responded at length in its reply brief. *See* Appellant's Reply Brief at 8-11. At oral argument, the government also elaborated on the relevance of the documents, not in a vague or evasive way, but by specifically demonstrating that the medical records are *both* relevant

and highly probative of the issues in the underlying case. *See supra* at 26-29.

[**48] [*939] That brings us back to the question of undue burden, which, along with HIPAA, should have been the focus of the narrow question before the district court and this court in this case. Under Rule 45, a court may quash a subpoena where it creates an undue burden. There is no such burden in this case because HIPAA establishes that there is no privacy interest in redacted records and those records are highly relevant to the constitutional challenge to the Partial Birth Abortion Ban Act. The only burden identified by the court seems to be a "potential psychological cost." Opinion at 13. Even assuming that is the kind of "burden" Rule 45 contemplates, reliance on that as a burden in effect creates a privilege where none exists. [6]

6 Northwestern does not claim that it is an undue burden to comply with the subpoena because it is too costly, difficult or time-consuming to produce the redacted records, only that it may negatively impact its reputation with past and future patients. The court agrees, calling it a "potential cost in lost goodwill," opinion at 13, because Northwestern "will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment." Opinion at 12. However, this is not an authentic "cost," because the same federal regulations apply equally to all hospitals. These regulations put all hospitals on the same footing, thus negating any basis for a patient rejecting a hospital's care because a federal court orders the production of redacted records pursuant to a federal regulatory standard.

[**49] Finally, contrary to the court's conclusion, quashing the subpoena in this case does come at a "substantial cost to federal substantive and procedural policy." The court's ruling may well be the death knell for Dr. Hammond's claim, as the district court made clear that it believed the records relevant and that it would consider dismissing the case if the records were not produced. Given that the government cannot adequately cross-examine Dr. Hammond, the district court would be well within its rights to bar Dr. Hammond's testimony, which will not only harm his case, but also the other plaintiffs'. The court's decision also comes at a substantial cost to the federal policy adopted by HIPAA. Lastly, and most significantly, it comes at a cost to the truth of Congress' [*940] findings that a partial-birth abortion is never necessary to protect a woman's health and poses significant health risks, and to the constitutionality of such a law. For these and the foregoing reasons, I would enforce the subpoena to produce the designated records.

LEXSEE 511 F.3D 77

**UNITED STATES OF AMERICA, Appellee, v. CHRISTOPHER SMITH, Defendant, Appellant.**

**No. 06-2247**

**UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

*511 F.3d 77*; *2007 U.S. App. LEXIS 29542*

**December 21, 2007, Decided**

**PRIOR HISTORY:** [**1]

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE. Hon. John A. Woodcock, Jr., U.S. District Judge.

*United States v. Smith, 2006 U.S. Dist. LEXIS 21760 (D. Me., Apr. 18, 2006)*

**COUNSEL:** Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.

J. Gregory Batten for appellant.

**JUDGES:** Before Lipez, Circuit Judge, Selya, Senior Circuit Judge, and Howard, Circuit Judge.

**OPINION BY:** LIPEZ

**OPINION**

[*79] **LIPEZ, *Circuit Judge.*** Appellant Christopher Smith was charged, pursuant to *18 U.S.C. § 922(a)(6)*, with having falsely stated on a federal firearms transaction record that he had never been committed to a mental hospital. He sought to suppress the record of his involuntary mental health commitment on the ground that it had been obtained through police records that were protected from disclosure by state law. Additionally, he argued that federal regulations governing records at federally assisted drug abuse treatment programs precluded disclosure of the record of his involuntary commitment.

After his suppression motion was denied, Smith entered a conditional guilty plea, preserving his right to appeal the denial. He now exercises that right and also appeals on the ground that the plea hearing, conducted by the district court pursuant [**2] to *Federal Rule of Criminal Procedure 11*, was deficient. We hold that state law was not violated by the disclosures in this case and that the order of commitment is not a record to which the federal regulations governing records at federally assisted drug abuse treatment programs apply. We also find that no error occurred during Smith's Rule 11 hearing. We therefore affirm.

**I.**

The following facts are undisputed. On April 2, 2005, Smith was involuntarily admitted to Acadia Hospital, a psychiatric hospital in Bangor, Maine. This involuntary admission was precipitated by his admission to the intensive care unit at Eastern Maine Medical Center ("EMMC") following a drug overdose. In the application section of an Application for Emergency Involuntary Admission to a Mental Hospital (a "blue paper"), [1] EMMC Nurse Practitioner Donna Huff explained:

> I believe Christopher Smith has a mental illness and due to mental illness, poses a likelihood of serious harm on the basis that Mr. Smith has a hx [history] of violent outbursts, threatening others and himself. He is here at EMMC in the ICU s/p [status post] overdose on a variety of medications. The last time he was admitted he fled before he was admitted. [**3] He is a flight risk. Therefore requesting Bangor PD.

Dr. Victor Kelmenson completed the certification portion of Smith's blue paper, concluding that he "pose[d] a likelihood of serious harm due to a mental illness because [of] amphetamine overdosed psychosis, hx [history] of suicidal ideation and paranoia, [and] violent outbursts." Later [*80] the same day, the Penobscot County Probate Judge completed the judicial review and endorsement section of the blue paper and authorized the Bangor

police to transport Smith to Acadia Hospital. Smith was subsequently hospitalized for about two weeks.

1 "Blue paper" is the shorthand parlance for emergency involuntary admission applications in Maine because the forms are typically printed on blue paper. *See United States v. Flanders, No. CRIM. 03-76-B-W, 2004 U.S. Dist. LEXIS 3838, 2004 WL 444027 (D. Me. Mar. 4, 2004).* Maine law provides for involuntary hospitalization for mentally ill persons who pose "a likelihood of serious harm." *Me. Rev. Stat. Ann. tit. 34-B, § 3863.* The procedure for involuntary commitment is as follows: first, an applicant completes an application indicating the grounds for his or her belief that the person to be hospitalized is mentally ill and poses a likelihood [**4] of serious harm. *Id. § 3863(1).* Then, a licensed physician completes a dated certificate to accompany the application, certifying that he or she has examined the patient and found him or her to be mentally ill and to pose a likelihood of serious harm. *Id. § 3863(2).* Finally, the application and accompanying certificate are reviewed and endorsed by a judicial officer. *Id. § 3863(3).* In practice, the application, certificate, and endorsement are all contained on a one-page form, known as the blue paper.

