UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| IN RE: ADMINISTRATIVE SUBPOENA ISSUED BY NATIONAL TRANSPORTATION SAFETY BOARD TO RHODE ISLAND HOSPITAL | : | MC 08-33 S |

**ORDER**
**GRANTING MOTION TO COMPEL**

Before the Court is the Motion to Compel Production (Document ("Doc.") #1) ("Motion to Compel" or "Motion") filed by the United States (the "Government"). By the Motion, the Government seeks to compel compliance with a federal administrative subpoena *duces tecum* issued by the National Transportation Safety Board ("NTSB") to Rhode Island Hospital (the "Hospital") seeking two blood specimens. See Motion at 1. The Motion to Compel has been referred to me for determination. See 28 U.S.C. § 636(b)(1)(A). The Hospital has filed an objection to the Motion. See Rhode Island Hospital's Objection to the United States' Motion to Compel Production (Doc. #3) ("Objection"). For the reasons stated herein, the Motion is granted.

**Facts and Travel**

On March 13, 2008, an Amtrak Acela train en route from New York to Boston struck an Amtrak maintenance-of-way crew at milepost 186.44 in Providence, Rhode Island. The crew, consisting of a track foreman and two trackmen, had been assigned to work with a contractor to inspect and mark defective concrete ties. One of the trackmen was assigned as a watchman/lookout and accompanied the track foreman and contractor as they conducted a walking concrete tie inspection. The second trackman was following the crew in a highway vehicle and was away from the

site at the time of the accident. As a result of the accident, the contractor was fatally injured and the track foreman, Richard Mallette ("Mr. Mallette"), and the watchman/lookout, Julius Chisolm ("Mr. Chisolm"), were transported to Rhode Island Hospital (the "Hospital") for treatment. In the course of treating Mr. Mallette and Mr. Chisolm, the Hospital procured blood samples from them.

On March 18, 2008, the NTSB sent a letter to the Hospital, requesting blood specimens obtained from Mr. Mallette and Mr. Chisolm. The letter explained that the NTSB is required to investigate transportation accidents, including railroad accidents in which there is a fatality, and that the NTSB "is authorized to 'require, by subpoena or otherwise, necessary witnesses and evidence.'" Letter from Payan to Hospital of 3/18/08 at 1 (quoting 49 U.S.C. § 1113(a)(1)). The Hospital responded in a March 19, 2008, letter, objecting to the request and citing its obligation to protect the privacy of its patients and confidentiality of patient health care information. The Hospital further indicated that the statutory provisions cited by the NTSB did not permit the Hospital "to release blood specimens or samples without a fully completed patient authorization, court-ordered warrant, or subpoena or summons issued by a judicial officer." Letter from Friedemann to Payan of 3/19/08 at 1. That same day the NTSB served an administrative subpoena duces tecum on the Hospital which required that it produce within ten days the "[r]emaining portions of fluid specimens for Mr. Richard Mallette ... and Mr. Julius Chisolm ...." Declaration of Ruben Payan ("Payan Decl."), Exhibit 1 (Subpoena Duces Tecum).

The instant Motion was filed on April 14, 2008. The Court issued a notice and order on April 17, 2008, scheduling the matter for hearing on May 5, 2008, and directing the Government to notify Mr. Mallette and Mr. Chisolm of the hearing. See

Notice and Order Scheduling Hearing (Doc. #2) ("Order of 4/17/08"). The Hospital filed an objection to the Motion on April 28, 2008. See Objection.

Because the Government was unable to provide Mr. Mallette and Mr. Chisolm with notice of the May 5th hearing, that hearing was rescheduled to May 21, 2008. See Tape of 5/21/08 Hearing. At the May 21, 2008, hearing, counsel for the Government confirmed that Mr. Mallette and Mr. Chisolm had received written notice of the hearing on May 14, 2008, in accordance with the Order of 4/17/08.[1] See Hearing Exhibits. After listening to argument from counsel, the Court took the matter under advisement.[2]

**Law**

The requirements for enforcement of an administrative subpoena are not onerous. United States v. Sturm, Ruger & Co., 84 F.3d 1, 4 (1st Cir. 1996). "In order to obtain judicial backing the agency must prove that (1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately

---

[1] The Court directed that copies of the receipts showing that notice of the hearing had been sent to Mr. Mallette and Mr. Chisolm on May 13, 2008, by FedEx US Airbill be marked as hearing exhibits.