Less than four months later, on July 18, 2005, Smith went to Frati the Pawnbrokers, a federally licensed firearms dealer in Bangor, and completed ATF Form 4473 in anticipation of purchasing a gun. Question 12.f on the form asked: "Have you ever been adjudicated mentally defective (which includes having been adjudicated incompetent to manage your own affairs) or have you ever been committed to a mental institution?" Smith answered, "No." On July 20, 2005, Erik Tall, a Bangor police detective assigned to an ATF Task Force, reviewed Smith's ATF Form. Tall discovered from computerized records at the Bangor Police Department that Smith had been transported by two officers on April 2. He then [**5] obtained a copy of the police report indicating that Smith had been transported from EMMC to Acadia Hospital for involuntary admission.

On July 25, Tall interviewed Smith and his mother, who both confirmed that Smith had been involuntarily committed in April. The government then sought a court order, pursuant to regulations under the Health Insurance Portability and Accountability Act ("HIPAA"), *45 C.F.R. § 164.512(f)*, and Maine law, *Me. Rev. Stat. Ann. tit. 34-B, § 1207(1)(C)*, directing Acadia Hospital to turn over a copy of the blue paper authorizing Smith's involuntary admission. A magistrate judge granted this request, and the government received a copy of Smith's blue paper on August 30, 2005, confirming his involuntary admission and the inaccuracy of his answer on the ATF form.

Following his indictment on September 27, 2005 for knowingly making a false statement on the ATF Form, Smith moved to suppress the police reports related to his transportation to Acadia Hospital and the blue paper evidencing his involuntary admission. He argued that the police reports should be suppressed because they were obtained in violation of Maine's law designating "all orders of commitment, medical [**6] and administrative records, application and reports, and facts contained in them" as confidential records. *Me. Rev. Stat. Ann. tit. 34-B, § 1207(1).* He contended that the blue paper should be suppressed as a fruit of the illegally obtained police report and as a drug abuse treatment record, designated as confidential under the federal Public Health Service Act, *42 U.S.C. § 290dd-2.* [2]

2 As we discuss below, the Public Health Service Act (PHSA) renders confidential certain records of drug abuse diagnosis and treatment. *42 U.S.C. § 290dd-2.* The PHSA and the regulations implementing it are distinct from and more protective than the nondisclosure requirements for "health information" established by HIPAA regulations. *Compare 42 C.F.R. § 2.65* (establishing explicit criteria for a court to consider before authorizing disclosure of drug abuse records under the PHSA) *with 45 C.F.R. § 164.512* (permitting the release of health information "in response to an order of a court").

The same magistrate judge who issued the order directing the hospital to turn over the blue paper recommended that Smith's motion to suppress be denied, and the district court adopted her recommendation. Smith then agreed [**7] to enter a conditional guilty plea, preserving his right to appeal on the suppression issue. The district court conducted a plea hearing, described in further detail below, and accepted Smith's plea, sentencing him to fifteen months in prison and three years supervised release. Smith now appeals the denial of his motion to suppress the police [*81] report and the blue paper. He also appeals on the ground that the judge conducting his Rule 11 hearing improperly relied on a written document instead of directly and personally addressing him in open court about his understanding of the charge against him.

**II.**

We review the denial of a motion to suppress under a bifurcated standard: questions of law are reviewed de novo, while findings of fact are reviewed for clear error. *United States v. Charles, 213 F.3d 10, 17-18 (1st Cir. 2000).* The facts underlying the motion to suppress in

this case are not in dispute. As a result, our review is de novo.

### A. State Law

Smith argues that Tall violated state law, specifically *Maine Revised Statutes title 34-B, § 1207*, when he reviewed computer records and a police report related to the transportation of Smith from EMMC to Acadia Hospital. *Section 1207*, located [**8] in a chapter governing the Department of Behavioral and Developmental Services, provides:

> 1. GENERALLY. All orders of commitment, medical and administrative records, applications and reports, and facts contained in them, pertaining to any client shall be kept confidential and may not be disclosed by any person, except that:
>
> . . .
>
> C. Information may be disclosed if ordered by a court of record. . . .

*Me. Rev. Stat. Ann. tit. 34-B, § 1207(1).* [3]

> 3 Prior to 2007, unlawful disclosure of these records was punishable as a Class D crime. *Me. Rev. Stat. Ann. tit. 34-B, § 1207(4)(B)*. The statute as amended now provides that "[d]isclosure of client information in violation of this section is an offense under the licensing standards of the mental health professional committing the violation and must be promptly reported to the licensing board with jurisdiction for review, hearing and disciplinary action." *Id. § 1207(4-A)*. This revision provides further support for our conclusion that *police* records are not intended to be encompassed by the statute's confidentiality protections because such records are unrelated to the work of mental health professionals.

Smith argues that Tall violated Maine law by improperly [**9] obtaining and disclosing to federal prosecutors, without a court order, the police report documenting the Bangor Police Department's transport of Smith to Acadia Hospital. This argument fails because the police report is not a "report . . . pertaining to [a] client" covered by *§ 1207(1)*. A "client" is defined in this title of the Maine statutes as "a person receiving services from the department [of Behavioral and Developmental Services], from any state institution or from any agency licensed or funded to provide services falling under the jurisdiction of the department." *Id. § 1001(2)*. Given that the Bangor Police Department is not a state agency or institution under this definition, Smith cannot be the police department's client. Thus, the police report is not a "report pertaining to a client." [**10] It follows that Tall's acquisition of the police report and his disclosure of it to federal prosecutors was not a violation of state law. Accordingly, we affirm the district court's denial of Smith's motion to suppress the police report. Because the police report was not illegally obtained, we also reject Smith's theory that the blue paper should be suppressed as a fruit of the police report.

### B. Federal Law

Smith also argues that the blue paper should be suppressed on federal law grounds. The Public Health Service Act (PHSA) [*82] makes certain drug abuse records confidential:

> Records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse . . . treatment [or] rehabilitation . . . which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States shall . . . be confidential and be disclosed only for the purposes and under the circumstances expressly authorized . . . .