[2] In addition to counsel for the Government and for the Hospital, also present at the May 21, 2008, hearing was Attorney Robert T. Naumes of Thornton & Naumes LLP, 100 Summer Street, 30th Floor, Boston, Massachusetts. Attorney Naumes identified himself as representing the union of which Mr. Mallette and Mr. Chisolm are members. He explained that Messrs. Mallette and Chisolm had given the notice of the hearing to the union and that he was in attendance as an "observer." Near the end of the hearing, Attorney Naumes indicated that he wished to address the Court, and he was permitted to do so. Attorney Naumes indicated that Mr. Mallette was still hospitalized and that the first notice of the instant proceeding which Mr. Mallette had received was the letter from counsel for the Government (dated May 13, 2008). He also stated that Mr. Mallette was potentially subject to fines from the "FRA" which was jointly investigating the accident with the NTSB.

described, and (4) proper procedures have been employed in issuing the subpoena." Id.; cf. In re Grand Jury Matters, 751 F.2d 13, 18 (1st Cir. 1984)("In the absence of privilege, courts normally will ask only whether the materials requested are relevant to the investigation, whether the subpoenas specify the materials to be produced with reasonable particularity, and whether the subpoena commands production of materials covering only a reasonable period of time.").

Once the government makes the preliminary showing that the inquiry is within the authority of the agency, that the information sought is reasonably relevant to the authorized inquiry, and that the information has been adequately described, the burden shifts to the respondent to prove that enforcement of the subpoena would be improper. See Chao v. Cmty. Trust Co., 474 F.3d 75, 79 (3rd Cir. 2007); cf. RNR Enters., Inc. v. SEC, 122 F.3d 93, 97 (2nd Cir. 1997)("The respondent opposing enforcement must shoulder the burden of showing that the subpoena is unreasonabl[e] or was issued in bad faith or for an improper purpose, or that compliance would be *unnecessarily* burdensome.") (alterations in original)(internal quotation marks omitted).

## Discussion

***Applicability of HIPAA to Blood Specimens***

The Court addresses initially the Government's contention that the blood specimens are not subject to the restrictions contained in the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996) ("HIPAA"), and the regulations promulgated under that act because the blood specimens do not fall under the definition of "health information." Motion at 3 (citing definition of "health information" contained in 45 C.F.R. § 160.103). In the Government's view, "[b]lood specimens are not information, much less health information or protected health information." Id.

The Court is unpersuaded that this is so. The definition contained in 45 C.F.R. § 160.103 is broad enough to encompass blood specimens. The regulation states in relevant part:

> Health information means any information, whether oral or recorded in any form or medium, that:
>
> (1) Is created or received by a health care provider, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse; and
>
> (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual.

45 C.F.R. § 160.103.

The following illustration will help to explain the Court's reasoning on this issue. Assuming that there were some medical reason for doing so, the Hospital could have taken a small drop of blood from each specimen, placed it on plain white index card, and allowed it to dry. It seems reasonably clear that the index card would constitute health care information subject to the provisions of HIPAA (even if there was no other information on the card). Thus, in the instant matter, the fact that the blood is held in a test tube or vial (as opposed to being fixed on an index card) should not make a difference in whether the specimens constitute health care information.

Moreover, it is inconceivable to the Court that the test tubes or vials containing the specimens are completely devoid of information relating to Mr. Mallette and Mr. Chisolm. At a minimum, there must be markings which identify whose blood is contained within the test tube or vial and very likely the date the blood was obtained. Doubtless such information falls within the definition of health information quoted above. While

possibly the Hospital could remove all markings from the test tube or vial (or place the specimens in unmarked tubes or vials) before producing them to the NTSB, the fact that such hyper-technical and wasteful measures would be required to avoid HIPAA's protective sweep only serves to confirm the Court's belief that the blood specimens constitute health care information.

Lastly, it makes little sense that HIPAA would protect the results of any laboratory analysis which the Hospital may have performed on the blood specimens, but provide no protection as to the specimens themselves. Indeed, from the point of view of the individuals who provided the blood, they may have a greater expectation of privacy as to the blood samples than they have in any document or report containing information about the blood. Accordingly, to the extent that the Government contends that HIPAA does not restrict the dissemination of the blood specimens, such argument is rejected.