*42 U.S.C. § 290dd-2*. The regulations promulgated pursuant to this statute define "records" to mean "any information, whether recorded or not, relating to a patient [**11] received or acquired by a federally assisted alcohol or drug program." *42 C.F.R. § 2.11*. A "patient" is defined as "any individual who has applied for or been given diagnosis or treatment for alcohol or drug abuse at a federally assisted program." *Id.* "Drug abuse" is broadly defined to encompass "the use of a psychoactive substance for other than medicinal purposes which impairs the physical, mental, emotional, or social well-being of the user." *Id.*

The application and certificate on Smith's blue paper contain diagnoses referencing drug abuse ("[status post] overdose on a variety of medications" and "amphetamine overdosed psychosis") and therefore are, arguably, records within the regulatory definition. [4] The PHSA permits the use of such records to "initiate or substantiate any criminal charges against a patient" when authorized by "an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor." *42 U.S.C. § 290dd-2(b)(2)(C), (c)*. The statute prescribes a general balancing test for assessing good cause,

instructing the court to "weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient [**12] relationship, and to the treatment services." *Id.* However, the regulations promulgated under the statute articulate a more specific five factor test to be applied when the records are sought for use in a criminal investigation or a criminal prosecution:

> A court may authorize the disclosure and use of patient records for the purpose of conducting a criminal investigation or prosecution of a patient only if the court finds that all of the following criteria are met:
>
> (1) The crime involved is extremely serious, such as one which causes or directly threatens loss of life or serious bodily injury including homicide, rape, kidnapping, armed robbery, assault with a deadly weapon, and child abuse and neglect.
>
> (2) There is a reasonable likelihood that the records will disclose information of substantial value in the investigation or prosecution.
>
> (3) Other ways of obtaining the information are not available or would not be effective.
>
> (4) The potential injury to the patient, to the physician-patient relationship and to the ability of the program to provide services to other patients is outweighed by the public interest and the need for the disclosure.
>
> (5) If the applicant is a person performing a law [**13] enforcement function that:
>
> [*83] (i) The person holding the records has been afforded the opportunity to be represented by independent counsel. . . .

*42 C.F.R. § 2.65(d).*

4 The parties agree that Acadia Hospital is a "federally assisted program" under the regulatory definition.

Although a court order was granted authorizing the release of the blue paper for use in the government's investigation and prosecution of Smith, none of the findings required by the regulations were made. The explanation for this lack of findings is simple: neither the government nor the magistrate judge granting the order had any reason to believe, at the time, that the blue paper referenced a drug abuse diagnosis and thus arguably included drug abuse information under *42 U.S.C. § 290dd-2*. The magistrate judge explained in her ruling on the suppression motion that her order authorizing release of the commitment record was made pursuant to the HIPAA regulations, *45 C.F.R. § 164.512(a)(1)* (permitting disclosure of health records pursuant to court order), and applicable state law, *Me. Rev. Stat. Ann. tit. 34-B, § 1207* (permitting disclosure of orders of commitment pursuant to court order). She noted that when considering [**14] the government's request for an order authorizing disclosure of the blue paper, she "never for one moment considered whether the application might mention the word 'drugs' and therefore became a patient record within the meaning of *42 C.F.R. § 2.65(d)*."

However, to resolve the suppression issue before us, we need not decide whether the application and certificate portions of the blue paper are patient records, nor whether the government would have been able to show that all five criteria required by *§ 2.65(d)* were satisfied in this case. Instead, we focus only on the judicial endorsement portion of the blue paper. We do so for two reasons. First, the Maine law authorizing emergency admission, described *supra* note 1, suggests that the procedure involves three different forms: an application, a certificate, and a judicial endorsement. Although Maine has decided to use a single piece of paper to consolidate the application, certification, and endorsement steps of the procedure, this happenstance does not necessarily mean that the three discrete portions of the form, filled out by three separate people, are all part of single "record" for the purpose of the PHSA. In other words, the practical [**15] convenience of putting these three forms on a single piece of paper does not transform the judicial endorsement from a judicial order into a patient record.

Second, the government has no interest in introducing evidence of Smith's drug abuse at trial. Its only interest is the introduction of evidence of the *fact* of Smith's involuntary commitment to a mental hospital. That fact could be shown with a redacted copy of the blue paper that includes only the judicial endorsement. [5] Thus, even assuming an error was made in ordering disclosure of the entire, unredacted blue paper (and we intimate no view on that question), the dispositive issue is whether the judicial endorsement on Smith's blue paper, with the application and certificate redacted, could be "used to initiate or substantiate any criminal charges against" Smith without the findings necessitated by the five factor test under the PHSA regulations. Accordingly, we must determine whether the judicial endorsement is a "record"

to which the PSHA regulations restricting use apply. We hold that it is not.

5 At oral argument, the government stated that it would have agreed to stipulate to the fact of involuntary commitment rather than introducing [**16] the blue paper.

The applicability statement in the PHSA regulations limits the broad definition of [*84] "records" when the "use" of information in a criminal case is at issue [6]:

> The restriction on use of information to initiate or substantiate any criminal charges against a patient or to conduct any criminal investigation of a patient applies to any information, . . . which is drug abuse information *obtained* by a federally assisted drug abuse program after March 20, 1972, . . . *for the purpose of treating . . . drug abuse, making a diagnosis for the treatment, or making a referral for the treatment.*

*42 C.F.R. § 2.12(a)(2)* (emphasis added) (internal citation omitted). The judicial endorsement on Smith's blue paper reads:

> Upon review pursuant to *34-B M.R.S.A. § 3863(3)*, I find this application and certificate to be regular and in accordance with the law, and I hereby authorize Bangor Police Dept to take Christopher Smith into custody and transport him to the Acadia Hospital.