***Applicability of State Law***

The Hospital does not appear to dispute that the subpoena has been issued for a congressionally authorized purpose, that the blood samples are relevant to the authorized purpose, and that the blood samples have been adequately described. Rather, the Hospital objects to the subpoena on the grounds that the blood specimens are allegedly protected by state and federal law.

In particular, the Hospital argues that the specimens constitute "[c]onfidential health care information," R.I. Gen. Laws § 5-37.3-3(3)(ii),[3] as that term is defined by the Rhode Island Confidentiality of Health Care Communications and

---

[3] R.I. Gen. Laws § 5-37.3-3(3)(ii) states: "'Confidential health care information'" means all information relating to a patient's health care history, diagnosis, condition, treatment, or evaluation obtained from a health care provider who has treated the patient." R.I. Gen. Laws § 5-37.3-3(3)(ii) (2004 Reenactment).

Information Act ("CHCCIA"), see R.I. Gen. Laws §§ 5-37.3-1 to 5-37.3-11, and that the NTSB must comply with the procedural provisions of CHCCIA, see id. The Hospital further argues that because CHCCIA is more stringent in its protection of individually identifiable health care information than HIPAA the preemption normally afforded federal law does not apply. See Memorandum in Support of Rhode Island Hospital's Objection to the United States' Motion to Compel Production ("Hospital Mem.") at 4 (citing 45 C.F.R. § 160.203(b)).[4]

The Seventh Circuit considered a similar argument advanced by a hospital in Northwestern Memorial Hospital v. Ashcroft, 362 F.3d 923, 924-26 (7th Cir. 2004). In that case, the Department of Justice had subpoenaed a hospital in Chicago to produce the medical records of certain patients on whom a particular doctor had performed late-term abortions using a controversial method. See id. at 924. The records were sought for use in a trial in the Southern District of New York of a suit challenging the constitutionality of the Partial-Birth Abortion Ban Act of 2003, 18 U.S.C. § 1531. See Northwestern Mem'l Hosp. v. Ashcroft, 362

[4] The Hospital actually cites to "42 C.F.R. § 160.203(b)," but it is clear that "42" is a typographical error. Section 160.203 provides in relevant part:

> A standard, requirement, or implementation specification adopted under this subchapter that is contrary to a provision of State law preempts the provision of State law. This general rule applies, except if one or more of the following conditions is met:
>
> ....
>
> (b) The provision of State law relates to the privacy of individually identifiable health information and is more stringent than a standard, requirement, or implementation specification adopted under subpart E of part 164 of this subchapter.

45 C.F.R. § 160.203.

F.3d at 924. The hospital moved to quash the subpoena, asserting that the records were privileged from disclosure under HIPAA as well as Illinois and federal statutory and common law. See Nat'l Abortion Fed'n v. Ashcroft, No. 04 C 55, 2004 WL 292079, at *2 (N.D. Ill. Feb. 6, 2004).[5] The district court found that because Illinois' nonparty patient privacy laws were more stringent than HIPAA's disclosure requirements, Illinois state law was not preempted by HIPAA and its subsequent regulations. See id. at *4. The district court granted the motion to quash, stating that "HIPAA's preemption over state privacy laws must yield when state law is stricter than and contrary to HIPAA and the material sought relates to the privacy of individually identifiable health information." Id. at *5.

Although the Seventh Circuit affirmed the district court's order quashing the subpoena, it did so on different grounds. See Northwestern Mem'l Hosp. v. Ashcroft, 362 F.3d at 928-33. Rejecting the district court's conclusion regarding preemption, the appeals court found that, while the issue was not free from doubt, HIPAA regulations do not impose state evidentiary privileges on suits to enforce federal law. See id. at 925. The court observed that "[t]he enforcement of federal law might be hamstrung if state-law privileges more stringent than any federal privilege regarding medical records were applicable to all federal cases." Id. Apparently having in mind 45 C.F.R. § 160.203(b), the court stated:

> [W]e think it improbable that HHS intended to open such a can of worms when it set forth a procedure for disclosure of medical records in litigation-intended, that is, to be regulating, actually or potentially

[5] For these particular facts, the Court cites to the district court memorandum opinion which the Seventh Circuit reviewed in Northwestern Memorial Hospital v. Ashcroft, 362 F.3d 923 (7th Cir. 2004).