It is dated and signed by the probate judge and indicates the address of the probate court. This endorsement contains no information that was obtained for the purpose of treatment, diagnosis, or referral; indeed, it contains [**17] no medical information at all and no reference to drugs. Instead, it contains the statement of a judge authorizing the police to transport a patient to a hospital for emergency commitment. It is properly characterized as a judicial order and, as such, is far more akin to a court record than to a patient record of drug treatment. [7] The endorsement was "obtained" for the purpose of complying with Maine's emergency involuntary commitment statute, rather than for treatment, diagnosis, or referral. Because the endorsement contains no information to which the PHSA regulatory restrictions on use apply, it is not a "record" within the purview of those regulations. [8] As a result, the judicial endorsement may be used to prosecute Smith without the [*85] findings required by *42 C.F.R. § 2.65(d)*. Accordingly, Smith's appeal of the denial of his motion to suppress the blue paper is denied.

6 When disclosure of records is at issue, the applicability of the regulations is further circumscribed by the requirement that the information "would identify a patient as an alcohol or drug abuser either directly, by reference to other publicly available information, or through verification of such an identification [**18] by another person." *42 C.F.R. § 2.12(a)(1)(i)*.

7 Under Maine law, "orders of commitment" are confidential and may be disclosed only by court order. *Me. Rev. Stat. Ann. tit. 34-B, § 1207*. That statute was fully complied with in this case. Additionally, we note that the Maine confidentiality law is phrased so as to distinguish between "orders of commitment" and "medical and administrative records." *Id.* The court order in this case orders Acadia Hospital to provide the blue paper as well as "any and all records relating to the fact of involuntary admission to hospitalization at Acadia Hospital of Christopher Smith, specifically EXCLUDING any records relating to substantive medical diagnosis or treatment." The order thus reflects the magistrate judge's sensitivity to the confidentiality of medical diagnosis and treatment records and confirms the judge's surprise when the blue paper itself contained such information. That surprise suggests that the state of Maine should consider using a two-page form for involuntary commitment to separate the substantive medical diagnosis from the judicial order authorizing commitment. This approach would allow the judicial order to be disclosed pursuant [**19] to court order under Maine law without risking a violation of these federal regulations in the future.

8 We note that, in addition to containing no information obtained for the purpose of diagnosis, referral, or treatment, the judicial endorsement, by itself, would not identify Smith "as an alcohol or drug abuser either directly" or indirectly. As such, it contains no information to which the restrictions on disclosure would apply. *See 42 C.F.R. § 2.12(a)*. Accordingly, the court-ordered disclosure of the *redacted* blue paper, including only the judicial endorsement, would not have been error, even in the absence of the findings required by *42 C.F.R. § 2.65(d)*.

III.

Smith asserts a violation of *Federal Rule of Criminal Procedure 11* for the first time on appeal. He did not

object during the plea colloquy, nor did he move at any time to withdraw his plea. As a result, our review is for plain error. *United States v. Vonn, 535 U.S. 55, 58-59, 122 S. Ct. 1043, 152 L. Ed. 2d 90 (2002)*; *United States v. Caraballo-Rodriguez, 480 F.3d 62, 69 (1st Cir. 2007)*. To establish plain error, Smith bears the burden of demonstrating that: "'(1) there was error; (2) the error was plain; (3) the error affected the defendant's substantial rights; [**20] and (4) the error adversely impacted the fairness, integrity, or public reputation of judicial proceedings.'" *Caraballo-Rodriguez, 480 F.3d at 69* (quoting *United States v. Riggs, 287 F.3d 221, 224 (1st Cir. 2002))*.

*Federal Rule of Criminal Procedure 11* requires a court to conduct a plea colloquy, advising the defendant of his rights and questioning him to establish that the plea is knowing and voluntary. *Fed. R. Crim. P. 11(b)*. The rule requires the court to "determine that there is a factual basis for the plea," *Fed. R. Crim. P. 11(b)(3)*, and that the defendant understands "the nature of each charge to which the defendant is pleading," *Fed. R. Crim. P. 11(b)(1)(G)*.

When conducting the colloquy, "the court must address the defendant personally in open court." *Fed. R. Crim. P. 11(b)(1)*. We have repeatedly asserted that "a defendant's acknowledgment of signed agreements or other written documents will not suffice in lieu of the court's personal examination." *United States v. Martinez-Martinez, 69 F.3d 1215, 1220 (1st Cir. 1995)* (citing *United States v. Martinez-Molina, 64 F.3d 719, 734 (1st Cir. 1995))*; *see also United States v. Medina-Silverio, 30 F.3d 1, 3 (1st Cir. 1994)*. However, [**21] we have also held that "where the prosecutor's statement . . . of the facts sets forth all elements of the offense and the conduct of the defendant that constitutes the offense, 'the defendant's admission that the allegations are true is sufficient evidence that he understands the charge.'" *United States v. Cotal-Crespo, 47 F.3d 1, 6 (1st Cir. 1995)* (quoting *United States v. Darling, 766 F.2d 1095, 1099 (7th Cir. 1985))*.

Smith argues that his Rule 11 proceeding was deficient in that "the trial judge failed to directly and personally address [Smith] in open court about [his] understanding of the law in relation to the alleged facts which would constitute the offense charged in the indictment, and instead, relied upon a written document as a substitute for personal examination in determining that a factual basis for the plea existed." Smith is apparently claiming that the court improperly relied on the written indictment or on the Amended Government's Version of the Offense during the plea colloquy. However, the transcript of Smith's Rule 11 hearing does not support this contention.

In a thorough and organized fashion, the court began the Rule 11 hearing by questioning Smith directly [**22] about his competency to enter a plea. Finding him competent, the court then asked Smith about his understanding of the allegations in the indictment. Far from relying on a written document, the court conducted a lengthy and thorough inquiry into Smith's understanding of the offense charged:

> COURT: Mr. Smith, have you received a copy of the indictment?
>
> SMITH: Yes, your Honor.
>
> [*86] COURT: Have you had enough time to discuss the charge with your lawyer?
>
> SMITH: Yes, your Honor.
>
> COURT: Has Mr. Bate [defense counsel] explained to you the elements and nature of the offense charged?
>
> SMITH: Yes, your Honor.
>
> COURT: Has he also told you about the penalties that can be imposed?
>
> SMITH: Yes, your Honor.
>
> COURT: Mr. Bate, are you satisfied that your client understands the charge contained in Count One of the indictment and the penalties that can be imposed?
>
> MR. BATE: Yes, your Honor.
>
> COURT: Now, Mr. Smith, you're charged in a one-count indictment, and it alleges as follows, that on or about July 18, 2005, you attempted to acquire a handgun from Frati the Pawn Brokers in Bangor, and when you did so, you knowingly made a false, fictitious statement on the Department of Treasury, Bureau of Alcohol, Tobacco and Firearms [**23] firearms transaction record, A[T]F Form 4473, which statement was likely to deceive Frati the Pawn Brokers as to a fact material to the lawfulness of the attempted acquisition of the firearm and that you answered "no" to Question 2-F. 2-F read, "Have you ever been adjudicated mentally defective which includes having been adjudicated incompetent to manage your own affairs?" or "Have you ever been committed to a mental institution?" And that -- it further alleges that you knew at the time that answer was

> false and that is a violation of federal firearms law. Do you understand the charge set forth in the indictment?
>
> SMITH: Yes, your Honor.