> (depending on other statutory provisions regulating subpoenas), the litigation of federal employment discrimination cases, social security disability cases, ERISA cases, Medicare and Medicaid fraud cases, Food and Drug Administration cases, and the numerous other classes of federal case in which medical records whether of the parties or of nonparties would not be privileged under federal evidence law.

Northwestern Mem'l Hosp. v. Ashcroft, 362 F.3d at 925.

A similar conclusion was reached by the court in National Abortion Federation v. Ashcroft, No. 03 Civ. 8695(RCC), 2004 WL 555701 (S.D.N.Y. Mar. 19, 2004), where the suit challenging the constitutionality of the Partial-Birth Abortion Ban Act had been filed. The Attorney General of the United States moved to enforce a subpoena for records which had been served upon a New York hospital. See id. at *2. The hospital argued that HIPAA incorporates New York state law requiring patient consent before disclosure. See id. In considering this argument, the court acknowledged that Congress in enacting HIPAA had expressly provided that all state laws contrary to regulations promulgated by HHS are preempted, unless the state laws fall within an exception created by HIPAA section 264(c)(2).[6] See id. at *4. However, the court found that:

---

[6] Section 264(c)(2) states:

> PREEMPTION.- A regulation promulgated under ...[HHS's rulemaking authority] shall not supercede a contrary provision of State law, if the State law imposes requirements, standards, or implementation specifications that are more stringent than the requirements, standards, or implementation specifications imposed under the regulation.

Nat'l Abortion Fed'n v. Ashcroft, No. 03 Civ. 8695(RCC), 2004 WL 55701, at *3 (S.D.N.Y. Mar. 19, 2004)(quoting Section 264 of Pub. L. 104-191)(alterations in original); see also 42 U.S.C. § 1320d-7(a)(2)(B). This antipreemption exception is echoed in the implementing regulations. See 45 C.F.R. § 160.203; see also Nat'l Abortion Fed'n v. Ashcroft, 2004 WL 555701, at *3.

> There is a difference ... between a federal law that does not preempt a state law and a federal law that *incorporates* a state rule of law. The latter gives the state law the force of federal law and makes it binding where it would not otherwise be; the former merely allows the state law to continue to operate in its sphere of influence, unaffected by the federal statute. The negative language in section 264(c)(2) does not equate to the positive power to create binding law in the federal domain-here, a case arising under federal law brought in federal court. See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 324 n.12 (1971)("In federal-question cases, the law applied is federal law.").

Nat'l Abortion Fed'n v. Ashcroft, 2004 WL 555701, at *4.

Although the hospital argued that HIPAA's antipreemption provision required federal courts to apply more stringent state standards because, in effect, those state standards preempt the federal regulations,[7] the court found that "Congress has been more explicit when it intended such a result." Id. As an example of such explicitness, the court cited a provision in the Occupational Safety and Health act of 1970, 29 U.S.C. §§ 251 et seq., which permits state standards to preempt federal law, see Nat'l Abortion Fed'n v. Ashcroft, 2004 WL 555701, at *4 (citing 29 U.S.C. § 667(b)). The court also cited provisions in the Individuals with Disabilities in Education Act, see id. (citing 20 U.S.C. § 1401(8)(B) (defining "free appropriate public education" to include special education services that meet standards set by state education agencies)), the Assimilative Crimes Act of 1948, see id. (citing 18 U.S.C. § 13 (making violations of state or local criminal laws federal crimes when committed on federal territory)), and the Outer Continental Shelf

---

[7] HIPAA gave the Secretary of Health and Human Services ("HHS") authority to promulgate regulations to protect the privacy of medical records. See Northwestern Mem'l Hosp. v. Ashcroft, 362 F.3d at 924 (citing Section 264 of HIPAA, 42 U.S.C. § 1320d-2 Note).

Lands Act, see id. (citing 43 U.S.C. § 1333(a)(2)(A) ("[T]he civil and criminal laws of each adjacent State ... *are declared to be the law of the United States ....*"))(alterations in original), as additional examples where "Congress has explicitly incorporated state standards into federal law when it so intends," id. In contrast:

> No such language of incorporation is present in HIPAA. The language of section 264(c)(2) evinces no congressional intent to adopt state law as federal law, thereby placing the power of the Supremacy Clause behind more stringent state medical privacy laws.