The court reviewed the range of penalties that could be imposed and told Smith that he would have the right to change his mind and withdraw his plea "up until the time that I accept your guilty plea if I decide to accept it." The court then explained the rights Smith would give up by pleading guilty and the consequences of his conditional plea agreement. Throughout this colloquy, the court repeatedly asked Smith if he understood what he was being told and he answered "yes, your Honor" each time.

Then, the court turned to its determination that there was [**24] a factual basis for the plea. The court asked Smith whether he had been given an opportunity to review the amended version of the offense. He replied that he had. The court said, "I'm going to ask a very important question, Mr. Smith, and obviously I need a truthful answer. Is there any respect with which you disagree with what is set forth in the amended Government's version of the offense?" Instead of answering, Smith conferred with counsel. His attorney then responded to the question by carefully walking the court through a series of objections to factual details in the amended version of the offense.

In particular, Smith's counsel stated that Smith could neither admit nor deny the allegation that he had seen various signs on the walls of the hospital entrance while being transported to Acadia Hospital because he was medicated and had no recollection of the event. [9] Smith's counsel also contested the allegation that Smith had admitted to Tall that he should have answered "yes" to the question on the ATF form regarding involuntary commitment. Additionally, Smith's counsel indicated that [*87] he contested certain allegations regarding Smith's drug use.

9 The signs would have been relevant [**25] to show that Smith was aware that he had been involuntarily admitted to a *mental* hospital.

Turning back to Smith personally, the court said, "[Y]ou've heard this conversation between me and your lawyer. And he has made certain points about whether or not you recognize[d] the signs and the nature of the conversation you had with Officer Tall. Have you followed the conversation that we've had?" Smith replied that he had. When asked, "Is there anything else in the amended Government's version that you believe is in any way inaccurate or incorrect?" Smith replied that there was not. The court continued: "Is the information, to the best of your knowledge, except for what your lawyer has pointed out, true to the best of your personal knowledge?" Smith replied, "Yes, your Honor."

The court permitted the defendant to be seated at that point, but its Rule 11 colloquy continued. The court proceeded to recite in great detail the uncontested facts alleged in the amended version of the offense and how those facts would be sufficient to meet the government's legal burden in this case. Following this lengthy recitation of the facts and the law, the court concluded: "So I do find, based on my review [**26] of the prosecution version, Mr. Smith's responses, the responses of his attorney, that there is a factual basis for the guilty plea to the crime charged in . . . the indictment."

The court then questioned Smith personally regarding the voluntary nature of his plea. Smith continued to answer affirmatively to all of the court's inquiries. Before accepting the plea, the court asked Smith once again whether he still wished to enter the conditional guilty plea and Smith replied, "Yes, your Honor."

Far from relying on a written document in lieu of a true colloquy, this exchange between the court, Smith, and Smith's counsel parsed the factual details of the allegations in the written document and included a detailed oral exposition of the factual basis for the plea. Thus, we find no error, much less plain error, in the district court's Rule 11 colloquy in this case.

*Affirmed.*

**CAROL A. KALINOSKI, Plaintiff, v. DONALD L. EVANS, Secretary of Commerce, Defendant.**

**Civil Action No. 04-1206 (JDB)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**377 F. Supp. 2d 136; 2005 U.S. Dist. LEXIS 13858; 96 Fair Empl. Prac. Cas. (BNA) 175; 67 Fed. R. Evid. Serv. (Callaghan) 874**

**July 12, 2005, Decided**

**SUBSEQUENT HISTORY:** Summary judgment granted, in part, summary judgment denied, in part by Kalinoski v. Gutierrez, 2006 U.S. Dist. LEXIS 32922 (D.D.C., May 25, 2006)

**LexisNexis(R) Headnotes**

***Evidence > Privileges > Attorney-Client Privilege > Waiver***
***Evidence > Privileges > Psychotherapist-Patient Privilege > Scope***
***Evidence > Privileges > Psychotherapist-Patient Privilege > Waiver***
[HN1] The psychotherapist privilege is waived when a plaintiff places her mental state at issue.

***Healthcare Law > Business Administration & Organization > Patient Confidentiality > Health Insurance Portability & Accountability Act***
***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Health Insurance Portability & Accountability Act***
[HN2] See 45 C.F.R. § 164.508(a)(2).

***Contracts Law > Negotiable Instruments > Enforcement > Joint & Several Instruments***
***Healthcare Law > Business Administration & Organization > Patient Confidentiality > Health Insurance Portability & Accountability Act***
***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Health Insurance Portability & Accountability Act***
[HN3] "Psychotherapy notes" are defined in the Health Insurance Portability and Accountability Act of 1996 (HIPAA) regulations as notes recorded (in any medium) by a health care provider who is a mental health professional documenting or analyzing the contents of conversation during a private counseling session or a group, joint, or family counseling session and that are separated from the rest of the individual's medical record. Psychotherapy notes excludes medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of the following items: Diagnosis, functional status, the treatment plan, symptoms,

prognosis, and progress to date. 45 C.F.R. § 164.501.

***Healthcare Law > Business Administration & Organization > Patient Confidentiality > General Overview***
[HN4] The regulation 45 C.F.R. § 164.608(a)(2) refers to "an authorization," connoting a single authorization rather than two. Other regulations suggest that the "authorization" referred to throughout § 164.508 is the "authorization of the individual," and there is nothing in § 164.508(a)(2) in particular that suggests the word "authorization" was intended to imply something different there. 45 C.F.R. § 164.512(e).