Id. at *5.

The court also noted that as part of the notice-and-comment process used by administrative agencies when Congress gives them rule-making power, HHS had interpreted section 264(c)(2), the antipreemption provision which is also at issue here. See id. HHS stated:

> We considered whether the preemption provision of section 264(c)(2) ... would give effect to State laws that would otherwise be preempted by federal law. For example, we considered whether section 264(c)(2) could be read to make the Medicare program subject to State laws relating to information disclosures that are more stringent than the requirements proposed in this rule, where such laws are presently preempted by the Medicare statute. We also considered whether section 264(c)(2) could be read to apply such State laws to procedures and activities of federal agencies, such as administrative subpoenas and summons, that are prescribed under the authority of federal law. In general, we do not think that section 264(c)(2) would work to apply State law provisions to federal programs or activities with respect to which the State law provisions do not presently apply. Rather, the effect of section 264(c)(2) is to give preemptive effect to State laws that would otherwise be in effect, to the extent they conflict with and are more stringent than the requirements promulgated under the Administrative Simplification authority of HIPAA. *Thus, we do not believe that it is the intent of section 264(c)(2) to give an effect to State law that it would not otherwise*

> *have in the absence of section 264(c)(2).*

Id. (quoting 64 Fed. Reg. 59918, 6000 (Nov. 3, 1999))(alterations in original).

Based on the above statement, the court found that HHS had "interpreted the antipreemption provision to merely maintain the status quo in states in which more stringent privacy regulations existed prior to HIPAA." Id. The court also noted that it "must defer to HHS's reasonable interpretation of HIPAA," id. (citing Chevron USA, Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843-44 (1984)),[8] and concluded that HHS had "reasonably construed section 264(c)(2) not to give any more effect to state law than it would have had in the absence of HIPAA." Id. Summarizing its conclusion, the court wrote:

> Under the Hospital's interpretation, on the other hand, HIPAA would give to state legislatures a sword when it really provides a shield. If not for HIPAA's antipreemption exception, the Supremacy Clause would sweep away all contrary state medical privacy regulations. Instead, Congress spared more stringent state statutes from preemptive effect. It did not, however, give more stringent state regulations the force of federal law. Thus, N.Y. C.P.L.R. 4504(a) remains the law in areas in which New York State has the authority to regulate, but it has not become the law in areas within the federal domain. Accordingly, New York law does not apply here.

Id.

This Court finds the above-described analysis and reasoning of District Judge Richard C. Casey in National Abortion Federation v. Ashcroft, 2004 WL 555701, to be persuasive. Applying that reasoning to the instant matter, the Court finds

[8] See also Rumierz v. Gonzalez, 456 F.3d 31, 37 (1st Cir. 2006) ("[A] court must uphold [an agency's] interpretation of a silent or ambiguous statute so long as it is reasonable and consistent with the statute.").

that Rhode Island law does not apply to this federal matter. This finding is in accord with the decisions of several additional federal courts which have considered the preemption issue. See In re Grand Jury Proceedings, 450 F.Supp.2d 115, 116 (D. Me. 2006)(finding that HIPAA preemption provision does not "effectuate[] a kind of reverse preemption, pursuant to which stricter state medical privacy laws apply in federal-law cases brought in federal court"); Kalinoski v. Evans, 377 F.Supp.2d 136, 140-41 (D.D.C. 2005)("The Supremacy Clause of the United States Constitution ... prevent[s] a State from directing a federal court with regard to the evidence it may order produced in the adjudication of a federal claim."); see also id. at 140 ("[S]everal courts have held that state laws relating to the privacy of mental health information that are 'more stringent' than the HIPAA regulations -- although not preempted by those regulations -- are unenforceable with regard to federal claims in federal court."); id. (citing cases). Accordingly, to the extent that the Hospital seeks to have the Motion denied on the grounds that the specimens are protected by CHCCIA and that CHCCIA is not preempted by HIPAA, such argument is rejected for the reasons stated above.[9]

---

[9] The Hospital notes that: "Federal courts are to recognize state privileges 'where this can be accomplished at no substantial cost to Federal substantive and procedural policy.'" Supplemental Memorandum in Support of Objection to Motion to Compel Production (Doc. #7) ("Hospital Supp. Mem.") at 3 (quoting Northwestern Mem'l Hosp. v. Ashcroft, 362 F.3d 923, 932 (7th Cir. 2004)). Here the Court finds that application of § 5-37.3-6.1 of CHCCIA to the instant matter would have a substantial cost to Federal substantive and procedural policy (primarily because of the difficulty of satisfying the requirement of § 5-37.3-6.1(d) that "the need for the information clearly outweigh[] the privacy interest of the individual," R.I. Gen. Laws § 5-37.3-6.1(d) (2004 Reenactment)).