***Healthcare Law > Business Administration & Organization > Patient Confidentiality > General Overview***
[HN5] 45 C.F.R. § 164.512(e) provides that a covered entity may use or disclose protected health information without the written authorization of the individual, as described in 45 C.F.R. § 164.508, in response to an order of a court.

***Healthcare Law > Business Administration & Organization > Patient Confidentiality > Health Insurance Portability & Accountability Act***
***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Health Insurance Portability & Accountability Act***
[HN6] D.C. Code § 7-1201.03 imposes strict limits on the disclosure of the "personal notes" of mental health professional.

***Healthcare Law > Business Administration & Organization > Patient Confidentiality > General Overview***
[HN7] See D.C. Code § 7-1201.03.

***Constitutional Law > Supremacy Clause > General Overview***
***Healthcare Law > Business Administration & Organization > Patient Confidentiality > General Overview***
***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Health Insurance Portability & Accountability Act***
[HN8] The reference in D.C. Code § 7-1201.03 to "any other provision of this chapter" includes those provisions of the D.C. Code relating to the production of mental health information upon client authorization or in certain court proceedings, meaning that this section overrides those provisions as to "personal notes." And because § 7-1201.03 is "more stringent" than the federal regulations under the Health Insurance Portability and Accountability Act of 1996 with regard to the treatment of those notes, it is not preempted by those regulations. 45 C.F.R. § 160.202, 45 C.F.R. § 160.203(b).

***Healthcare Law > Business Administration & Organization > Patient Confidentiality > General Overview***
[HN9] "Personal notes" are defined as (A) Mental health information disclosed to the mental health professional in confidence by other persons on condition that such information not be disclosed to the client or other persons; and (B) The mental health professional's speculations. D.C. Code § 7-1201.01(13).

***Civil Procedure > Federal & State Interrelationships > Federal Common Law > General Overview***
***Evidence > Privileges > General Overview***
***Evidence > Procedural Considerations > Rule Application & Interpretation***
[HN10] A federal district court is limited to applying the federal law of privilege in a case

involving a federal cause of action. Fed. R. Evid. 501.

***Evidence > Privileges > Doctor-Patient Privilege > General Overview***
***Healthcare Law > Business Administration & Organization > Patient Confidentiality > Health Insurance Portability & Accountability Act***
***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Health Insurance Portability & Accountability Act***
[HN11] State laws relating to the privacy of mental health information that are "more stringent" than the regulations under the Health Insurance Portability and Accountability Act of 1996-- although not preempted by those regulations -- are unenforceable with regard to federal claims in federal court.

***Civil Procedure > Federal & State Interrelationships > Federal Common Law > General Overview***
***Constitutional Law > Supremacy Clause > General Overview***
[HN12] The Supremacy Clause of the United States Constitution (as well as Fed. R. Evid. 501) prevent a State from directing a federal court with regard to the evidence it may order produced in the adjudication of a federal claim.

**COUNSEL:** [**1] Robert C. Seldon, Robert C. Seldon & Associates, P.C., Washington, DC, Counsel for Plaintiff.

Peter S. Smith, United States Attorney's Office, Washington, DC, Counsel for Defendant.

Cathy A. Harris, Kator, Parks & Weiser, PLLC, Washington, DC, Counsel for Mary Jane Kane.

**JUDGES:** JOHN D. BATES, United States District Judge.

**OPINION BY:** JOHN D. BATES

**OPINION**

[*137] **ORDER**

This action arising under Title VII of the Civil Rights Act of 1964 ("Title VII") comes before the Court on the motion of Mary Jean Kane -- a licensed social worker who has provided counseling to the plaintiff -- to quash a subpoena served on her by the defendant in this action. The subpoena requests:

> Any and all medical records pertaining to treatment for mental health, emotional conditions and physical symptoms related to any psychiatric or emotional condition without limitation, regardless of the date or subject matter (including progress notes, hospital entries, psychiatric records, counseling records, lab reports, data, xray, films, reports, bills, invoices, and all other such documents) for Carol A. Kalinosky [sic].

Motion to Quash, Ex. 1. Kane argues that the subpoena seeks the disclosure of [**2] information that is protected from disclosure by the common law psychotherapy privilege under Jaffee v. Redmond, 518 U.S. 1, 11, 135 L. Ed. 2d 337, 116 S. Ct. 1923 (1996), the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the regulations promulgated thereunder, and District of Columbia law. For the reasons set out below, the motion to quash the subpoena is granted in part and denied in part. [1]

1 This Order clarifies, and to some extent departs from, the reasoning expressed by the Court in a recent hearing on this matter.

Kane's contention that the information sought in the subpoena is privileged under Jaffee v. Redmond runs up against the rule that [HN1] the psychotherapist [*138] privilege is waived when a plaintiff places her mental state at issue. See Schoffstall v. Henderson, 223 F.3d 818, 822 (8th Cir. 2000) (" Numerous courts since Jaffee have concluded that, similar to attorney-client privilege that can be waived when the client places the attorney's representation [**3] at issue, a plaintiff waives the psychotherapist-patient privilege by placing his or her medical condition at issue."); Fox v. The Gates Corp., 179 F.R.D. 303, 305-06 (D. Colo. 1998) (holding that a plaintiff waives "the psychotherapist-patient privilege by initiating a legal action in which she claims damages for emotional distress"). Plaintiff has done precisely that, through her allegations that defendant's actions caused her severe emotional distress and led her to seek the services of a mental health professional. See Compl. PP52, 63, 75; Dep. of Carol Kalinoski, Mar. 10, 2004, at 161-62.

The Court turns next to the relevant provisions of the HIPAA regulations. Kane argues that disclosure of her notes is foreclosed by 45 C.F.R. § 164.508(a)(2), which provides: [HN2] "Notwithstanding any provision of this subpart ... a covered entity must obtain an authorization for any use or disclosure of psychotherapy notes." [2] However, Kane has received precisely the authorization required by the regulations. Plaintiff has signed an "Authorization to Release Medical Information" that lists Kane as the provider and requests:

> Any and all documents [**4] ... regarding Carol A. Kalinosky [sic], including but not limited to .... Copy of complete chart, progress notes & interview notes, intake form, discharge summaries, operative reports, x-ray & all imagery, laboratory tests, pathology tissue, and all diagnostic studies.