Nevertheless, the Court has taken into consideration the procedural requirement of CHCCIA that twenty days notice be given to "the individual whose records are being sought ...," R.I. Gen. Laws § 5-37.3-6.1(a)(1), of the individual's right to challenge the subpoena.

***Compliance with Federal Law***

The Hospital also appears to argue that the Motion should be denied because the NTSB has not satisfied conditions contained in HIPAA and its corresponding regulations governing the release of the sought blood samples. See Hospital Mem. at 5-9. However, HIPAA expressly permits covered entities to produce protected materials where a court orders production. See 45 C.F.R. § 164.512(e)(1)("A covered entity may disclose protected health information in the context of any judicial or administrative proceeding ... in response to an order of the court or administrative tribunal, provided that the covered entity discloses only the protected health information expressly authorized by such order ...."). The instant Motion has been brought pursuant to 49 U.S.C. § 1113(a)(4) which specifically authorizes the NTSB to bring a civil action to enforce a subpoena. Thus, the present action is clearly a "judicial ... proceeding" within the meaning of § 164.512(e)(1). The Court is satisfied that the NTSB needs to test the blood specimens to complete its investigation and that without those specimens it cannot fully perform its federal statutory duties.

---

Although the Notice and Order Scheduling Hearing (Doc. #2) did not specifically state that Mr. Mallette and Mr. Chisolm had a right to challenge the subpoena, the Court believes that a reasonable individual being advised of the hearing would draw the conclusion that such advisement was being made for the purpose of giving him the opportunity to appear and voice any objection to the subpoena. More than twenty days has now elapsed since notice of the instant matter was given to Messrs. Mallette and Chisolm. Other than the appearance of Attorney Naumes at the May 21, 2008, hearing, they have not moved to interfere or otherwise sought to be heard regarding the instant Motion. Finally, the Court is delaying compliance with this Order until June 6, 2008, in order to give Messrs. Mallette and Chisolm an opportunity to appeal (and to seek a further stay of the Order) before the specimens are transferred. See n.10.

## Conclusion

The Court finds that: (1) the subpoena is issued for a congressionally authorized purpose, namely the investigation of a railroad accident in which there was a fatality or that involved a passenger train, see 49 U.S.C. § 1131(a)(1)(C); (2) the information sought, i.e., the blood specimens, is relevant to the authorized purpose because examination of the specimens may reveal the presence or absence of substances indicative of impairment; (3) the information sought has been adequately described in the subpoena; and (4) proper procedures have been employed in issuing the subpoena. Accordingly, the Government has satisfied the requirements for enforcement of the subpoena. See United States v. Sturm, Ruger & Co., 84 F.3d 1, 4 (1st Cir. 1996). The Hospital has not persuaded the Court that enforcement of the subpoena would be improper, and therefore, it has not met its burden in that regard. See Chao v. Cmty. Trust Co., 474 F.3d 75, 79 (3rd Cir. 2007). Accordingly, the Motion to Compel is granted. The Hospital is ordered to comply with the subpoena on June 6, 2008, or within five business days thereafter.[10] The Hospital is further ordered to coordinate with Ruben Payan, the NTSB investigator-in-charge of the investigation, regarding the transfer of the samples.

To the extent that it is feasible and does not adversely affect the NTSB's testing, the NTSB is directed to separate and preserve a portion of each specimen so that if Mr. Mallette and Mr. Chisolm desire to have their own independent testing of the specimens it will be possible.

---

[10] The Court delays compliance until June 6, 2008, in order to give Mr. Mallette and Mr. Chisolm an opportunity to appeal this order before the specimens have been transferred from the custody of the Hospital.

So ordered.

ENTER:

/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
June 3, 2008