Def.'s Opp. to Mot. to Quash, Ex. 2.

> 2 [HN3] "Psychotherapy notes" are defined elsewhere in the HIPAA regulations as:
>
> > notes recorded (in any medium) by a health care provider who is a mental health professional documenting or analyzing the contents of conversation during a private counseling session or a group, joint, or family counseling session and that are separated from the rest of the individual's medical record. Psychotherapy notes excludes medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of the following items: Diagnosis, functional status, the treatment plan, symptoms, prognosis, and progress to date.
>
> 45 C.F.R. § 164.501.

[**5] Kane contends that the "authorization" required by section 164.508(a)(2) refers not only to the authorization of the client, but to that of the mental health specialist as well. This is an untenable reading of the provision. At least in those cases where the specialist is the "covered entity" in possession of the notes, Kane's reading of the regulation leads to the awkward construction that a specialist is expected to "obtain" her own authorization. [HN4] The regulation also notably refers to "an

required to recognize state-law privilege in a case with "the principle claims" being federal despite one supplemental state claim).

[HN13] While the state standards for privilege are most often not followed in a case with mixed federal and state claims, they are not completely disregarded either. *See Mem'l Hosp. for McHenry County,* 664 F.2d at 1061. "A strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at *no substantial cost* to federal substantive and procedural policy." *Id.* (citation omitted) (emphasis added). One occasion where a state privilege standard can apply in a mixed federal question with a supplemental state law claim case is when the contested evidence is only relevant to the state claim. *See Freeman v. Fairman,* 917 F. Supp. 586, 588 (N.D. Ill. 1981). Yet, the contested documents in this matter are not only relevant [*22] to the state claims.

Plaintiff alleges that the ambulance reports are relevant to his establishing the elements of Count IV (§ 1983 malicious prosecution) and Count V (§ 1983 conspiracy), as well as serving possible impeachment purposes or evidence to prove motive, intent, and/or *modus operdani.* (Pl.'s Reply Mem in Supp. of Protective Order at 8 n.6, 12-14.) We need not resolve the admissibility of ambulance reports for such purposes at such an early stage in the litigation. However, [HN14] relevance in discovery is a far broader concept than under the Federal Rules of Evidence. It is well settled that relevance for discovery purposes, is to be interpreted broadly. *See Goldman v. Checker Taxi Co.,* 325 F.2d 853, 855 (7th Cir. 1963) (citing *Hickman v. Taylor,* 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 (1947)). And, relevant material for discovery purposes may encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case. *Minch v. City of Chicago,* 213 F.R.D. 526, 527 (N.D. Ill. 2003) (internal quotations omitted) (citing *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 57 L. Ed. 2d 253, 98 S. Ct. 2380 (1978)). [*23] Plaintiff's assertion that the Loyola-disclosed material is relevant to his federal claims seems reasonable, as it may prove to bear directly on or lead to other matters that may bear on his causes of action rooted in federal law. The above, taken together, supports the application of the federal law on privilege regarding physician-patient and medical record privilege over the corresponding state standards. There being no such privilege under federal law, the disputed documents are discoverable. Defendants' motions to quash the subpoena to Loyola with respect to rider PP 1.c and 1.d are denied. [4]

4 The result is the same for defendants' motions to quash rider P 1.f (covering documents pertaining to a specific ambulance run, incident # C307-283) and the remaining portion of rider P 3 (covering letters of commendation). Similar to their grounds of objection to rider PP 1.c and 1.d, defendants base their objection to rider PP 1.f and 3 by asserting that the Illinois physician-patient privilege and the state privilege contained in the Medical Studies Act, 735 ILCS 5/8-2101 and 2102, are the applicable sources of privilege. (Defs. Geiger & Winkler's Mot. to Quash at 3-4; Def. Metro's Mot. to Quash at 4-5.)

As stated previously, this Court need not delve into the scope of state case law or statute, as neither inquiry furthers the threshold question: whether federal or state privilege law applies to the case at hand. In a non-diversity case such as this, the existence of a privilege must be determined by reference to federal common law, even where, as here, the action includes supplemental claims under state law. *Mem'l Hosp. for McHenry County v. Shadur,* 664 F.2d at 1061. There being

authorization", connoting a single authorization rather than two. Finally, other regulations suggest that the "authorization" referred to throughout section 164.508 is the "authorization of the individual," and there is nothing in section 164.508(a)(2) in particular that suggests the word "authorization" was intended to imply something different there. [3] 45 C.F.R. § 164.512(e). [*139] See 45 C.F.R. 164.512 (discussing the situations where "the written authorization of the individual, as described in § 164.508" is unnecessary).

3 Kane must look outside of the text of section 164.508(a)(2) to support her argument that a client authorization is insufficient, seizing on the language in 45 C.F.R. § 164.524(a)(1)(i) excluding "psychotherapy notes" from the general rule that "an individual has a right of access to inspect and obtain a copy of protected health information about the individual in a designated record set." However, it does not follow from the fact that a patient is not allowed to inspect her own notes under section 164.524(a)(1)(i) that a court order plus a patient authorization are insufficient to permit the production of notes in a court proceeding. Unlike section 7-1201.03 of the D.C. Code (which even then applies only to a subset of a psychotherapist's notes), there is no indication that the intent of the HIPAA regulations were to shield psychotherapy notes entirely from discovery in a judicial proceeding.

[**6] Kane is therefore left to argue that the authorization is inadequate because it does not specifically make reference to "psychotherapy notes" in the list of permitted disclosures. But since the form is addressed to a psychotherapist, authorizes the disclosure of "progress notes" and "interview notes", and includes an umbrella provision for "any and all documents" regarding plaintiff, it would blink reality to conclude that the authorization somehow excludes psychotherapy notes. Any lingering doubt on the issue is removed by plaintiff's own statement that she believes the authorization is "sufficient" for present purposes, and that she would be willing to submit another authorization were the court to so require. Pl.'s Resp. to Mot. to Quash at 3-4. The Court therefore finds that plaintiff has authorized the disclosure of psychotherapy notes within the meaning of section 164.508(a)(2).

The issue is ultimately an academic one, however, for section [HN5] 45 C.F.R. § 164.512(e) of the regulations provides that a "covered entity may use or disclose protected health information without the written authorization of the individual, as described in § 164.508 .... in [**7] response to an order of a court...." The Court concludes that an order that denies Kane's motion to quash and therefore enforces the defendant's subpoena is appropriate in this case. Defendant's request for the notes is "reasonably calculated to lead to the discovery of admissible evidence" under Federal Rule of Civil Procedure 26, in that the notes bear directly on plaintiff's claims of emotional distress. There is no claim that the subpoena imposes an "undue burden or expense" on Kane within the meaning of Federal Rule of Civil Procedure 45. A comprehensive and stringent protective order is in effect in this case that will severely limit the disclosure of these materials. And as indicated, the plaintiff has taken the step of placing her mental health in issue, and has expressly authorized the disclosure of her mental health information to defendant in a written authorization to Kane and in her papers to the Court. All of these circumstances weigh strongly in favor of an order requiring Kane to produce the mental health information in her possession under 45 C.F.R. § 164.512(e) [**8] .

Kane nonetheless objects to such an order on the final ground that it would conflict with District of Columbia law. Kane is correct that the provisions of the District of Columbia code

are -- in several pertinent respects -- even more protective of mental health information than the HIPAA regulations. Of most relevance here is [HN6] section 7-1201.03 of the Code, which imposes strict limits on the disclosure of the "personal notes" of mental health professional:

> [HN7] If a mental health professional makes personal notes regarding a client, such personal notes shall not be maintained as a part of the client's record of mental health information. *Notwithstanding any other provision of this chapter*, access to such personal notes shall be *strictly and absolutely limited* to the mental health professional and shall not be disclosed except to the degree that the personal notes or the information contained therein are needed in litigation [*140] brought by the client against the mental health professional on the grounds of professional malpractice or disclosure in violation of this section.

D.C. Code § 7-1201.03 (emphasis added). 4 [HN8] The reference in section [**9] 7-1201.03 to "any other provision of this chapter" includes those provisions of the D.C. Code relating to the production of mental health information upon client authorization or in certain court proceedings, meaning that this section would seem to override those provisions as to "personal notes." And because section 7-1201.03 is "more stringent" than the federal HIPAA regulations with regard to the treatment of those notes, it is not preempted by those regulations. See 45 C.F.R. § 160.202, 45 C.F.R. § 160.203(b).

4 [HN9] "Personal notes" are defined as "(A) Mental health information disclosed to the mental health professional in confidence by other persons on condition that such information not be disclosed to the client or other persons; and (B) The mental health professional's speculations." D.C. Code § 7-1201.01(13).

However, [HN10] this Court is limited to applying the federal law of privilege in this case involving a federal cause [**10] of action. See Fed. R. Evid. 501 (providing that "the privilege of a ... person ... shall be governed by the principles of the common law" as interpreted by the federal courts "except as ... provided by Act of Congress"); In re Sealed Case, 363 U.S. App. D.C. 214, 381 F.3d 1205, 1211 (D.C. Cir. 2004) (holding that it is "clear that when a plaintiff asserts federal claims, federal privilege law governs"). For this reason, several courts have held that [HN11] state laws relating to the privacy of mental health information that are "more stringent" than the HIPAA regulations -- although not preempted by those regulations -- are unenforceable with regard to federal claims in federal court. As the Seventh Circuit recently explained:

> The HIPAA regulations do not impose state evidentiary privileges on suits to enforce federal law. Illinois is free to enforce its more stringent medical-records privilege ... in suits in state court to enforce state law and, by virtue of an express provision in Fed. R. Evid. 501, in suits in federal court (mainly diversity suits) as well in which state law supplies the rule [**11] of decision. But the Illinois privilege does not govern in federal-question suits, such as the suit in the Southern District of New York.

Northwestern Mem'l Hosp. v. Ashcroft, 362 F.3d 923, 925 (7th Cir. 2004); EEOC v. Boston Mkt. Corp., 2004 U.S. Dist. LEXIS 27338,

No. 03-4227, 2004 WL 3327264, at *2 (E.D.N.Y. Dec. 16, 2004) ("The C.P.L.R. section to which plaintiff points remains the law in areas in which New York State has the authority to regulate, but it has not become the law in areas within the federal domain. Accordingly, New York law does not apply here, and no comparison of HIPAA and New York law is necessary to determine if the state law is 'more stringent.'") (quotation omitted); A Helping Hand, LLC v. Baltimore County, 295 F. Supp. 2d 585, 592 (D. Md. 2003) ("As for the cited Maryland provisions" relating to a patient-psychotherapist privilege, "the privileges they establish are not applicable here because this lawsuit is governed by federal, rather than state, law."). [5]

5 But see United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., 2004 U.S. Dist. LEXIS 21830, No. 99-3298, 2004 WL 2009416, at *3 (D.D.C. May 17, 2004) ("The Court finds that Florida law is not preempted by HIPAA, and, therefore, any discovery of the medical records of Florida patients must comply with Florida law governing such disclosures.").

[**12] This Court agrees with the reasoning of the Seventh Circuit and the other cases that have reached the same conclusion. [HN12] The Supremacy Clause of the United States Constitution (as well as Federal [*141] Rule of Evidence 501) prevent a State from directing a federal court with regard to the evidence it may order produced in the adjudication of a federal claim. See Memorial Hosp. for McHenry County v. Shadur, 664 F.2d 1058, 1063 (7th Cir. 1981) (holding that conflict between federal and state evidentiary law is "wholly illusory when considered in light of the Supremacy Clause" and that to "the extent Illinois' Medical Studies Act could be construed to exclude evidence relevant to a claim based on federal law in an action brought in federal court, it is rendered void and of no effect by that provision"). The plaintiff in this action has chosen to assert discrimination claims in federal court and under federal law. The otherwise valid subpoena in this action therefore cannot be avoided on the ground that it is inconsistent with the District of Columbia privilege rules in section 7-1201.03.

**CONCLUSION**

For the reasons stated above, [**13] the motion to suppress is DENIED.

JOHN D. BATES

United States District Judge

Dated: July 12, 2005